NORTH CAROLINA

DURHAM COUNTY

FILED
2020 JAN 18 P 4: 05

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
_____ CVS _____

UNIVERSAL LIFE INSURANCE COMPANY )
                                 )
                    Plaintiff,   )
                                 )
        v.                       )        COMPLAINT
                                 )
GREG E. LINDBERG,                )
                                 )
                    Defendant.   )

Plaintiff Universal Life Insurance Company ("ULICO"), complaining of Defendant Greg E. Lindberg ("Lindberg"), avers that:

## PARTIES

1.    Plaintiff ULICO is a stock life insurance company domiciled in Puerto Rico, with its principal place of business in Puerto Rico.

2.    Defendant Lindberg is an individual resident of Durham County, North Carolina and is domiciled in Durham County, North Carolina.

3.    This action concerns the guaranty issued on June 30, 2017 by Mr. Lindberg, in favor of ULICO, with respect to certain obligations of PB Life and Annuity Co., Ltd. f/k/a Private Bankers Life and Annuity Co., Ltd. ("PBLA") (the "Guaranty"). The Guaranty is attached hereto as **Exhibit A** and is incorporated into this Complaint for all purposes.

## JURISDICTION AND VENUE

4.    This Court has jurisdiction over the parties, pursuant to G.S. § 1-75.4.

5.    Venue is proper in this Court, pursuant to G.S. § 1-82.

6. Jurisdiction and venue are also proper in this Court pursuant to § 4.7(b) of the Guaranty, which states "[t]he courts of North Carolina have exclusive jurisdiction to settle any dispute arising from or connected with [the Guaranty]."

## FACTUAL BACKGROUND

### A. The Lindberg Guaranty

7. Mr. Lindberg is the controlling owner of dozens of commercial businesses and insurance companies, including PBLA. PBLA is "ultimately controlled by" Mr. Lindberg. *See* Ex. A at 1.

8. In or around early 2017, PBLA sought to form a reinsurance relationship with ULICO. On June 30, 2017, ULICO and PBLA entered into a Coinsurance Reinsurance Agreement (the "Reinsurance Agreement") whereby ULICO ceded, and PBLA agreed to reinsure, certain of ULICO's annuity insurance business. The Reinsurance Agreement is attached hereto as **Exhibit B** and is incorporated into this Complaint for all purposes.

9. Due to his relationship with PBLA, Mr. Lindberg would "derive substantial direct or indirect benefit from the transactions contemplated by the Reinsurance Agreement." Ex. A at 1. Therefore, "in order to induce [ULICO] to enter into the Reinsurance Agreement," Mr. Lindberg agreed to unconditionally guarantee PBLA's obligations to ULICO under the Reinsurance Agreement. *Id.* Mr. Lindberg issued the Guaranty in ULICO's favor on June 30, 2017, the same day ULICO and PBLA entered into the Reinsurance Agreement.

10. The Guaranty states that Mr. Lindberg "hereby guarantees [PBLA's] full and prompt payment when due of [PBLA's] obligations under the Reinsurance Agreement (the **"Guaranteed Obligations"**)." Ex. A, § 2.1(a). The Guaranty "is an agreement of payment and not merely of collection." *Id.*

11.     In the Guaranty, Mr. Lindberg expressly waived any defense relating to "any lack of validity, legality or enforceability" of the Guaranty, and "any defense, set-off, waiver, release, statute of limitations, incapacity, illegality or unenforceability or other circumstance which might otherwise constitute a discharge of or defense available to" Mr. Lindberg in respect of the Guaranty. Ex. A, § 2.1(c).

12.     The Guaranty provides that, "following the failure of [PBLA] to pay its obligations under the Reinsurance Agreement and upon the written demand of [ULICO]," Mr. Lindberg "shall . . . pay the full amount or any portion of the Guaranteed Obligations that are then due and payable and have not been paid within thirty (30) calendar days of the due date." *Id.* § 2.1(b).  ULICO has the right to "proceed directly and at once" against Mr. Lindberg to enforce its rights under the Guaranty. *Id.* § 2.1(c).

## B.     The Arbitration Award Against PBLA

13.     On January 27, 2020 ULICO demanded arbitration against PBLA under the Reinsurance Agreement.  An arbitration panel (the "Panel") was duly constituted in accordance with the arbitration agreement between ULICO and PBLA. *See* Ex. B, § 10.1.  ULICO moved the Panel for an order requiring PBLA to deposit the cash amount of $524,009,051.26 into a segregated account identified by ULICO, in order to satisfy the requirements of the Reinsurance Agreement that PBLA maintain security for its reinsurance obligations to ULICO.

14.     In a June 2, 2020 award ("Arbitration Award"), the Panel ordered PBLA to "pay to ULICO the amount of $524,009,051.26" by June 16, 2020, after which "interest shall run at 6% per annum," to be held in a segregated bank account strictly for the purpose of securing PBLA's obligations under the Reinsurance Agreement.  A true and accurate copy of the Arbitration Award is attached hereto as **Exhibit C** and is incorporated into this Complaint for all purposes.

- 3 -

15.     By letter dated June 9, 2020, ULICO gave written notice to Mr. Lindberg of the Arbitration Award in the manner provided in the Guaranty.  In that same notice, ULICO declared that it is exercising its right to "proceed directly and at once" to collect from Mr. Lindberg the full amount owed by PBLA in the event that PBLA failed to make the required payment.  A true and accurate copy of this letter is attached hereto as **Exhibit D** and is incorporated into this Complaint for all purposes.

16.     PBLA did not pay any of the $524,009,051.26 to ULICO on or before June 16, as the Arbitration Award required.  As of the date of this Complaint, PBLA has not complied with that payment obligation, but has, by counsel, advised ULICO that it does not intend to honor the Arbitration Award.

## COUNT I

### (Breach of Lindberg Guaranty)

17.     The allegations set forth in Paragraphs 1 through 16 of the Complaint are realleged and incorporated herein by reference.

18.     The Guaranty is a valid and enforceable contract between ULICO and Defendant Lindberg, supported by consideration.

19.     PBLA has failed to pay the $524,009,051.26 to ULICO, as it was required to do no later than June 16, 2020, and PBLA has therefore failed to satisfy its obligations under the Reinsurance Agreement.

20.     In the form and manner required by the Guaranty, ULICO has made a formal written demand that Mr. Lindberg pay to ULICO the full amount of PBLA's liability in an amount equal to $524,009,051.26, plus applicable interest, as is called for by the Arbitration Award and required by the Guaranty.

- 4 -

21. PBLA's failure to comply with the Arbitration Award triggers Mr. Lindberg's unconditional obligations under the Guaranty.

22. Mr. Lindberg has not responded to ULICO's demand under the Guaranty, nor has Mr. Lindberg paid to ULICO the amounts required under the Guaranty.

23. ULICO is entitled to have and recover from Mr. Lindberg the $524,009,051.26 owed by PBLA, plus applicable interest in accordance with the terms of the Arbitration Award.

## COUNT II

### (Declaratory Judgment)

24. The allegations set forth in Paragraphs 1 through 23 of the Complaint are realleged and incorporated herein by reference.

25. The Guaranty is a valid and enforceable contract.

26. Upon PBLA's failure to comply with the Panel's Arbitration Award and therefore its obligations under the Reinsurance Agreement, and upon ULICO's written demand dated June 9, 2020, Mr. Lindberg was required under the terms of the Guaranty to pay the full amount of PBLA's liability.

27. An actual controversy exists between the parties with respect to Lindberg's obligations under the Guaranty.

28. ULICO is entitled to a declaration that Mr. Lindberg is obligated to pay $524,009,051.26, plus applicable interest, into the segregated account pursuant to the Arbitration Award.

WHEREFORE, ULICO respectfully prays the Court that:

1. the Court declare that Mr. Lindberg is obligated to comply with his obligations under the Guaranty and pay $524,009,051.26, plus applicable interest, into the segregated account identified pursuant to the Arbitration Award;

2.    ULICO have and recover from Mr. Lindberg damages in excess of $524,009,051.26, plus applicable interest, to be paid into the segregated account identified pursuant to the Arbitration Award;

3.    ULICO have and recover post-judgment interest;

4.    ULICO have and recover its attorneys' fees;

5.    the costs of this action be taxed against Mr. Lindberg; and

6.    ULICO have such other and further relief as the Court deems just and proper.

This the 18th day of June, 2020.

TROUTMAN SANDERS LLP

By: _Christopher D. Browning, Jr._
Christopher G. Browning, Jr.
N.C. State Bar No. 13436
Post Office Drawer 1389
Raleigh, North Carolina 27602-1389
Telephone: (919) 835-4127
chris.browning@troutman.com

*Attorney for Plaintiff Universal Life Insurance Company*

- 6 -

# EXHIBIT A

## GUARANTY AGREEMENT

**THIS GUARANTY AGREEMENT,** (this **"Agreement"**), is made and entered into as of June 30, 2017 by **Greg E. Lindberg,** an individual resident of North Carolina (the **"Guarantor"**), in favor **Universal Life Insurance Company,** a Puerto Rico life insurance company (the **"Company"**), with respect to certain obligations of **Private Bankers Life and Annuity Co., Ltd.** a Bermuda Class E insurer (the **"Reinsurer"**). Capitalized terms used but not otherwise defined herein have the meanings set forth in the Reinsurance Agreement.

## RECITALS

**WHEREAS,** effective on the date hereof, Company and Reinsurer have entered that certain Coinsurance Reinsurance Agreement dated June 30, 2017 pursuant to which, among other things, Company has agreed to cede to Reinsurer, and Reinsurer has agreed to reinsure, certain of the liabilities arising out of, relating to or in connection with the liabilities reinsured thereunder on the terms and subject to the conditions set forth therein (the **"Reinsurance Agreement"**);

**WHEREAS,** the Reinsurer is ultimately controlled by the Guarantor and the Guarantor shall derive substantial direct or indirect benefit from the transactions contemplated by the Reinsurance Agreement; and

**WHEREAS,** in order to induce Company to enter into the Reinsurance Agreement, the Guarantor has agreed to enter into this Agreement;

**NOW, THEREFORE,** in consideration of the foregoing, the covenants and agreements set forth herein and other good and valuable consideration, the adequacy and receipt of which are hereby acknowledged, and intending to be legally bound hereby, the Guarantor hereby agrees as follows:

1     **DEFINITIONS**

       **1.1**     **Definitions.** The following terms shall have the respective meanings set forth below throughout this Agreement.

       **"Affiliate"** means, with respect to any Person, at the time in question, any other Person controlling, controlled by or under direct or indirect common control with such Person. For this purpose, "control" means the power to direct the management and policies of a Person through the ownership of securities, by contract or otherwise and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

       **"Agreement"** has the meaning set forth in the preamble of this Agreement.

       **"Business Day"** means any day other than a Saturday, Sunday or a day on which commercial banks in Durham, North Carolina, Hamilton, Bermuda and San Juan, Puerto Rico are required or authorized by law to be closed.

       **"Company"** has the meaning set forth in the preamble of this Agreement.

       **"Guaranteed Obligations"** has the meaning set forth in Section 2.1(a).

**"Guarantor"** has the meaning set forth in the preamble of this Agreement.

**"Guaranty"** has the meaning set forth in Section 2.1(a).

**"Person"** means any natural person, corporation, partnership, limited liability company, trust, joint venture or other entity, including any governmental body or other regulatory authority.

**"Reinsurance Agreement"** has the meaning set forth in the recitals of this Agreement.

**"Reinsurer"** has the meaning set forth in the preamble of this Agreement.

**"Representatives"** means, with respect to any Person, such Person's officers, directors, employees, agents, advisors and other representatives.

## 2     GUARANTY

### 2.1     Guaranty.

      **(a)**      Guarantor hereby guarantees (the **"Guaranty"**) the Reinsurer's full and prompt payment when due of Reinsurer's obligations under the Reinsurance Agreement (the **"Guaranteed Obligations"**). This Guaranty is an agreement of payment and not merely of collection. The obligations of the Guarantor under this Guaranty shall remain in full force and effect until the date on which the Reinsurer achieves a long-term credit rating of (i) Baa3 or above from Moody's Investors Service, (ii) BBB- or above from Standard & Poor's Financial Services LLC, (iii) BBB- or above from Fitch Ratings Inc. or (iv) B++ from AM Best Company.

      **(b)**      The Guarantor shall, solely following the failure of the Reinsurer to pay its obligations under the Reinsurance Agreement and upon the written demand of the Company, pay the full amount or any portion of the Guaranteed Obligations that are then due and payable and have not been paid within thirty (30) calendar days of the due date.

      **(c)**      The Guaranty is a guaranty of payment and collection, and upon any failure of the Reinsurer to pay any Guaranteed Obligation as set forth above, the Company may, at its option, proceed directly and at once, with notice, against Guarantor to collect and recover the full amount of the Reinsurer's liability to pay the Guaranteed Obligations (or any portion thereof) then due and owing, and otherwise enforce its rights under this Agreement. The Guaranty is a continuing guaranty and the obligations of the Guarantor hereunder are and shall be absolute under any and all circumstances, irrespective of, and the Guarantor hereby waives any defense he may have relating to, (i) any lack of validity, legality or enforceability of this Agreement, (ii) any change in time, manner or place of payment of or other term of any Guaranteed Obligation, or any other amendment or waiver of or consent to departure from this Agreement, (iii) any change, restructuring, sale, disposition of all or substantially all of the assets and liabilities of, or termination of the corporate structure or existence of, the Reinsurer, or any dissolution, liquidation, conservation, rehabilitation, bankruptcy, statutory reorganization, receivership, insolvency, compulsory composition, or similar proceeding affecting the Reinsurer or any of its assets or any resulting release or discharge of any obligation of the Reinsurer under the Primary Guaranty or the Reinsurance Agreement, or (iv) any defense, set-off, waiver, release, statute of limitations, incapacity, illegality or unenforceability or other circumstance which might otherwise constitute a discharge of or defense available to the Guarantor (other than a defense of discharge arising

from the payment or performance in full of the Guaranteed Obligations).

(d)     The Guarantor hereby expressly waives promptness, diligence, demand, presentment, notice of dishonor, exchange, release, non-payment, non-performance or other default with respect to the Guaranteed Obligations.

(e)     To the extent that the Guarantor shall have made any payments under this Section 2.1, any rights to subrogation, reimbursement, indemnity, set-off, contribution and any other claim which the Guarantor may have as a result of any such payment shall be deferred, postponed and subordinated to the prior indefeasible payment or performance in full of the Guaranteed Obligations. If all or any part payment applied to the Guaranteed Obligations is or must be recovered, rescinded or returned to the Reinsurer, the Guarantor or any other Person because of a dissolution, liquidation, conservation, rehabilitation, bankruptcy, statutory reorganization, receivership, compulsory composition, or similar proceeding affecting any party, such Guaranteed Obligations shall be deemed to have continued in existence and this Section 2.1 shall continue in effect as to such Guaranteed Obligations, all as though such payment had not been made. The Company shall not be obligated to file any claim relating to the Guaranteed Obligations in the event the Reinsurer becomes subject to a bankruptcy, reorganization or similar proceeding, and the failure of the Company to so file shall not affect the Guarantor's obligations hereunder.

(f)     For the avoidance of doubt, but subject to this Section 2.1, the payment or performance of a Guaranteed Obligation by the Guarantor pursuant to the Guaranty shall be deemed to satisfy the Reinsurer's obligation to perform or pay such Guaranteed Obligation under the Reinsurance Agreement. The Company shall not be entitled to obtain payment or performance of a Guaranteed Obligation from the Reinsurer to satisfy a Guaranteed Obligation to the extent that such Guaranteed Obligation has theretofore been paid in full by the Guarantor under the Guaranty.

(g)     The Guaranty shall be effective upon delivery to the Company, without further act, condition, or acceptance by the Company, shall be binding upon the Guarantor and the successors and assigns of the Guarantor and shall inure to the benefit of the Company and its endorsees, successors and permitted assigns of this Guaranty.

3       **REPRESENTATIONS AND WARRANTIES**

**3.1     Representations and Warranties.** As of the date hereof, the Guarantor represents and warrants that:

(a)     the execution, delivery, and performance of this Guaranty has been duly authorized by all necessary action on his part;

(b)     he has executed and delivered this Guaranty and this Guaranty is the legal, valid, and binding obligation of the Guarantor, enforceable against him in accordance with its terms subject to the effect of applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance or similar laws relating to or affecting creditors' rights generally, and to the effect of general principles of equity;

(c)     neither the execution nor delivery of this Guaranty nor compliance with the terms hereof, conflicts with, results in a material breach or violation of the terms of (i) any judgment, order,

agreement, indenture, instrument, governmental permit, or other authorization or obligation to which the Guarantor is a party or by which the Guarantor is bound, or (ii) any federal, state, or local law, statute, ordinance, rule, or regulation applicable to the Guarantor;

**(d)** except for the consent or non-objection of the North Carolina Department of Insurance (which consent or non-objection has been granted or has occurred, as applicable) no consent, authorization, approval, filing or registration with, any U.S. governmental authority or any party to any contract, agreement or instrument to which the Guarantor is a party or by which the Guarantor is bound, is required for the execution, delivery, performance, or compliance with the terms hereof by the Guarantor; and

**(e)** there is no pending, or to the best of his knowledge, threatened, litigation against the Guarantor in any court or before any commission or regulatory body which challenges the validity or enforceability of this Guaranty.

## 4    <u>**MISCELLANEOUS**</u>

**4.1**    <u>**Notices.**</u> Any notice, request, demand, waiver, consent, approval or other communication required or permitted to be given hereunder shall be in writing and shall be delivered personally, sent by registered or certified mail, postage prepaid, or sent by a standard overnight courier of national reputation with written confirmation of delivery. Any such notice shall be deemed given when so delivered personally on the date received (provided that any notice received after 5:00 p.m. (addressee's local time) shall be deemed given at 9:00 a.m. (addressee's local time) on the next Business Day), or if mailed, on the date shown on the receipt therefor, or if sent by overnight courier, on the date shown on the written confirmation of delivery. Such notices shall be given to the following address:

To Company:

Universal Life Insurance Company
PO Box 2145
San Juan, PR 00922-2145
Attention: Jose Benitez, President
Telephone No.:  787-706-7339
Facsimile No.:  787-625-7095
E-mail Address:  jobenitez@universalpr.com

With a copy to:

Universal Life Insurance Company
PO Box 71338
San Juan, PR 00936-8438
Attention: Josely Vega, Chief Legal Counsel
Telephone No.:  787-706-7321
Facsimile No.:  787-620-4264
E-mail Address:  jvega@universalpr.com

To the Guarantor:

> Greg E. Linberg
> 2222 Sedwick Road
> Durham, NC 27713

The Company and the Guarantor may, by notice given in accordance with this <u>Section 4.1,</u> designate another address or Person for receipt of notices hereunder.

**4.2** **Entire Agreement.** This Agreement constitutes the entire agreement among the Guarantor and the Company with respect to the subject matter hereof and thereof and supersedes all prior negotiations, discussions, writings, agreements and understandings, oral and written, among the parties with respect to the subject matter hereof and thereof.

**4.3** **Waivers and Amendment.** This Agreement may not be amended, superseded or canceled, and the terms hereof may not be waived, except by instrument in writing signed by the Company and the Guarantor, or, in the case of a waiver, by the Company, provided that any such amendment, supersession or cancellation has been previously approved by the Commissioner. Any change or modification to this Agreement not in compliance with the previous sentence shall be invalid *ab initio.* No delay on the part of the Company in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other such right, power or privilege. No waiver of any breach of this Agreement shall be held to constitute a waiver of any other or subsequent breach.

**4.4** **Successors and Assigns.** The obligations of the Guarantor under this Agreement shall not be subject to assignment without the prior written consents of the Company, and any attempted assignment without the prior written consents of the Company shall be void *ab initio.* The terms of this Agreement shall be binding upon and inure to the benefit of and be enforceable by and against the successors and permitted assigns of the Guarantor and the Company.

**4.5** **Headings.** The headings of this Agreement are for convenience of reference only and shall not define or limit any of the terms or provisions hereof.

**4.6** **Construction; Interpretation.** The Guarantor and the Company have participated jointly in the negotiation and drafting of this Agreement. In the event of an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by such parties and no presumption of burden of proof shall arise favoring or disfavoring either party by virtue of the authorship of any of the provisions of this Agreement. When a reference is made to an Article, Section or Exhibit such reference shall be to an Article, Section or Exhibit of or to this Agreement unless otherwise indicated. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation." The word "Agreement," means this Agreement as amended or supplemented, together with all Exhibits attached hereto or incorporated by reference, and the words "hereof," "herein," "hereto," "hereunder" and other words of similar import shall refer to this Agreement in its entirety and not to any particular Article, Section or provision of this Agreement. The references to "dollars" or "$" shall be to United States dollars. Reference to any Applicable Law means such Applicable Law as amended, modified, codified,

replaced or reenacted, and all rules and regulations promulgated thereunder and references to any contract or agreement are to the contract or agreement as amended, modified, supplemented or replaced from time to time, unless otherwise stated. The word "or" shall not be exclusive unless expressly specified herein. The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms.

**4.7      Governing Law and Jurisdiction.**

(a)      This Agreement and any disputes or claims arising out of or in connection with its subject matter shall be governed by and construed in accordance with the law of North Carolina.

(b)      The courts of North Carolina have exclusive jurisdiction to settle any dispute arising from or connected with this Agreement (a **"Dispute"**) including a Dispute regarding the existence, validity or termination of this Agreement or the consequences of its nullity. The Guarantor and the Company agree, irrevocably and for all purposes, that the courts of North Carolina are the most appropriate and convenient courts to settle any Dispute and no party shall advance any argument to the contrary in any court.

**4.8      Severability.** Any term or provision of this Agreement which is invalid or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Agreement or affecting the validity or enforceability of any of the terms or provisions of this Agreement in any other jurisdiction, so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. If any provision of this Agreement is so broad as to be unenforceable, that provision shall be interpreted to be only so broad as is enforceable. Upon such determination that any term or other provision is invalid or unenforceable, the Guarantor and the Company shall negotiate in good faith so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated by this Agreement be consummated as originally contemplated to the greatest extent possible.

**4.9      Incontestability.** In consideration of the covenants and agreements contained herein, the Guarantor hereby agrees that this Agreement, and each and every provision hereof, is and shall be enforceable by the Company according to its terms, and each party hereby agrees that it shall not contest in any respect the validity or enforceability hereof.

**4.10      Expenses.** Except as otherwise provided herein, the Guarantor and the Company hereto shall each bear their respective costs and expenses incurred in connection with the negotiation, preparation, execution, performance and enforcement of this Agreement and the transactions contemplated hereby, including all fees and expenses of counsel, actuaries and other Representatives.

**4.11      Remedies Not Exclusive.** No remedy herein conferred upon or reserved to the Company in this Guaranty is intended to be exclusive of any other available remedy or remedies, but each and every such remedy shall be cumulative and shall be in addition to every other remedy given under this Guaranty or now or hereafter existing at law or in equity.

**4.12      Waiver of Jury Trial.** The Guarantor hereto hereby waives, to the fullest extent permitted by law, any right to a trial by jury in respect of any litigation arising directly or indirectly out

of, under, or in connection with this Guaranty, whether in tort, contract, or equity.

  **4.13**  **Termination.** This Guaranty will automatically terminate without action by the Guarantor or the Company upon the earlier to occur of (i) the satisfaction in full by the Reinsurer or Guarantor of all of the Guaranteed Obligations or (ii) the Reinsurer achieving the ratings identified in Section 2.1(a)(i), (ii), (iii) or (iv).

  **(The remainder of this page is intentionally left blank; Signature Page follows.)**

**IN WITNESS HEREOF,** the Guarantor has caused this Agreement to be duly executed as of the day and year first set forth above.

By: _____
Name: Greg E. Lindberg

# EXHIBIT B

COINSURANCE REINSURANCE AGREEMENT

BY AND BETWEEN

UNIVERSAL LIFE INSURANCE COMPANY

AND

PRIVATE BANKERS LIFE AND ANNUITY CO., LTD

DATED JUNE 30, 2017



# TABLE OF CONTENTS

Page

Article I Definitions...........................................................................................................3

Article II Reinsurance of the Insurance Policies ................................................................8

    Section 2.1    Scope of Reinsurance ...............................................................5
    Section 2.2    Reinsurance Structure................................................................6
    Section 2.3    Excluded Liabilities ..................................................................6
    Section 2.4    Changes In Pricing Methodology ..............................................6
    Section 2.5    Administration ...........................................................................6
    Section 2.6    Credited Rates and Non-Guaranteed Elements ...........................6
    Section 2.7    Programs of Internal Replacement .............................................7
    Section 2.8    No Privity...................................................................................7

Article III  Related Matters.................................................................................................10

    Section 3.1    Reimbursement & Reports .........................................................7
    Section 3.2    Reporting and Payments...........................................................10
    Section 3.3    Records......................................................................................8
    Section 3.4    Errors and Omissions.................................................................8

Article IV Credit for Reinsurance and Related Matters .....................................................12

    Section 4.1    Reserves....................................................................................12
    Section 4.2    Trust and Comfort Trust ...........................................................12
    Section 4.3    Use of Funds by ULICO............................................................14
    Section 4.4    Reinsurer Change of Control .....................................................11

Article V Regulatory Matters and Requirements; Closing...................................................12

    Section 5.1    Cooperation...............................................................................12
    Section 5.2    Insolvency.................................................................................15
    Section 5.3    Closing Conditions ....................................**Error! Bookmark not defined.**

Article VI Representations and Warranties of ULICO.........................................................12

    Section 6.1    Organization and Standing of ULICO ........................................12
    Section 6.2    Authorization. ...........................................................................13
    Section 6.3    No Conflict or Violation............................................................16

i

Article VII Representations and Warranties of PBLA .................................................................17

    Section 7.1    Organization and Standing of PBLA .......................................................17

    Section 7.2    Authorization ..........................................................................................17

    Section 7.3    No Conflict or Violation..........................................................................17

    Section 7.4    U.S. Federal Income Taxes....................................................................17

Article VIII Indemnification.......................................................................................................17

    Section 8.1    Indemnification by ULICO.....................................................................17

    Section 8.2    Indemnification by PBLA.......................................................................17

    Section 8.3    Notice of Potential Liability ...................................................................18

    Section 8.4    Opportunity to Defend ............................................................................18

    Section 8.5    Exclusive Remedy ..................................................................................18

Article IX Term; Termination ....................................................................................................18

    Section 9.1    Term........................................................................................................18

    Section 9.2    Termination............................................................................................18

    Section 9.3    Effect of Termination .............................................................................19

Article X Miscellaneous Provisions ..........................................................................................20

    Section 10.1    Arbitration.............................................................................................20

    Section 10.2    Assignment and Delegation ..................................................................21

    Section 10.3    Confidentiality......................................................................................21

    Section 10.4    Construction.........................................................................................22

    Section 10.5    Counterparts.........................................................................................22

    Section 10.6    Entire Agreement..................................................................................22

    Section 10.7    Governing Law. ....................................................................................22

    Section 10.8    Interpretations ......................................................................................22

    Section 10.9    Notices .................................................................................................23

    Section 10.10    Offset. ................................................................................................24

    Section 10.11    Other Instruments ...............................................................................24

    Section 10.12    Severability.........................................................................................19

    Section 10.13    Subrogation.........................................................................................24

    Section 10.14    Waiver of Breach................................................................................24

Case 1:20-cv-00681-LCB-JEP   Document 5   Filed 07/27/20   Page 19 of 123

# COINSURANCE REINSURANCE AGREEMENT

THIS COINSURANCE REINSURANCE AGREEMENT (this "Reinsurance Agreement") is entered into this 30th day of June 2017 and effective as of the Effective Time by and between Universal Life Insurance Company ("ULICO") and Private Bankers Life and Annuity Co., Ltd. ("PBLA"). ULICO and PBLA are sometimes hereinafter referred to individually as a "Party" and together as the "Parties."

## RECITALS

A.    PBLA is a stock life reinsurance company licensed and domiciled in the Bermuda.

B.    ULICO is a stock life insurance company licensed and domiciled in Puerto Rico.

C.    The Parties desire to set forth their rights and obligations in relation to this transfer of liability by ULICO to PBLA.

D.    This Reinsurance Agreement is an indemnity coinsurance agreement solely between PBLA, as reinsurer, and ULICO, as ceding company, and the performance of the obligations of each Party hereunder shall be rendered solely to the other Party.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual benefits to be received by the Parties and the mutual covenants and agreements contained herein, the Parties agree as follows:

## Article I
## Definitions

As used in this Reinsurance Agreement, the following terms shall have the meanings set forth herein:

"Affiliate" of any Person means another Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with, such first Person. For purposes of this definition, "control", when used with respect to any Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities by contract or otherwise, and the terms "controlling" and "controlled" have the meanings correlative to the foregoing.

"Applicable Law" means any law, statute, ordinance, code, written rule or regulation, order, writ, injunction, judgment, decree, ruling, constitution, or treaty enacted, promulgated, issued, enforced, or entered by any Governmental Entity applicable to any Person or such Person's businesses, properties, or assets, as may be amended from time to time.

"Book Value" shall mean, with respect to assets in the trust accounts, at any date of determination, the amount stated for such assets on PBLA's statutory financial statements

3

determined in accordance with then applicable statutory accounting principles and the requirements of the Applicable Laws of their respective domiciliary jurisdictions.

"BSCR" shall mean the Bermuda Solvency Capital Requirement for a Class "E" insurer as submitted to the Bermuda Monetary Authority.

"BSCR Ratio" shall mean the available statutory economic capital and surplus as defined in the Bermuda Insurance Act 1978 divided by the BSCR.

"Business Day" means any day other than a Saturday, a Sunday, or any other day on which banking institutions in Durham, North Carolina, Hamilton, Bermuda or San Juan, Puerto Rico are required or authorized by Applicable Law to be closed..

"Expense Allowances" shall mean ULICO expense allowances shown in Schedule 1 and 2 based on PBLA's portion of the reserves premiums stated in the Exhibits, unless reflected on a per policy basis.

"Closing" shall have the meaning ascribed to it in Section 5.3.

"Closing Date" shall mean the date on which the Closing occurs.

"Company Action Level RBC" shall mean the equivalent of company action level risk-based capital of PBLA calculated in accordance with the Life RBC Instructions of the National Association of Insurance Commissioners or any successor thereof as in effect at the applicable time of determination.



"Cure Period" shall mean (i) a period of thirty (30) calendar days following notice from ULICO in accordance with Section 4.2(h) hereof during which PBLA shall be allowed to add assets to the Reinsurance Trust Account and/or Comfort Trust Account, as applicable, in order to bring the value of assets in such trust accounts into compliance with the requirements of Section 4.2 of this Reinsurance Agreement, (ii) a period of ten (10) Business Days following notice from ULICO in accordance with Section 4.2(i) hereof during which PBLA shall be allowed to add assets to the Reinsurance Trust Account in order to bring the value of assets in such trust accounts into compliance with the requirements of Section 4.2 of this Reinsurance Agreement or (iii) such other cure period provided in any provision of this Reinsurance Agreement.

"Comfort Trust Account" shall mean a trust account established by PBLA for the benefit of ULICO to secure PBLA's obligations to ULICO with respect to PBLA's obligations hereunder with respect to any over-collateralization. For the avoidance of doubt, the Parties acknowledge and agree that the Comfort Trust Agreement shall be in the form attached as Exhibit C hereto.

"Effective Time" shall mean either (i) April 1, 2017 or (ii) such date as the Parties otherwise mutually agree.

"Extra Contractual Liabilities" means any liabilities or obligations not arising under the express terms and conditions of, or in excess of the applicable policy limits of, the Insurance Policies, including liabilities or obligations for statutory or regulatory fines, penalties, Taxes, fees, forfeitures, compensatory damages, and similar charges of a penal or disciplinary

Case 1:20-cv-00681-LCB-JEP   Document 5   Filed 07/27/20   Page 21 of 123

nature and punitive, special, incidental, treble, bad faith, tort, exemplary, or other form of extra-contractual damages, including such liabilities or obligations that arise from any act, error, or omission, whether or not intentional, negligent, in bad faith, or otherwise relating to (i) the form, marketing, sale, underwriting, production, issuance, delivery, cancellation, or administration of the Insurance Policies, (ii) the investigation, defense, trial, settlement, or handling of claims, benefits, or payments under the Insurance Policies, (iii) all escheat and unclaimed property liabilities arising under or relating to the Insurance Policies or (iv) the failure to pay, the delay in payment, or errors in calculating or administering the payment of benefits, claims, or any other amounts due or alleged to be due under or in connection with the Insurance Policies.

"Fair Market Value" shall mean, with respect to any asset, the fair market value thereof as determined in good faith in accordance with the Fair Market Value Methods.



"Fair Market Value Methods" means the methodologies, procedures and policies that PBLA uses as of the relevant date of determination to determine the fair market value of an asset in its general account for financial reporting purposes; provided, however, that to the extent that the foregoing methodologies, procedures and policies do not contemplate or are not applicable to a particular asset class, the Fair Market Value Methods applicable to such asset shall be determined using the asset classifications prescribed by the Financial Accounting Standards Board as follows: (i) Level 1 assets will be valued using unadjusted, quoted prices for identical assets in an active market; (ii) Level 2 assets will be valued using a model that has been verified by a qualified independent securities valuation firm and the inputs to that model will be observable either directly or indirectly for substantially the full term of the asset; and (iii) Level 3 assets will be valued using a model that has been verified by a qualified independent securities valuation firm and the inputs to that model will reflect management's assumptions that reflect reasonable assumptions a market participant would use in the pricing the same asset. For the purposes of this Reinsurance Agreement, the Parties acknowledge and agree that Cap-Val-American Business Appraisers, LLC, FactSet Research Systems, Inc., and IHS Markit will each be an acceptable "qualified independent securities valuation firm" for purposes of determining Fair Market Value hereunder. A new "qualified independent securities valuation firm" can be utilized if mutually agreed by the parties.

"GAAP" means generally accepted accounting principles as applicable in the United States of America.

"GEL Guaranty" means that certain Guaranty Agreement dated as of June 30, 2017 by and between Greg E. Lindberg and ULICO in the form attached as Exhibit G hereto.

"Governmental Entity" means any national, state, municipal or local government, any instrumentality, subdivision, court, or arbitrator panel, regulatory or administrative agency or commission, or other authority thereof, or any regulatory or quasi-regulatory organization or private body exercising any regulatory, taxing, importing or other governmental or quasi-governmental authority.

"Guaranteed Lifetime Withdrawal Benefit (GLWB) or Income for Life Rider" is a guarantee under an Insurance Policy pursuant to which the policyholder may take a specified annual withdrawal amount regardless of the policy value with respect to such Insurance Policy.

5

Once the policy value an Insurance Policy with such a rider becomes 0, PBLA will continue to reimburse ULICO for annual withdrawal amounts for the life of the policyholder.

"Insurance Liabilities" means all liabilities and obligations arising out of or relating to the Insurance Policies, including, without limitation: (i) liabilities and obligations for benefits or other payments arising under or relating to an Insurance Policy, whether (a) included or not included within the Statutory Reserves or (b) incurred on or after the Effective Time and any reasonable attorneys' fees related to such claims or other payments; (ii) administration expenses and expense reimbursement amounts arising out of the Insurance Policies; (iii) liabilities and obligations arising out of any changes to the terms and conditions of the Insurance Policies mandated by Applicable Law (including, without limitation, by a court of competent jurisdiction), incurred on or after the Effective Time; (iv) commissions due with respect to the Insurance Policies to the extent that such commissions are based on premiums paid on or after the Effective Time; (v) liabilities and obligations for amounts payable on or after the Effective Time for returns or refunds of premiums with respect to the Insurance Policies; and (vi) liabilities and obligations directly or indirectly arising out of or relating to any actual or alleged action or inaction of PBLA or any of its Affiliates, subcontractors or delegates in respect of the Insurance Policies on or after the Effective Time. For the avoidance of doubt, the Insurance Liabilities shall not include any Excluded Liabilities.

"Insurance Policies" shall mean any annuity or insurance contract identified on Schedule 5 hereto, including; provided, that "Insurance Policies" shall not include any annuity contracts that have annuitized prior to the Effective Time.

"Investment Guidelines" means the investment guidelines set forth in Exhibit A.

"Monthly Settlement Report" shall mean a report prepared by ULICO and provided to PBLA on a monthly basis as provided pursuant to Section 3.1 hereof that shall provide the financial data for such monthly period in the form set forth in Exhibit D-1 hereto, as such exhibit may be amended by the Parties from time to time.

"Overcollateralization Trigger" shall mean (on or after December 31, 2017) that PBLA's BSCR Ratio has fallen below one hundred and twenty percent (120%) and PBLA has not cured its BSCR Ratio to be equal to or in excess of one hundred and twenty percent (120%) within forty-five (45) calendar days following notice from ULICO.

"Party" or "Parties" shall have the meaning ascribed to it in the Preamble.

"Person" means any individual, corporation, partnership, limited partnership, joint venture, Limited Liability Company, trust or unincorporated organization or Governmental Authority or any other entity.

"Qualifying Trust Assets" shall mean those assets that comply with the Investment Guidelines and are held in the Reinsurance Trust Account or Comfort Trust Account, as applicable.

"Recapture Agreement" means that certain recapture agreement dated as of June 30, 2017 by and between ULICO and Beechwood Bermuda International Ltd. pursuant to which the parties mutually agreed to terminate that certain coinsurance reinsurance agreement to which they are parties dated February 14, 2014 with a recapture effective date as of March 31, 2017.

6

"Reinsurance Agreement" shall have the meaning ascribed to it in the Preamble.

"Reinsurance Trust Account" shall have the meaning ascribed to it in Section 4.2(a). For the avoidance of doubt, the Parties acknowledge and agree that the Trust Agreement will comply with applicable requirements of Puerto Rico law such that ULICO may receive full credit for the reinsurance provided hereunder and shall be in the form attached as Exhibit B hereto.

"SNH Guaranty" means that certain Guaranty Agreement dated as of June 30, 2017 by and between Southland National Holdings, Inc. and ULICO in the form attached as Exhibit H hereto.

"Statutory Reserve" shall mean, as of a given date, an amount equal to the statutory reserves of ULICO with respect to the Insurance Policies, determined in accordance with applicable requirements of Puerto Rico law and the requirements of the OIC; provided, that such reserves shall expressly exclude (i) additional actuarial reserves, if any, established by ULICO as a result of its annual cash flow testing, (ii) any asset valuation reserves established by ULICO, (iii) any voluntary reserves, and (iv) any other reserve not directly attributable to specific Insurance Policies.

"Third Party Accountant" shall mean a nationally recognized independent accounting firm which is mutually acceptable to ULICO and PBLA, or, if ULICO and PBLA are unable to agree on such an accounting firm, an independent accounting firm selected by mutual agreement of ULICO's and PBLA's independent auditors.

"Trust Amount" shall mean the Fair Market Value of the assets held in the Reinsurance Trust Account and the Book Value of the assets held in the Comfort Trust Account, as provided in Section 4.1 hereof.



Case 1:20-cv-00681-LCB-JEP   Document 5   Filed 07/27/20   Page 24 of 123

**Article II**
**Reinsurance of the Insurance Policies**

**Section 2.1** **Scope of Reinsurance:**

(a)    ULICO agrees to cede to PBLA, and PBLA agrees to reinsure, on a quota share basis and as of April 1, 2017, (i) a seventy-five percent (75%) quota-share of the Insurance Liabilities with respect to each of the Insurance Policies comprising the In-Force Fixed Annuity Business identified on Schedule 5 hereto (the "<u>In-Force Fixed Annuity Business</u>") which Insurance Policies were issued prior to January 1, 2017 and (ii) a one hundred percent (100%) quota share of the Insurance Liabilities with respect to the GLWB or Income For Life Rider for the In-Force Fixed Annuity Business.

(b)    ULICO agrees to cede to PBLA, and PBLA agrees to reinsure, on a quota share basis and as of January 1, 2017, (i) a seventy-five percent (75%) quota-share of the Insurance Liabilities with respect to each of the Insurance Policies comprising the New Fixed Annuity Business identified on Schedule 5 hereto (the "<u>New Fixed Annuity Business</u>") which Insurance Policies were issued after January 1, 2017 and (ii) a one hundred percent (100%) quota-share of the Insurance Liabilities with respect to the GLWB or Income For Life Rider for the New Fixed Annuity Business.



(c)    This Reinsurance Agreement shall be the exclusive reinsurance arrangement for newly issued fixed annuity business sold in Puerto Rico for both PBLA and ULICO; provided that this exclusive relationship will automatically terminate in the event that ULICO and PBLA terminate this Agreement for new annuity business. Notwithstanding the foregoing, the exclusivity restrictions set forth in the immediately preceding sentence shall in no way restrict PBLA's or ULICO's ability to enter into reinsurance or similar transactions related to (i) any insurance or annuity business other than fixed annuity contracts or (ii) any fixed annuity business currently being sold or that has been sold in Puerto Rico as part of a U.S. life insurance company's portfolio that consists primarily of business sold in the United States and not in Puerto Rico. In addition, PBLA and ULICO will have an exclusive relationship with respect to pursuing in-force fixed annuity reinsurance opportunities that may arise in Puerto Rico. ULICO hereby unconditionally and irrevocably grants to PBLA a right of first refusal with respect to any in-force fixed annuity reinsurance opportunities originated by ULICO in Puerto Rico. Further, any in-force fixed annuity reinsurance opportunities in Puerto Rico that come to the attention of PBLA will be referred to ULICO.

**Section 2.2** **Reinsurance Structure:** As security for the Insurance Liabilities, PBLA shall fund the Reinsurance Trust Account and Comfort Trust Account as provided in Section 4.2 hereof. In addition, PBLA shall, or shall cause its Affiliates to, provide ULICO with the GEL Guaranty and the SNH Guaranty.

**Section 2.3** **Excluded Liabilities:** PBLA will not be liable for any Excluded Liabilities. "<u>Excluded Liabilities</u>" include (a) Extra Contractual Liabilities, (b) any liabilities other than liabilities related to partial surrenders, full surrenders, death claims, annuity payouts or other contractual benefits under the Reinsured Policies, (c) any *ex gratia* payments made by ULICO (i.e., payments ULICO is not required to make under the terms of the Reinsured Policies).

8

**Section 2.4    Changes in Pricing Methodology:** The pricing methodology with respect to the Insurance Policies reinsured hereunder shall be that which is in effect on the Effective Date and employed by ULICO to establish initial and renewal interest rates, including non-guaranteed elements of its annuities. ULICO will not, without the prior written consent of PBLA, make any changes to the Pricing Methodology as it relates to the Insurance Policies reinsured hereunder unless agreed to by PBLA in writing.

**Section 2.5    Administration:**



(a)    ULICO will provide all administrative and other services with respect to the Insurance Policies (i) at its own expense (except for amounts due as Expense Allowances hereunder); (ii) in good faith and with the skill, diligence and expertise that experienced and qualified personnel performing such duties would employ in like circumstances and in any case with no less skill, diligence and expertise as it applies to servicing its business other than the Insurance Policies; (iii) in the manner of a prudent insurer, (iv) in a manner reasonably designed to maximize the embedded value of the Insurance Policies and (v) in conformity in all material respects with Applicable Law and the requirements of the Insurance Policies and this Agreement. For purposes of this Section 3.1, "prudent insurer" means an insurer who complies with all its duties and responsibilities under Applicable Law and takes into account reputational and other issues in respect of itself and its Affiliates. ULICO shall not assign, delegate or otherwise outsource the administration and other servicing obligations with respect to the Insurance Policies to a third-party administrator or other service provider without the prior written consent of PBLA, which shall not be unreasonably withheld or delayed.

(b)    In the event of a breach of Section 2.5(a) that has a material adverse effect on the expected profits of the business reinsured under this Agreement, PBLA shall notify ULICO in writing setting out in its notice in reasonable detail a description of such breach and of the material adverse effect on the expected profits of the business reinsured under this Agreement. Within twenty (20) Business Days following service of such notice, ULICO and PBLA shall discuss in good faith commercially reasonable steps to be taken to remedy such breach. ULICO shall implement the steps agreed with PBLA in accordance with a reasonable mutually agreed timeline.

**Section 2.6    Credited Rates and Non-Guaranteed Elements:** ULICO will be responsible for determining credited interest rates and other non-guaranteed elements of the Insurance Policies reinsured hereunder in accordance with its existing practices and will meet on at least a monthly basis to determine credited interest rates and other non-guaranteed elements. The Parties have agreed to a framework for determining credited interest rates and other non-guaranteed elements of the Insurance Policies to ULICO as described in detail on Schedule 3, as amended from time to time by the Parties. All established interest rates regardless of the formula will always be equal or higher than the minimum guaranteed rate of the annuity contract being offered. The Parties acknowledge and agree that if an interest rate reduction is required, it will be announced prior to the new interest rates effective date; provided that in the event a transfer or exchange is initiated and received at ULICO's Home Office prior to the effective day of the new rates, a rate lock will be offered for a time period not to exceed ninety (90) days.

**Section 2.7    No Privity:** The Parties agree that no rights or legal duties shall arise, by virtue of the reinsurance provided under this Reinsurance Agreement, between PBLA and any policyholder insured by ULICO. PBLA's liability is to ULICO as provided under the terms of this Reinsurance Agreement.

9

Case 1:20-cv-00681-LCB-JEP    Document 5    Filed 07/27/20    Page 26 of 123

**Section 2.8    Retention:**  ULICO shall at all times during the term of this Agreement retain, net and unreinsured, at its own risk and liability, at least twenty-five percent (25%) of the Insurance Liabilities with respect to each of the Insurance Policies comprising the In-Force Fixed Annuity Business and the New Fixed Annuity Business (other than Insurance Liabilities with respect to Insurance Policies comprising the GLWB or Income For Life Riders for such business) and ULICO shall not transfer, assign, convey, reinsure or otherwise dispose of its share of such liabilities with respect to the Insurance Policies to cause its share to fall below twenty-five percent (25%) without the prior written consent of PBLA.

Article III
Related Matters

**Section 3.1    Reimbursement and Reports:**  ULICO will deliver to PBLA within ten (10) Business Days of the end of each month, a netted Monthly Settlement Report detailing all premiums due and liabilities at the end of the monthly period.  PBLA shall reimburse ULICO for the relevant quota share of all Insurance Liabilities with respect to the In-Force Annuity Business, New Annuity Business and GLWB or Income For Life Rider as provided in Section 2.1 hereof.  The Monthly Settlement Report provided by ULICO following the end of each calendar quarter will also include the Statutory Reserve calculated as of the end of each quarter.  Each Monthly Settlement Report delivered by ULICO shall include financial data sufficient for PBLA to determine the accuracy of any amounts reflected in such report, seriatim data reports substantially in the form of Exhibit D-3 and any other data required to complete quarterly or annual reporting.

**Section 3.2    Reporting and Payments:**

(a)    Within ten (10) Business Days after the end of each calendar quarter, PBLA shall prepare a written investment report (the "Investment Reports") substantially in the form attached as Exhibit E hereto setting forth, among other things, the aggregate Fair Market Value of the assets held in the Reinsurance Trust Account and the aggregate Book Value of the assets held in the Comfort Trust Account, together with supporting detail, and such other information reasonably necessary to verify the compliance of the assets held in the Reinsurance Trust Account and Comfort Trust Account with all Investment Guidelines.  Furthermore, PBLA shall include with the Investment Report a calculation of PBLA's BSCR Ratio and Company Action Level RBC.  In addition to the Investment Report, PBLA will perform an evaluation of compliance with Chapter 6 of the Puerto Rico Insurance Code ("Chapter 6") within ten (10) Business Days after the end of each quarter.  A compliance template will be used to address limits and constraints stipulated in Chapter 6. An official certification stating the status of the portfolio's compliance and substantially in the form attached as Exhibit F hereto should be submitted by the designated Compliance Officer(s) of PBLA and kept on record as part of the quarterly review. Notwithstanding the foregoing, the Parties acknowledge and agree that the assets held in the Reinsurance Trust Account and Comfort Trust Account do not have to be in compliance with the requirements of Chapter 6 until September 30, 2017.

(b)    As soon as is practicable, but in no event more than ten (10) calendar days following its receipt of each Monthly Settlement Report, PBLA shall either (i) agree with the contents of the Monthly Settlement Report or (ii) notify ULICO that it objects to any item in the Monthly Settlement Report.  The Parties shall promptly begin good faith negotiations to resolve such dispute.  If the Parties are unable to resolve such dispute within ten (10) Business Days of

10

Case 1:20-cv-00681-LCB-JEP   Document 5   Filed 07/27/20   Page 27 of 123

PBLA's transmittal to ULICO of its notice of objection, the Parties shall submit the dispute to the Third Party Accountant for resolution of the dispute. The Third Party Accountant shall deliver no later than five (5) Business Days after commencement of its review a report setting forth its determination concerning the disputed item(s) of the Investment Reports. Such Third Party Accountant's report shall be final and binding upon PBLA and ULICO. The fees, costs and expenses of the Third Party Accountant shall be borne equally by ULICO and PBLA. PBLA shall permit ULICO and/or the Third Party Accountant to audit its records in order to perform their respective reviews. PBLA shall cooperate fully with such audit. Access to PBLA and its employees by ULICO and/or the Third Party Accountant in connection with such audit shall be at reasonable times during regular business hours upon reasonable prior written notice (including by e-mail) in a manner which does not unreasonably interfere with the business or operations of PBLA.



(c)     If a Monthly Settlement Report shows a balance due to a Party, the other Party shall remit the amount of such balance to such owed Party within ten (10) Business Days after receipt of the report. Any amount due and unpaid under this Reinsurance Agreement shall accrue interest at a rate equal to the ten (10) year U. S. Treasury note plus one hundred (100) basis points.

(d)     PBLA shall make available to the Office of the Insurance Commission of Puerto Rico ("OIC") any reports given to the Bermuda Monetary Authority as required by the jurisdiction, in addition to any other reports reasonably requested by the OIC.

**Section 3.3     Records; Audit:**

(a)     Either Party and its employees and authorized representatives may audit, examine and copy (at such Party's own expense), during regular business hours, at the home office of the other Party, any and all books, records, statements, correspondence, reports and other documents that relate to the Insurance Policies or this Reinsurance Agreement, upon giving at least fifteen (15) Business Days' prior notice to the other Party. The other Party shall (i) provide a reasonable work space for such audit, examination or copying, (ii) cooperate in good faith and (iii) disclose the existence of and produce any and all materials reasonably requested by such other party.

(b)     No Party shall have the right to conduct an audit or examination pursuant to this Section 3.4 more than once during any consecutive twelve (12) month period except for reasonable cause or as otherwise required to attend to litigation threatened or instituted against a Party or to comply with Applicable Law or a Governmental Entity's investigation or inquiry (including financial or market conduct examinations).

**Section 3.4     Errors and Omissions:** If any delay, omission, error or failure to pay amounts due or to perform any other act required by this Reinsurance Agreement is unintentional and caused by misunderstanding or oversight, the Parties shall adjust the situation to what it would have been had the misunderstanding or oversight not occurred, and the reinsurance provided hereunder shall not be invalidated. The Party first discovering such misunderstanding or oversight shall promptly notify the other Party in writing, and the Parties shall cooperate in good faith to correct such misunderstanding or oversight promptly following receipt of such notice.

Case 1:20-cv-00681-LCB-JEP   Document 5   Filed 07/27/20   Page 28 of 123

## Article IV
## Credit for Reinsurance and Related Matters

### Section 4.1    Reserves:

(a)    ULICO and PBLA shall establish and maintain proper reserves for the Insurance Policies in accordance with statutory accounting principles and the requirements of the Applicable Laws of their respective domiciliary jurisdictions. PBLA shall take such steps as may be required for ULICO to receive full credit on ULICO's statutory financial statements for the reinsurance ceded under this Reinsurance Agreement. To that end, as of the Closing Date and at all times during the term of this Reinsurance Agreement, PBLA shall enter into the Reinsurance Trust Agreement and Comfort Trust Agreement as required by Section 4.2, and comply with all terms therein.

### Section 4.2    Reinsurance Trust and Comfort Trust:

(a)    ULICO and PBLA shall enter into a Reinsurance Trust Agreement and Comfort Trust Agreement substantially in the form attached hereto as Exhibit B and Exhibit C, respectively, to be effective concurrent with this Reinsurance Agreement. The Reinsurance Trust Agreement shall contain those provisions necessary to effect the terms and conditions of this Reinsurance Agreement and shall comply with the requirements of Chapter 6 of the Insurance Code of Puerto Rico. PBLA shall establish in accordance with the Reinsurance Trust Agreement and the Comfort Trust Agreement, respectively, the Reinsurance Trust Account and the Comfort Trust Account each with an independent financial institution reasonably acceptable to ULICO for the sole use and benefit of ULICO, for so long as there are Insurance Policies reinsured under this Reinsurance Agreement. Collateral with an aggregate Fair Market Value equal to one hundred and two percent (102%) of Statutory Reserves will be held within the Reinsurance Trust Account in accordance with Article 11 of Rule 98 of the Insurance Code of Puerto Rico. Excess collateral with an aggregate Book Value equal to three percent (3%) of the Statutory Reserves will be held in the Comfort Trust Account for the benefit of ULICO; provided that such excess collateral shall increase to an aggregate Book Value equal to five percent (5%) of the Statutory Reserves following an Overcollateralization Trigger.

(b)    On the Closing Date, PBLA shall deposit assets into (i) the Reinsurance Trust Account consisting of Qualifying Trust Assets with an aggregate Fair Market Value equal to one hundred and two percent (102%) of the Statutory Reserve as of the Effective Time and (ii) the Comfort Trust Account consisting of Qualifying Trust Assets with an aggregate Book Value equal to three percent (3%) of the Statutory Reserves as of the Effective Time. Notwithstanding the foregoing, the Parties acknowledge and agree that the assets held in the Reinsurance Trust Account and Comfort Trust do not have to be in strict compliance with the requirements of Chapter 6 until September 30, 2017.

(c)    PBLA, or its designated investment manager, will direct the trustee to invest or reinvest the trust assets in accordance with the Investment Guidelines or as otherwise mutually agreed upon by ULICO and PBLA.

(d)    Prior to depositing assets in the Reinsurance Trust Account and Comfort Trust Account, PBLA shall execute assignments, endorsements in blank or transfer legal title to the trustee of all shares, obligations or any other assets requiring assignments, in order that ULICO

12

(or the trustee at the direction of ULICO) may whenever necessary negotiate the Qualifying Trust Assets without the consent or signature of PBLA or any other entity.

(e)     ULICO will have the right to instruct the trustee to withdraw Qualifying Trust Assets from (i) the Reinsurance Trust Account for the purposes set forth in Section 4.3(a) hereof and in accordance with the terms of the Reinsurance Trust Agreement or (ii) the Comfort Trust Account for the purposes set forth in 4.3(b) hereof and in accordance with the terms of the Comfort Trust Agreement.

(f)     If (i) the aggregate Fair Market Value of the Qualifying Trust Assets in the Reinsurance Trust Account at the end of any calendar quarter exceeds one hundred and two percent (102%) of the Statutory Reserve as of such calendar quarter end and (ii) the sum of (A) the aggregate Fair Market Value of the Qualifying Trust Assets in the Reinsurance Trust Account and (B) the aggregate Book Value of the Qualifying Trust Assets in the Comfort Trust Account exceeds (I) one hundred and five percent (105%) of the Statutory Reserve at the end of any calendar quarter or (II) one hundred and seven percent (107%) of the Statutory Reserve at the end of any calendar quarter following an Overcollateralization Trigger, PBLA shall have the right to instruct the trustee to withdraw assets from the Reinsurance Trust Account in accordance with the requirements of the Reinsurance Trust Agreement, but only to the extent of such excess.

(g)     If (i) the aggregate Book Value of the Qualifying Trust Assets in the Comfort Trust Account at the end of any calendar quarter exceeds (A) three percent (3%) of the Statutory Reserve as of such calendar quarter end or (B) five percent (5%) of the Statutory Reserve as of such calendar quarter end following an Overcollateralization Trigger, and (ii) the sum of (1) the aggregate Fair Market Value of the Qualifying Trust Assets in the Reinsurance Trust Account and (2) the aggregate Book Value of the Qualifying Trust Assets in the Comfort Trust Account exceeds (I) one hundred and five percent (105%) of the Statutory Reserve at the end of any calendar quarter or (II) one hundred and seven percent (107%) of the Statutory Reserve at the end of any calendar quarter following an Overcollateralization Trigger, the Grantor shall have the right to withdraw Assets from the Comfort Trust Account, but only to the extent of such excess.

(h)     If, at the end of any calendar quarter, the sum of (i) the aggregate Fair Market Value of the Qualifying Trust Assets in the Reinsurance Trust Account and (ii) the aggregate Book Value of the Qualifying Trust Assets in the Comfort Trust Account is less than (A) one hundred and five percent (105%) of the Statutory Reserve or (B) one hundred and seven percent (107%) of the Statutory Reserves following an Overcollateralization Trigger, as of such calendar quarter end, then, within the applicable Cure Period, PBLA shall cause to be deposited into the Reinsurance Trust Account and/or Comfort Trust Account, as applicable, such additional assets as are necessary to ensure that (A) the aggregate Fair Market Value of the Qualifying Trust Assets in the Reinsurance Trust Account is no less than one hundred and two percent (102%) of the Statutory Reserve and (B) the aggregate Book Value of the Qualifying Trust Assets in the Comfort Trust Account is no less than (I) three percent (3%) of the Statutory Reserve or (II) five percent (5%) of the Statutory Reserves following an Overcollateralization Trigger.

(i)     If, at the end of any calendar quarter, the sum of (i) the aggregate Fair Market Value of the Qualifying Trust Assets in the Reinsurance Trust Account and (ii) the aggregate Book Value of the Qualifying Trust Assets in the Comfort Trust Account is less than one hundred percent (100%) of the Statutory Reserve as of such calendar quarter end, then, within the applicable Cure Period, PBLA shall cause to be deposited into the Reinsurance Trust Account and/or Comfort Trust Account such additional assets as are necessary to ensure that (A) the aggregate Fair Market Value of the Qualifying Trust Assets in the Reinsurance Trust Account is

13

no less than one hundred and two percent (102%) of the Statutory Reserve and (B) the aggregate Book Value of the Qualifying Trust Assets in the Comfort Trust Account is no less than (I) three percent (3%) of the Statutory Reserve or (II) five percent (5%) of the Statutory Reserves following an Overcollateralization Trigger.

(j)     Changes to the Reinsurance Trust Agreement and Comfort Trust Agreement shall not be permitted without first receiving the prior written consent of ULICO and PBLA, which consent shall not to be unreasonably withheld or delayed.

(k)     The Reinsurance Trust Account and Comfort Trust Account are intended to secure payment of amounts owed by PBLA to ULICO under this Reinsurance Agreement. Assets properly withdrawn from the trust and Comfort Trust by PBLA will not be subject to any security interest.

(l)     ULICO shall promptly (but no more than three (3) Business Day) return (or instruct the trustee to return) to PBLA any assets withdrawn from the Reinsurance Trust Account or the Comfort Trust Account (and interest paid or accrued thereon) in excess of the actual amounts required for Section 4.3. Pending such return, ULICO shall be deemed to hold such excess amount in constructive trust for the benefit of PBLA.

### Section 4.3     Use of Funds by ULICO:

(a) ULICO may use assets withdrawn from the Reinsurance Trust Account only for the following purposes:

1.     to reimburse ULICO for the applicable quota share of premiums returned to owners of the Insurance Policies on account of cancellations of such Insurance Policies;

2.     to reimburse ULICO for the applicable quota share of surrenders and benefits or losses paid by ULICO under the terms and provisions of the Insurance Policies; and

3.     to pay the applicable quota share of any other amounts ULICO claims are due under this Reinsurance Agreement.

(b)     ULICO shall be permitted to withdraw assets from the Comfort Trust Account only if (x) a Recapture Triggering Event has occurred and is continuing and (y) PBLA has not paid an amount in full that is due and owing (or, if part of the amount is disputed, the undisputed portion) to ULICO under this Reinsurance Agreement and any applicable payment period respect thereof (or, to the extent of the portion of the payment under dispute, the dispute resolution period afforded PBLA has expired); and then only for the purpose reimbursing ULICO for undisputed amounts due by, but not yet recovered from PBLA under this Reinsurance Agreement in order to satisfy liabilities of PBLA under this Reinsurance Agreement.

(c)     Payment of funds to ULICO by the trustee shall constitute payment by PBLA pursuant to this Reinsurance Agreement and shall discharge PBLA of the obligation that gave rise to the withdrawal.

### Section 4.4 Reinsurer Change of Control:

PBLA shall give ULICO sixty (60) calendar days' prior written notice of any proposed change in control of PBLA and ULICO shall have the right to recapture the business reinsured under this

14

Agreement pursuant to Article IX hereof. For the avoidance of doubt, a "change in control" for purposes of this Section 4.4 shall mean a change in the ultimate controlling person with respect to PBLA and not a change in direct or indirect ownership beneath the ultimate controlling person.

## Article V
## Regulatory Matters and Requirements; Closing

**Section 5.1    Cooperation:**    The Parties shall cooperate in good faith in complying with regulatory requirements and responding to regulatory inquiries associated with the Insurance Policies or this Reinsurance Agreement. The duty of cooperation provided for in this Section 5.1 shall extend to any and all litigation matters regarding the Insurance Liabilities or the Insurance Policies, including litigation involving third parties.

**Section 5.2    Insolvency:**    Reinsurance provided under this Reinsurance Agreement shall be payable by PBLA on the basis of ULICO's liability under the Insurance Policies without diminution because of any insolvency of ULICO. PBLA shall pay, in its discretion, its quota share of ULICO's liability with respect to the Insurance Policies reinsured hereunder directly to ULICO or its liquidators, receivers or statutory successors. The liquidators, receivers or statutory successors shall give written notice to PBLA of the pendency of a claim against ULICO involving an Insurance Policy reinsured under this Reinsurance Agreement within a reasonable time after such claim is filed in the insolvency proceeding. During the pendency of such claim, PBLA may investigate the claim and interpose, at its own expense, in the proceeding where the claim is to be adjudicated, any defense or defenses that it may deem available to ULICO or ULICO's liquidators, receivers or statutory successors. Any expense PBLA incurs shall be chargeable, subject to court approval, to ULICO as part of the expense of liquidation to the extent of the proportionate share of the benefit which may accrue to ULICO solely from the defense undertaken by PBLA. In the event two or more assuming PBLAs are involved in the same claim and a majority in interest elects to interpose a defense to such claim, the expense shall be apportioned in accordance with the terms of this Reinsurance Agreement as though such expenses had been incurred by ULICO.

**Section 5.3    Closing Statement; Closing Payments:**

(a)    The Parties have agreed on detailed closing statements with respect to the In-Force Fixed Annuity Business and the New Fixed Annuity Business in the form of <u>Exhibit D-2</u> to this Agreement (the "<u>Closing Statement</u>"), setting forth mutually agreed upon calculations of amounts to be paid at Closing.

(b)    As consideration for the reinsurance of the Insurance Liabilities to PBLA, PBLA will pay to ULICO, within three (3) Business Day from the date that Wilmington Trust Company as trustee of the Comfort Trust Account and the Reinsurance Trust Account notifies the Parties that such accounts are ready to be funded, the amounts due with respect to the In-Force Fixed Annuity Business and the New Fixed Annuity Business as reflected on the Closing Statement, and ULICO will pay or cause to be paid to PBLA, within three (3) Business Day from the date that Wilmington Trust Company as trustee of the Comfort Trust Account and the Reinsurance Trust Account notifies the Parties that such accounts are ready to be funded, the amounts to be paid to PBLA on the Closing Date in accordance with the Closing Statement, in each case subject to adjustment as set forth in Section 5.3(c) below.

15

(c)     In connection with the first Monthly Settlement Report delivered following the Closing Date, and in addition to the other amounts reflected in such Monthly Settlement Report, ULICO shall provide a reasonably detailed statement setting forth ULICO's updated calculation of the amounts reflected in the Closing Statement. Any objections or disputes regarding such calculations shall be resolved pursuant to the provisions of Section 3.2(b) hereof and any amounts due to either party shall be settled pursuant to Section 3.2(c).

(d)     ULICO hereby acknowledges and agrees that the amounts transferred to PBLA on the Closing Date shall include all cash and assets recaptured by ULICO pursuant to the Recapture Agreement, which, for the avoidance of doubt, includes any investment income on such recaptured assets for the period from and after April 1, 2017.

## Article VI
## Representations and Warranties of ULICO

ULICO represents and warrants to PBLA that the matters set forth in this Article VI are true and correct as of the date hereof (or, if made as of a specified date, as of such date):

**Section 6.1     Organization and Standing of ULICO:** ULICO is an insurance company duly organized, validly existing and in good standing under the laws of the Commonwealth of Puerto Rico.

**Section 6.2     Authorization:** ULICO has all requisite power and authority to execute, deliver and perform its obligations under this Reinsurance Agreement. All acts or proceedings required to be taken by ULICO to authorize the execution, delivery and performance of this Reinsurance Agreement and all transactions contemplated hereby have been duly and validly taken. This Reinsurance Agreement has been duly executed and delivered by ULICO, and assuming due and valid authorization, execution and delivery hereof by other parties hereto, constitutes the legal, valid and binding obligations of ULICO, enforceable against ULICO in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium or other similar laws affecting creditors' rights generally, by applicable insurance insolvency and liquidation statutes and regulations and by general equitable principles (regardless of whether such enforceability is considered in a proceeding in equity or at law).

**Section 6.3     No Conflict or Violation:** The execution, delivery and performance of this Reinsurance Agreement does not (i) violate any provision of the Articles of Incorporation, Bylaws or other charter or organizational document of ULICO, (ii) violate, conflict with or result in the breach of any of the terms of, result in any modification of, give any counterparty the right to terminate, or constitute a default under, any contract or other agreement to which ULICO is a party, (iii) violate any order, judgment or decree applicable to ULICO or (iv) subject to making the necessary regulatory filings and the absence of regulatory objections pursuant to Section 5.3, violate any statute, law or regulation of any jurisdiction applicable to ULICO.

16

## Article VII
### Representations and Warranties of PBLA

PBLA represents and warrants to ULICO that the matters set forth in this Article are true and correct as of the date hereof (or, if made as of a specified date, as of such date):

**Section 7.1    Organization and Standing of PBLA:**  PBLA is a life reinsurance company duly organized, validly existing and in good standing under the laws of the Bermuda.

**Section 7.2    Authorization:**  PBLA has all requisite power and authority to execute, deliver and perform its obligations under this Reinsurance Agreement. All acts or proceedings required to be taken by PBLA to authorize the execution, delivery and performance of this Reinsurance Agreement and all transactions contemplated hereby have been duly and validly taken. This Reinsurance Agreement has been duly executed and delivered by PBLA, and assuming due and valid authorization, execution and delivery hereof by other parties hereto, constitutes the legal, valid and binding obligations of PBLA, enforceable against PBLA in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium or other similar laws affecting creditors' rights generally, by applicable insurance insolvency and liquidation statutes and regulations and by general equitable principles (regardless of whether such enforceability is considered in a proceeding in equity or at law).

**Section 7.3    No Conflict or Violation:**  The execution, delivery and performance of this Reinsurance Agreement does not (i) violate any provision of the Articles of Incorporation, Bylaws or other charter or organizational document of PBLA, (ii) violate, conflict with or result in the breach of any of the terms of, result in any modification of, give any counterparty the right to terminate, or constitute a default under, any contract or other agreement to which PBLA is a party, (iii) violate any order, judgment or decree applicable to PBLA or (iv) subject to making the necessary regulatory filings and the absence of regulatory objections pursuant to Section 5.3, violate any statute, law or regulation of any jurisdiction applicable to PBLA.

**Section 7.4    U.S. Federal Income Taxes:**  PBLA is a non-United States federal income tax-paying entity.

## Article VIII
### Indemnification

**Section 8.1    Indemnification by ULICO:**  ULICO hereby indemnifies and holds PBLA harmless from and against all loss, damage, cost and expense of any nature, including legal, accounting, distribution, and other professional fees, arising from (i) any liability relating to the Insurance Policies that results from ULICO's acts, errors or omissions that occur before, on or after the Effective Time, (ii) any violation or breach of the provisions of this Reinsurance Agreement by ULICO or (iii) any inaccuracy or falsity of a representation or warranty made by ULICO under this Reinsurance Agreement.

**Section 8.2    Indemnification by PBLA:**  PBLA hereby indemnifies and holds ULICO harmless from and against all loss, damage, cost and expense of any nature, including legal, accounting and other professional fees, arising from (i) any violation or breach of the

17

provisions of this Reinsurance Agreement by PBLA or (ii) any inaccuracy or falsity of a representation or warranty made by PBLA under this Reinsurance Agreement.

**Section 8.3    Notice of Potential Liability:**    Promptly after receipt by an indemnified Party hereunder of notice of any demand, claim or circumstances which, with or without the lapse of time, would give rise to the commencement (or threatened commencement) of any action, proceeding or investigation that may result in an indemnified liability, the indemnified Party shall give notice of the potential liability to the indemnifying Party. The notice shall (i) describe the potential liability in reasonable detail, (ii) indicate the amount (estimated, if necessary) of the loss that has been or may be suffered by the indemnified Party and (iii) include a statement as to the basis for the indemnification sought. Failure to provide notice in a timely manner shall not be deemed a waiver of the indemnified Party's right to indemnification other than to the extent that such failure prejudices the defense of the action, proceeding or investigation by the indemnifying Party.

**Section 8.4    Opportunity to Defend:**    The indemnifying Party may elect to defend, at its own expense and by its own counsel, any potential liability covered by this Article; provided, however, that the indemnifying Party may not compromise or settle any such liability without the consent of the indemnified Party (which consent shall not be unreasonably withheld or delayed). If the indemnifying Party elects to defend the potential liability, it shall within thirty (30) calendar days from receipt of the notice required by Section 8.3 notify the indemnified Party of its intent to do so, and the indemnified Party shall cooperate in the defense at its own expense.

**Section 8.5    Exclusive Remedy:** Except as provided in Section 3.2, Section 9.4 and Section 10.1 of this Agreement, the provisions of this Article shall be the sole and exclusive remedy at law for any breach of a representation, warranty or covenant under this Reinsurance Agreement, except that nothing set forth in this Article shall be deemed to prohibit or limit either Party's right to seek specific performance or other equitable relief for the failure of the other Party to perform any covenant contained herein.

## Article IX
## Term; Termination

**Section 9.1    Term:**    This Reinsurance Agreement shall be effective as of the Effective Time, and shall remain in effect for all ceded premiums until ULICO ceases to have any obligations or liabilities under the Insurance Policies, unless terminated before such time by ULICO or PBLA pursuant to this Article. This Reinsurance Agreement shall hold a minimum term of one (1) year (twelve (12) calendar months) from the Effective Time for New Fixed Annuity Business pursuant to Section 2.1 of this Agreement, and shall automatically renew for successive one-year terms unless otherwise terminated as provided herein. This Reinsurance Agreement may be terminated at any time by mutual written agreement of the Parties within ninety (90) calendar days. During this ninety-day period, PBLA shall continue to accept and ULICO shall continue to cede any New Fixed Annuity Business issued prior to the termination of such 90-day period.

**Section 9.2    Recapture:**

(a)    _Recapture by ULICO._ ULICO may recapture the business reinsured by PBLA under this Reinsurance Agreement as follows (each, a "_Recapture Triggering Event_"):

18

(a)    immediately upon the failure, within forty-five (45) calendar days following prior written notice from ULICO, to correct material business or financial practices which are the subject of any order by any Governmental Entity with jurisdiction over PBLA;

(b)    if PBLA's BSCR Ratio as of any calendar quarter end (on or after December 31, 2017) is at or below one hundred percent (100%) and the Reinsurer has not cured such shortfall by the end of the succeeding quarter;

(c)    upon the initiation against PBLA of any delinquency proceeding, including but not limited to supervision, conservation, rehabilitation, liquidation, bankruptcy or any other proceeding of a similar nature, or any order of administrative supervision (or any other form of order that has substantially the same effect) is entered with respect to PBLA;



(d)    if there has been a failure by the Reinsurer to pay any undisputed amounts due hereunder, or to fund the Reinsurance Trust Account or the Comfort Trust Account to any undisputed required amount, and such breach has not been cured within the applicable Cure Period after notice thereof from ULICO; or

(e)    if PBLA is in material breach of the Investment Guidelines with respect to the Reinsurance Trust Account or Comfort Trust Account, and such breach has not been cured within the applicable Cure Period after notice thereof from ULICO.

(b)    Termination by PBLA.  PBLA may terminate this Reinsurance Agreement upon giving sixty (60) calendar days' prior written notice to ULICO for non-payment of amounts due by ULICO to PBLA under this Reinsurance Agreement (provided that the amounts due are not *de minimis*), unless the unpaid amounts are the subject of a good-faith dispute, if full payment of such amounts is not made within such sixty-day period.

(c)    Special Termination.  Either Party shall have the right to terminate this Reinsurance Agreement with respect to New Fixed Annuity Business at any time with immediate effect by giving notice thereof to the other Party if there is a change in control of the other Party.

Section 9.3    Notice of Recapture:  Upon the occurrence of any Recapture Triggering Event, ULICO shall have the right at any time during the continuation of the events which resulted in such Recapture Triggering Event to recapture in full PBLA's liability for the Insurance Policies upon no less than thirty (30) days and no more than ninety (90) days prior written notice to PBLA. Any notice of recapture shall state the effective date and time of the recapture (the "Recapture Effective Time") which shall be no less than thirty (30) days and no more than ninety (90) days following the Reinsurer's receipt of such notice.

Section 9.4    Effect of Termination Recapture:

(a)    Following any notice of recapture pursuant to this Article IX, ULICO shall deliver to PBLA within thirty (30) days after the Recapture Effective Time a calculation in reasonable detail of the Recapture Amount (the "Terminal Accounting and Settlement Report").

(b)    Subject to Section 9.3(c), within ten (10) Business Days after such Terminal Accounting and Settlement Report is received by PBLA, the Recapture Amount specified in the Terminal Accounting and Settlement Report shall be deducted by ULICO from the Reinsurance Trust Account and Comfort Trust Account, and PBLA shall pay the remaining balance, if any, to ULICO. Following such settlement, any remaining amount in the Reinsurance Trust Account and Comfort Trust Account shall be transferred to PBLA. The payment of the

19

Recapture Amount upon a recapture in full shall constitute a complete and final release of such Party hereto in respect of any and all known and unknown present and future obligations or liability of any nature to the other Party under this Reinsurance Agreement.

(c)     In the event that PBLA disagrees with any information or calculation included in any Terminal Accounting and Settlement Report, PBLA shall notify ULICO of such dispute within ten (10) days of receiving such Terminal Accounting and Settlement Report. The Parties agree to work together in good faith to resolve any disputed item in the fifteen (15) day period following the delivery of a notice of disagreement in accordance with the immediately preceding sentence. In the event such dispute is not resolved during such fifteen (15) day period, such dispute shall be resolved by the Third Party Accountant, and such determination by the Third Party Accountant shall be final and binding on the Parties and may be extended and enforced in any court of competent jurisdiction; provided, that PBLA and ULICO shall submit to the Third Party Accountant statements with respect to their respective positions on the disputed item and will cooperate with the Third Party Accountant by promptly providing any additional requested information. For the avoidance of doubt, the Third Party Accountant's review shall be limited to a determination of whether the disputed item was prepared without manifest mathematical errors and in accordance with this Reinsurance Agreement. The Third Party Accountant shall not review any line items or make any determination with respect to any matters not subject to a dispute specifically identified in the applicable notice of dispute. With respect to any such dispute, such determination, if not in accordance with the position of either PBLA or ULICO, shall not be more favorable to ULICO or PBLA than the amounts and calculations submitted by either such Party to the Third Party Accountant. Any expenses relating to the engagement of the Third Party Accountant in respect of its services shall be shared fifty (50) percent by PBLA and fifty (50) percent by ULIC. The Third Party Accountant shall be instructed to use reasonable best efforts to perform its services within ten (10) Business Days of submission by PBLA and ULICO of their respective statements with respect to the disputed item and, in any case, as promptly as practicable after such submission. In the event of any such dispute, PBLA, or ULICO, as applicable, shall pay such amount in full to the other Party no later than the fifth (5th) Business Day following settlement of such dispute.



(d)     Notwithstanding the remedies contemplated by this Article IX, ULICO may, in its sole discretion, require direct payment by PBLA of any sum in default under this Agreement in lieu of exercising the remedies in this Article IX, and it shall be no defense to any claim that ULICO might have had other recourse.

## Article X
## Miscellaneous Provisions

### Section 10.1     Arbitration:

(a)     Except as otherwise provided in this Reinsurance Agreement, all disputes or differences between the Parties arising under or relating to this Reinsurance Agreement upon which an amicable understanding cannot be reached shall be decided by arbitration pursuant to the terms of this Section. Except as otherwise provided in this Reinsurance Agreement, the arbitration proceeding shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association.

Case 1:20-cv-00681-LCB-JEP   Document 5   Filed 07/27/20   Page 37 of 123

(b)     The court of arbitrators shall consist of three (3) arbitrators who must be officers or retired officers of life insurance or reinsurance companies (other than the Parties to this Reinsurance Agreement or their Affiliates). Each arbitration under this Reinsurance Agreement shall be held in Puerto Rico, unless a different location is mutually agreed upon by the Parties.

(c)     Within thirty (30) calendar days of written demand of any Party to arbitrate any dispute, ULICO and PBLA shall each appoint an arbitrator and notify the other Party of the name and address of their arbitrator. The two (2) arbitrators so appointed shall thereupon select a third (3rd) arbitrator. If either Party shall fail to appoint an arbitrator as herein provided, or should the two (2) arbitrators so named fail to select a third (3rd) arbitrator within thirty (30) calendar days of their appointment, then in either event, either Party may request the American Arbitration Association to appoint the third (3rd) arbitrator. The three (3) arbitrators so selected shall constitute the court of arbitrators.

(d)     A decision of a majority of said court of arbitrators shall be final and binding and there shall be no appeal therefrom. The court shall not be bound by legal rules of procedure and may receive evidence in such a way as to do justice between the Parties. The court shall enter an award which shall do justice between the Parties and the award shall be supported by written opinion.



(e)     The cost of arbitration, including the fees of the arbitrators, shall be borne equally by the Parties unless the court of arbitrators shall decide otherwise.

**Section 10.2     Assignment and Delegation:** This Reinsurance Agreement may not be assigned, and the duties and obligations hereunder may not be delegated, by any Party unless such assignment or delegation is agreed to in advance in writing by both Parties hereto; provided, however, that PBLA shall have the right to assign or delegate its duties and obligations with respect to managing the investments in the Reinsurance Trust Account and Comfort Trust Account to an Affiliate without the prior written consent of ULICO; and provided further that PBLA shall provide ULICO with notice of any such assignment or delegation to an Affiliate. Any assignment in violation of this Section 10.2 shall be void and shall have no force and effect. This Reinsurance Agreement shall be binding on the Parties, their permitted assignees, delegates and successors (including, without limitation, any liquidator, rehabilitator, receiver or conservator of a Party).

**Section 10.3     Confidentiality:**

(a)     The Parties shall comply with all applicable Puerto Rico and Bermuda privacy laws and requirements. In addition, each Party (i) shall keep the business, policy and other records of the other Party confidential, (ii) shall not disclose or reveal such records to anyone and (iii) shall not use the records for any purpose whatsoever, other than performing its responsibilities under this Reinsurance Agreement, unless the Party is legally required to disclose or reveal the information contained in such records. In that event, the information shall be disclosed only to the extent legally required and only after giving ten (10) calendar days' prior notice to the other Party.

(b)     Notwithstanding Section 10.3(a), (i) PBLA will not be prohibited from disclosing the confidential information described in Section 10.3(a) to its retrocessionaires in connection with its retrocession of all or a portion of the risks ceded hereunder, so long as any such retrocessionaires are bound to confidentiality obligations in respect thereof that are

21

Case 1:20-cv-00681-LCB-JEP   Document 5   Filed 07/27/20   Page 38 of 123

substantially similar to those contained herein and (ii) neither ULICO nor PBLA will be prohibited from disclosing the confidential information described in <u>Section 10.3(a)</u> to its and its Affiliates' directors, officers, employees, agents or advisors (legal, financial, accounting, actuarial or otherwise).

(c)    Each Party's obligation to maintain the confidentiality of the confidential information described in <u>Section 10.3(a)</u> shall survive termination of this Reinsurance Agreement and shall remain in effect for as long as such confidential information remains in such Party's possession.



**Section 10.4    Construction:**  The headings of Articles and Sections in this Reinsurance Agreement are provided for convenience only and shall not affect its construction or interpretation.  All references to "Articles" and "Sections" refer to the corresponding Articles and Sections of this Reinsurance Agreement.  All words used in this Reinsurance Agreement shall be construed to be of such gender or number as the circumstances require.  Unless otherwise expressly provided, the word "including" does not limit the preceding words or terms.

**Section 10.5    Counterparts:**  This Reinsurance Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original copy of this Reinsurance Agreement and all of which, when taken together, shall be deemed to constitute one and the same agreement.  The exchange of copies of this Reinsurance Agreement and of signature pages by facsimile or other electronic transmission shall constitute effective execution and delivery of this Reinsurance Agreement as to the Parties and may be used in lieu of the original agreement for all purposes.  Signatures of the Parties transmitted by facsimile or other electronic transmission shall be deemed to be their original signatures for all purposes.

**Section 10.6    Entire  Agreement:**    This  Reinsurance  Agreement,  the Reinsurance Trust Agreement and Comfort Trust Agreement supersede all prior agreements, whether written or oral, between the Parties with respect to its subject matter and constitutes (along with the exhibits, schedules and other documents delivered pursuant to this Reinsurance Agreement, the Reinsurance Trust and Comfort Trust Agreement) a complete and exclusive statement of the terms of the agreement between the Parties with respect to its subject matter.  This Reinsurance Agreement may not be amended, supplemented or otherwise modified except by a written agreement that identifies itself as an amendment to this Reinsurance Agreement executed by the Parties.

**Section 10.7    Governing Law:**  This Reinsurance Agreement shall be construed in accordance with the laws of the Commonwealth of Puerto Rico without giving effect to the principles of conflicts of law thereof.

**Section 10.8    Interpretations:**  No uncertainty or ambiguity in this Reinsurance Agreement shall be construed or resolved against any Party whether under any rule of construction or otherwise.  No Party to this Reinsurance Agreement shall be considered the draftsman.  The Parties acknowledge and agree this Reinsurance Agreement has been negotiated, reviewed and accepted by all Parties and their attorneys and shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of all Parties hereto.

Case 1:20-cv-00681-LCB-JEP   Document 5   Filed 07/27/20   Page 39 of 123

**Section 10.9** **Notices:** All notices and other communications required or permitted by this Reinsurance Agreement shall be in writing and shall be effective, and any applicable time period shall commence when (a) delivered to the following address by hand or by internationally recognized overnight courier service (cost prepaid) or (b) transmitted electronically to the following facsimile numbers or e-mail addresses with confirmation of receipt of transmission, in each case marked to the attention of the respective person (by name or title) designated below (or to such other address, facsimile number, e-mail address or person as a Party may designate by notice to the other Parties):

(a)    If to ULICO:



Universal Life Insurance Company
PO Box 2145
San Juan, PR 00922-2145
Attention: Jose Benitez, President
Telephone No.: 787-706-7339
Facsimile No.: 787-625-7095
E-mail Address: jobenitez@universalpr.com

With a copy to:

Universal Life Insurance Company
PO Box 71338
San Juan, PR 00936-8438
Attention: Josely Vega, Chief Legal Counsel
Telephone No.: 787-706-7321
Facsimile No.: 787 620-4264
E-mail Address: jvega@universalpr.com

(b)    If to PBLA:

Private Bankers Life & Annuity Co., Ltd.
Canon's Court
22 Victoria Street
Hamilton, Bermuda HM 12
Attention: Scott Boug
Telephone No.: 919-907-2662
E-mail Address: scott.boug@globalbankers.com

With a copy to:

Global Bankers Insurance Group
2327 Englert Drive
Durham, NC 27713
Attention: Tamre Edwards, General Counsel
Telephone No.: 919-205-0669
E-mail Address: tamre.edwards@globalbankers.com

23

**Section 10.10    Offset:** Any debts or credits, matured or unmatured, liquidated or unliquidated, regardless of when they arose or were incurred, in favor of or against either ULICO or PBLA with respect to this Reinsurance Agreement are deemed mutual debts or credits, as the case may be, and shall be set off, and only the balance shall be allowed or paid.

**Section 10.11    Other Instruments:** ULICO and PBLA shall promptly execute and deliver all additional instruments and shall promptly take all reasonable actions in order to carry out the purposes of this Reinsurance Agreement.

**Section 10.12    Severability:** If any provision of this Reinsurance Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Reinsurance Agreement shall remain in full force and effect. Any provision of this Reinsurance Agreement held invalid or unenforceable only in part or degree shall remain in full force and effect to the extent not held invalid or unenforceable.



**Section 10.13    Subrogation:** With respect to any payment made by PBLA under this Reinsurance Agreement, PBLA shall be subrogated to all of ULICO's rights to recover such payment against any person or organization, and ULICO shall execute and deliver any required documents or instruments and do whatever is necessary to preserve and secure such rights. Any recovery made by ULICO shall be paid to PBLA to the extent of payment made by PBLA under this Reinsurance Agreement.

**Section 10.14    Waiver of Breach:** Neither the failure nor any delay on the part of ULICO or PBLA to exercise any right, remedy, power or privilege under this Reinsurance Agreement shall operate as a waiver thereof. No single or partial exercise of any right, remedy, power or privilege shall preclude the further exercise of that right, remedy, power or privilege or the exercise of any other right, remedy, power or privilege. No waiver of any right, remedy, power or privilege with respect to any occurrence shall be construed as a waiver of that right, remedy, power or privilege with respect to any other occurrence. No waiver shall be effective unless it is in writing and signed by the Party granting the waiver.

[SIGNATURE PAGE TO FOLLOW]

24

Case 1:20-cv-00681-LCB-JEP   Document 5   Filed 07/27/20   Page 41 of 123

IN WITNESS WHEREOF, the Parties have caused this Reinsurance Agreement to be executed by their respective duly authorized officers, as of the dates indicated below.

**PBLA:**

PRIVATE BANKERS LIFE & ANNUITY CO., LTD.

By: _____
Name: _____
Title: _____
Date: _____

**ULICO:**

UNIVERSAL LIFE INSURANCE COMPANY

By: _____
Name: _Jose C. Benitez_
Title: _President_
Date: _06 - 30 - 17_

IN WITNESS WHEREOF, the Parties have caused this Reinsurance Agreement to be executed by their respective duly authorized officers, as of the dates indicated below.

**PBLA:**

PRIVATE BANKERS LIFE & ANNUITY CO., LTD.

By: _____
Name: _____ Paul Brown _____
Title: _____ Director _____
Date: _____ 6/30/2017 _____

**ULICO:**

UNIVERSAL LIFE INSURANCE COMPANY

By: _____
Name: _____
Title: _____
Date:

# EXHIBITS

EXHIBIT A – INVESTMENT GUIDELINES

EXHIBIT B –REINSURANCE TRUST AGREEMENT

EXHIBIT C – COMFORT TRUST AGREEMENT

EXHIBIT D – SETTLEMENT REPORTS

    EXHIBIT D-1 – MONTHLY SETTLEMENT REPORT

    EXHIBIT D-2 – CLOSING STATEMENT

    EXHIBIT D-3 — REPORTING REQUIREMENTS

EXHIBIT E – INVESTMENT REPORT (PBLA)

EXHIBIT F – COMPLIANCE CERTIFICATION

EXHIBIT G – GEL GUARANTY

EXHIBIT H – SNH GUARANTY



# Exhibit A – Investment Guidelines

The following classes of assets shall be considered Qualifying Trust Assets with regard to this Reinsurance Agreement and the related trust accounts:

**For assets held within the Reinsurance Trust Account:**

## Statement of Policy

Private Bankers Life and Annuity Co., Ltd.'s (the "Company") investment portfolio will be managed to support the Company's commitment to earn consistent and steadily increasing investment income. Our overall objective is to maintain a high quality investment portfolio structured to provide the highest level of investment income consistent with the economic and interest rate environment and respective market sector selection. Additionally, the Company shall ensure it is always in compliance with all applicable regulatory requirements including but not limited to Title Twenty Six Insurance Subtitle 1 Insurance Generally Chapter 6B Investments of the Insurance Code of Puerto Rico ("Chapter 6").

The more specific objectives of the Company's investment strategy are (in priority order):

1. Safety – to seek capital preservation through appropriate asset allocation, security selection and diversification strategies.

2. Liquidity – to continuously maintain an ability to meet any foreseeable cash needs of the Company.

3. Investment Income – to maximize the after-tax, risk-adjusted investment income, either in the form of interest and dividend income or in the form of capital gain, within the constraints set forth in this policy statement.



This is important as it provides a secure, stable source of income and principal preservation while maintaining a strong balance sheet for the benefit of policyholders, regulators, rating agencies and the stakeholder.

The Company will maintain assets in accordance with the Bermuda Monetary Authority's ("BMA") Insurance Act ("the Act"), specifically ensuring that the Company maintains at least the minimum margin of solvency and at least the minimum liquidity ratio.

## Pricing and Valuation

Valuation procedures, documentation and other relevant information must be clearly presented.

Holdings will be valued according to the Fair Market Value Methods.

All current applicable investment guidelines, limits and restrictions are subject to change by regulator. PBLA must constantly monitor and review Chapter 6 of the Insurance Code of Puerto Rico for any update.

## Appointment of Investment Committee

The Company's Board of Directors (the "BOD") has appointed an Investment Committee (the "Committee"). The Committee, with the approval of the BOD, may engage the services of an investment manager or investment managers to manage all or a portion of the investment portfolio. An investment manager may be an affiliate of the Company. The Committee shall determine investment portfolio strategies for the Company that are within the parameters of this policy. The Committee, with the approval of the BOD, may employ the help of investment manager(s) in developing investment portfolio strategies. The BOD shall be advised and furnished a list of all investment transactions quarterly at its regular BOD meeting to assure adherence to this policy.

The BOD has final responsibility and authority for the overall affairs of the Company including the investment portfolio. This policy has been adopted by the BOD and shall be reviewed and approved by the BOD on an annual basis. Any change in this policy requires BOD approval. This policy is to serve as a general framework within which the portfolio is to be managed. However, requirements of Bermuda and Puerto Rico insurance law are to be followed at all times.

## Investment Portfolio Structure and Compliance Guidelines



The structure of the investment portfolio and the amounts invested will be determined by the President of the Company, Chief Investment Officer of the Company and the Committee. The Committee, with the approval of the BOD, may employ the help of an investment manager or managers in determining the structure of the investment portfolio and the amounts invested. All decisions pertaining to the Company's investment policy will be made in regard to the Company's ongoing liquidity requirements, statutory reserve requirements and tax status. The portfolio shall adhere to Chapter 6 and may include the following security types:

I.     Money Market Securities

II.    U.S. Treasury and Federal Agency Securities

III.   Stripped Principal, Stripped Coupons and Treasury Receipts

V.     Municipal Securities

V.     Corporate Debt Obligations

VI.    Mortgage-Backed, Asset-Backed Securities and Mortgage Loans

VII.   Private or Direct Placement Securities

VIII.  Equity Securities – Common and Preferred Stocks

IX.     Wholly Owned Insurance Subsidiaries

X.     Real Estate

XVI.    Investments outside of the U.S.

Should the Company be notified of non-compliance with these guidelines, the Company shall have thirty (30) days from the time of the notification to cure the non-compliance.


## Compliance Considerations – Puerto Rico Regulations

| Asset Type Limits | Limit (%) |
|---|---|
| % Preferred Debt | 100 |
| % Cash Equivalents | 100 |
| % Corporate Debt | 40 |
| % Preferred Equity | 40 |
| % Common Equity | 30 |
| % Unregistered Equity | 5 |
| % Combined of Preferred, Common, and Unregistered Equity | 40 |

| Rating Based Limits (applicable to certain asset classes as provided in Chapter 6) | |
|---|---|
| % High grade (A- and better) | 40 |
| % Medium grade (BBB- to BBB+) | 20 |
| % Low rated (below BBB-) | 0 |
| % Unrated (applies to certain asset classes as per Chapter 6) | 5 |

| Foreign Investment Limits | |
|---|---|
| % Canadian Investments | 20 |
| % Total foreign issuers (excludes Canada) | 20 |
| % Per foreign jurisdiction, SVO 1 rating (excludes Canada) | 5 |

| Foreign currency limits | |
|---|---|
| Total Portfolio | 5 |

| Issuer based limits (excludes preferred debt) | |
|---|---|
| % Assets issued by a single entity | 5 |
| % Voting shares of a corporation | 5 |

| Additional Investment Authority | |
|---|---|
| % of admitted assets | 5 |

## Target Portfolio

| Asset Type Target | Target (%) |
|---|---|
| % Preferred Debt | 35 |
| % Cash Equivalents | 15 |
| % Corporate Debt | 40 |
| % Preferred Equity | 10 |
| % Common Equity | 0 |
| % Unregistered Equity | 0 |

| Rating Based Target (for credit investments) | |
|---|---|
| % High grade (A- and better) | 40 |
| % Medium grade (BBB- to BBB+) | 20 |
| % Low rated (below BBB-) | 0 |
| % Unrated (applies to certain asset classes as per Chapter 6) | 0 |

| Foreign Investment Targets | |
|---|---|
| % Canadian Investments | 5 |
| % Total foreign issuers (excludes Canada) | 15 |
| % Per foreign jurisdiction, SVO 1 rating (excludes Canada) | 5 |

| Foreign currency targets | |
|---|---|
| Total Portfolio | 1 |



**For assets held within the Comfort Trust Account:**

The Assets held in the Comfort Trust Account with a Book Value equal to three percent (3%) of Statutory Reserves or five percent (5%) of Statutory Reserves following an Overcollateralization Trigger will be Assets permissible under Chapter 6 of Puerto Rico Insurance Code, but shall not be subject to any applicable investment position limits thereunder.



**EXHIBIT B – REINSURANCE TRUST AGREEMENT**

REINSURANCE TRUST AGREEMENT

BY AND AMONG

UNIVERSAL LIFE INSURANCE COMPANY,

PRIVATE BANKERS LIFE AND ANNUITY CO., LTD.

AND

WILMINGTON TRUST, NATIONAL ASSOCIATION



# TABLE OF CONTENTS

Page

Article I Definitions ........................................................................................................................2

Article II Creation of Trust Account; Deposit of Assets ............................................................5

      Section 2.1     Creation of Trust Account ............................................................5

      Section 2.2     Deposit of Assets .........................................................................5

Article III Withdrawal or Transfer of Assets; Maintenance of the Trust Account; Trust Income ..7

      Section 3.1     Withdrawal and Transfer of Assets .............................................7

      Section 3.2     Maintenance of the Trust Account .............................................8

      Section 3.3     Trust Income ................................................................................9

Article IV Duties of Trustee .......................................................................................................9

      Section 4.1     Right to Vote Assets and Payments of Dividends and Interest ....9

      Section 4.2     Responsibilities of Trustee .........................................................9

      Section 4.3     Monthly Report ..........................................................................10

      Section 4.4     Reliance on Authority ................................................................10

      Section 4.5     Charges of Trustee .....................................................................10

      Section 4.6     Indemnification of Trustee ........................................................10

      Section 4.7     Resignation or Removal of Trustee ...........................................10

      Section 4.8     Additional Trustee Provisions ...................................................11

Article V Term; Termination .....................................................................................................11

      Section 5.1     Term; Termination .....................................................................11

      Section 5.2     Effect of Termination ................................................................11

Article VI Miscellaneous Provisions .........................................................................................12

      Section 6.1     Assignment and Delegation .......................................................12

      Section 6.2     Construction ...............................................................................12

      Section 6.3     Counterparts ...............................................................................12

      Section 6.4     Entire Agreement .......................................................................12

      Section 6.5     Governing Law ...........................................................................12

      Section 6.6     Notices .......................................................................................13

      Section 6.7     Other Instruments ......................................................................14

      Section 6.8     Severability ................................................................................14

      Section 6.9     Waiver of Breach ......................................................................14

dms.us.53161234.02

# REINSURANCE TRUST AGREEMENT

THIS REINSURANCE TRUST AGREEMENT (this "Reinsurance Trust Agreement") is made and entered into by and among UNIVERSAL LIFE INSURANCE COMPANY, a Puerto Rico stock life insurance company ("Beneficiary"), PRIVATE BANKERS LIFE AND ANNUITY CO., LTD., a Bermuda stock life reinsurance company ("Grantor"), and Wilmington Trust, National Association, a national banking association ("Trustee"). Beneficiary, Grantor and Trustee are sometimes hereinafter referred to individually as a "Party" and collectively as the "Parties."

## AGREEMENT

WHEREAS, Grantor and Beneficiary have entered into that certain Coinsurance Reinsurance Agreement, dated as of June 30, 2017 (the "Reinsurance Agreement"), pursuant to which Grantor has agreed to provide security to the Beneficiary for the payment of amounts due under the Reinsurance Agreement by Grantor to the Beneficiary;

WHEREAS, Grantors and Beneficiary desire to enter into this Reinsurance Trust Agreement and create a trust account (the "Reinsurance Trust Account") with the Trustee for the benefit of the Beneficiary to hold cash and assets (the "Assets") as security for the payment of certain amounts due under the Reinsurance Agreement by Grantor to the Beneficiary;

WHEREAS, the Trustee has agreed to act as Trustee hereunder, and to hold Assets in the Reinsurance Trust Account for the sole use and benefit of the Beneficiary in accordance with the terms and conditions of this Reinsurance Trust Agreement; and

NOW, THEREFORE, in consideration of the mutual benefits to be received by the Parties and the mutual covenants and agreements contained herein, the Parties agree as follows:

## Article I
### Definitions

As used in this Reinsurance Trust Agreement, the following terms shall have the meanings set forth herein:

"Affiliate" of any Person means another Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with, such first Person. For purposes of this definition, "control", when used with respect to any Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities by contract or otherwise, and the terms "controlling" and "controlled" have the meanings correlative to the foregoing.

"Applicable Law" means any law, statute, ordinance, code, written rule or regulation, order, writ, injunction, judgment, decree, ruling, constitution, or treaty enacted, promulgated, issued, enforced, or entered by any Governmental Entity applicable to any Person or such Person's businesses, properties, or assets, as may be amended from time to time.

Case 1:20-cv-00681-LCB-JEP   Document 5   Filed 07/27/20   Page 53 of 123

"Assets" shall have the meaning ascribed to it in the Recitals.

"Beneficiary" shall have the meaning ascribed to it in the Preamble and shall include any successor of Beneficiary by operation of law, including, without limitation, any liquidator, rehabilitator, receiver or conservator.

"Designee" shall have the meaning ascribed to it in Section 3.1(a) hereof.

"Beneficiary Withdrawal Notice" shall have the meaning ascribed to it in Section 3.1(a) hereof.

"Book Value" shall mean, with respect to assets in the trust accounts, at any date of determination, the amount stated for such assets on Grantor's statutory financial statements determined in accordance with then applicable statutory accounting principles and the requirements of the Applicable Laws of their respective domiciliary jurisdictions.

"Business Day" means any day other than a Saturday, Sunday or any other day on which banking institutions in Durham, North Carolina, Hamilton, Bermuda or San Juan, Puerto Rico are required or authorized by applicable law to be closed.

"Comfort Trust Account" shall mean a trust account established by Grantor for the benefit of Beneficiary to secure Grantor's obligations to Beneficiary with respect to Grantor's obligations under the Coinsurance Reinsurance Agreement with respect to any over-collateralization.

"Cure Period" shall mean (i) a period of thirty (30) calendar days following notice from the Beneficiary in accordance with Section 2.2(e) hereof during which the Grantor shall be allowed to add Assets to the Reinsurance Trust Account in order to bring the value of Assets in the Reinsurance Trust Account into compliance with the requirements of Section 3.2 of this Reinsurance Trust Agreement, (ii) a period of ten (10) calendar days following notice from the Beneficiary in accordance with Section 2.2(f) hereof during which the Grantor shall be allowed to add Assets to the Reinsurance Trust Account in order to bring the value of Assets in the Reinsurance Trust Account into compliance with the requirements of Section 3.2 of this Reinsurance Trust Agreement or (iii) such other cure period provided in any provision of this Reinsurance Trust Agreement.

"Effective Date" shall have the meaning ascribed to it on the signature page hereto.

"Fair Market Value" shall mean, with respect to any asset, the fair market value thereof as determined by Grantor in good faith in accordance with the Fair Market Value Methods.

"Fair Market Value Methods" means the methodologies, procedures and policies that the Grantor uses as of the relevant date of determination to determine the fair market value of an asset in its general account for financial reporting purposes; provided, however, that to the extent that the foregoing methodologies, procedures and policies do not contemplate or are not applicable to a particular asset class, the Fair Market Value Methods applicable to such asset

3

shall be determined using the asset classifications prescribed by the Financial Accounting Standards Board as follows: (i) Level 1 assets will be valued using unadjusted, quoted prices for identical assets in an active market; (ii) Level 2 assets will be valued using a model that has be verified by a qualified independent securities valuation firm and the inputs to that model will be observable either directly or indirectly for substantially the full term of the asset; and (iii) Level 3 assets will be valued using a model that has been verified by a qualified independent securities valuation firm and the inputs to that model will reflect management's assumptions that reflect reasonable assumptions a market participant would use in the pricing the same asset. For the purposes of this Reinsurance Trust Agreement, the Parties acknowledge and agree that Cap-Val-American Business Appraisers, LLC, FactSet Research Systems, Inc., and IHS Markit will each be an acceptable "qualified independent securities valuation firm" for purposes of determining Fair Market Value hereunder.

"Grantor" shall have the meaning ascribed to it in the Preamble.

"Grantor Withdrawal Notice" shall have the meaning ascribed to it in Section 3.1(e) hereof.

"Governmental Entity" means any national, state, municipal or local government, any instrumentality, subdivision, court, arbitrator or arbitrator panel, regulatory or administrative agency or commission, or other authority thereof, or any regulatory or quasi-regulatory organization or private body exercising any regulatory, taxing, importing or other governmental or quasi-governmental authority.

"Insurance Policy" shall have the meaning provided for such term in the Reinsurance Agreement.

"Investment Guidelines" means the investment guidelines attached hereto as Exhibit A.

"Investment Manager" shall have the meaning ascribed to it in Section 3.2(b) hereof.

"Overcollateralization Trigger" shall have the meaning provided for such term in the Reinsurance Agreement.

"Party" or "Parties" shall have the meaning ascribed to it in the Preamble.

"Person" means any individual, corporation, partnership, limited partnership, joint venture, Limited Liability Company, trust or unincorporated organization or Governmental Entity or any other entity.

"Qualifying Trust Assets" means cash (United States legal tender), certificates of deposit (issued by a United States bank and payable in United States legal tender), and investments permitted by the Puerto Rico Insurance Code; provided, however, that such investments are issued by an institution that is not the parent, a subsidiary or an affiliate of either Grantor or Beneficiary and, provided further, that the investments comply with the Investment

4

Guidelines, as the same may be amended from time to time upon written notice by Beneficiary and Grantor to Trustee.

"Reinsurance Agreement" means the reinsurance agreement entered into by and between the Grantor and the Beneficiary dated as of June 30, 2017.

"Reinsurance Trust Account" means the trust account established pursuant to Section 2.1. The name of the Reinsurance Trust Account shall be: PBLA ULICO 2017 and its Tax Identification Number shall be: xx-xxxxxxx.

"Reinsurance Trust Agreement" shall have the meaning ascribed to it in the Preamble.

"Statutory Reserve" shall have the meaning provided for such term in the Reinsurance Agreement.

"Trustee" shall have the meaning ascribed to it in the Preamble.

## Article II
## Creation of Trust Account; Deposit of Assets

### Section 2.1    Creation of Trust Account.

(a)    Grantor hereby establishes the Reinsurance Trust Account with Trustee for the sole use and benefit of Beneficiary, under the terms set forth herein. Trustee shall administer the Reinsurance Trust Account in its name as Trustee for the sole use and benefit of Beneficiary. The Reinsurance Trust Account shall be subject to withdrawal by Beneficiary solely as provided herein. Trustee hereby accepts the Reinsurance Trust Account upon the terms set forth in this Reinsurance Trust Agreement.

(b)    Prior to depositing the Assets in the Reinsurance Trust Account, and from time to time thereafter as required, Grantor shall execute or cause the execution of assignments, endorsement in blank, or transfer legal title to Trustee of all shares, obligations or other Assets requiring assignments, so that Beneficiary, or Trustee upon direction by Beneficiary, may whenever necessary negotiate any such Assets, without the consent or signature from Grantor or any other person or entity. Any Assets received by Trustee which are not in such proper negotiable form shall not be accepted by Trustee and shall be returned to Grantor as unacceptable. Trustee may hold Assets of the Reinsurance Trust Account in bearer form or in its own name or that of a nominee.

### Section 2.2    Deposit of Assets.

(a)    On or before the Effective Date, Grantor shall deposit in the Reinsurance Trust Account Assets that comply with the Investment Guidelines (the "Qualifying Trust Assets") with an aggregate Fair Market Value equal to one hundred and two percent (102%) of the Statutory Reserve as of the Effective Time. The Assets deposited in the Reinsurance Trust Account shall be valued according to their current Fair Market Value, shall consist only of Qualifying Trust Assets and shall be invested in accordance with the Investment Guidelines or as otherwise mutually agreed in writing by Grantor and Beneficiary.

5

(b)     Trustee will accept and credit to the Reinsurance Trust Account all Assets which from time to time are delivered to it for deposit in the Reinsurance Trust Account by or on behalf of Grantor or Beneficiary. Trustee may deposit any Qualifying Trust Assets in the Reinsurance Trust Account in a book-entry account maintained at the Federal Reserve Bank of New York or in depositories selected with due care (such as The Depository Trust Company). Trustee is authorized and shall have the power to receive such Assets and to hold, invest, reinvest and dispose of the same for the uses and purposes of and according to the provisions herein set forth. All Assets shall be maintained by Trustee in the Reinsurance Trust Account separate and distinct from all other assets under the control of or on the books of Trustee and shall, to the extent applicable, be received and continuously kept in a safe place at Trustee's office within the United States of America

(c)     Grantor shall ensure that (i) any Assets transferred to Trustee for deposit in the Reinsurance Trust Account will be in such form that Beneficiary, or Trustee upon direction by Beneficiary, may whenever necessary negotiate any such Assets, without consent or signature from Grantor or any other person or entity in accordance with the terms of this Reinsurance Trust Agreement, (ii) all Assets transferred to Trustee for deposit in the Reinsurance Trust Account will consist only of Qualifying Trust Assets, and (iii) each such Asset shall be at the time of transfer free and clear of all claims, liens, interests and encumbrances whatsoever (other than those arising under this Reinsurance Trust Agreement).



(d)     Grantor shall have the responsibility to determine whether the Assets in the Reinsurance Trust Account are sufficient to secure Grantor's obligations to Beneficiary. Furthermore, Trustee shall have no responsibility whatsoever to determine whether Assets transferred to the Reinsurance Trust Account constitute Qualifying Trust Assets.

(e)     If, at the end of any calendar quarter, the sum of (i) the aggregate Fair Market Value of the Qualifying Trust Assets in the Reinsurance Trust Account and (ii) the aggregate Book Value of the Qualifying Trust Assets in the Comfort Trust Account is less than (A) one hundred and five percent (105%) of the Statutory Reserve or (B) one hundred and seven percent (107%) of the Statutory Reserves following an Overcollateralization Trigger, as of such calendar quarter end, then, within the applicable Cure Period, the Grantor shall cause to be deposited into the Reinsurance Trust Account and/or Comfort Trust Account, as applicable, such additional Assets as are necessary to ensure that (A) the aggregate Fair Market Value of the Qualifying Trust Assets in the Reinsurance Trust Account is no less than one hundred and two percent (102%) of the Statutory Reserve and (B) the aggregate Book Value of the Qualifying Trust Assets in the Comfort Trust Account is no less than (I) three percent (3%) of the Statutory Reserve or (II) five percent (5%) of the Statutory Reserves following an Overcollateralization Trigger.

(f)     If, at the end of any calendar quarter, the sum of (i) the aggregate Fair Market Value of the Qualifying Trust Assets in the Reinsurance Trust Account and (ii) the aggregate Book Value of the Qualifying Trust Assets in the Comfort Trust Account is less than one hundred percent (100%) of the Statutory Reserve as of such calendar quarter end, then, within the applicable Cure Period, the Grantor shall cause to be deposited into the Reinsurance Trust Account and/or Comfort Trust Account such additional Assets as are necessary to ensure that (A) the aggregate Fair Market Value of the Qualifying Trust Assets in the Reinsurance Trust Account is no less than one hundred and two percent (102%) of the Statutory Reserve and (B) the aggregate Book Value of the Qualifying Trust Assets in the Comfort Trust Account is no less than (I) three

6

percent (3%) of the Statutory Reserve or (II) five percent (5%) of the Statutory Reserves following an Overcollateralization Trigger.

## Article III
### Withdrawal or Transfer of Assets; Maintenance of the Trust Account; Trust Income

#### Section 3.1    Withdrawal and Transfer of Assets.

(a)    The Beneficiary shall have the right to withdraw Assets from the Reinsurance Trust Account for the following purposes only:

(i)    to reimburse Beneficiary for the applicable quota share of premiums returned to owners of the Insurance Policies on account of cancellations of such Insurance Policies;

(ii)    to reimburse Beneficiary for the applicable quota share of surrenders and benefits or losses paid by Beneficiary under the terms and provisions of the Insurance Policies;

(iii)    to pay the applicable quota share of any other amounts Beneficiary claims are due under the Reinsurance Agreement;

(b)    Any such withdrawal made pursuant to Section 3.1(a) shall be limited to Assets having a Fair Market Value not in excess of the undisputed amount then in default, and may be utilized and applied by the Beneficiary or any successor by operation of law (including any liquidator, rehabilitator, receiver, or conservator of the Beneficiary) without diminution because of insolvency on the part of the Beneficiary or Grantor only for such purpose. The Beneficiary shall have the right to withdraw Assets from the Reinsurance Trust Account with a Fair Market Value not in excess of the amount the Beneficiary is permitted to withdraw from the Reinsurance Trust Account under the preceding two sentences upon written notice to the Trustee and the Grantor (a "Beneficiary Withdrawal Notice") in a form attached hereto as Exhibit B specifying the invested Assets or cash amount to be withdrawn. Each withdrawal from the Reinsurance Trust Account by the Beneficiary (i) shall constitute a representation and certification of the Beneficiary that such withdrawal is being made in accordance with the terms of the Reinsurance Agreement and this Reinsurance Trust Agreement, and (ii) shall be deemed to satisfy, to the extent of such withdrawn amount, the obligations of the Grantor in respect of which such withdrawal is made. If, notwithstanding the foregoing, a withdrawal is made in excess of the amount permitted by Section 3.1(a), such excess amount shall be deemed maintained in constructive trust for the benefit of the Grantor and promptly returned to the Grantor.

(c)    If (i) the aggregate Fair Market Value of the Assets at the end of any calendar quarter exceeds one hundred and two percent (102%) of the Statutory Reserve as of such calendar quarter end and (ii) the sum of (A) the aggregate Fair Market Value of the Assets in the Reinsurance Trust Account and (B) the aggregate Book Value of the Assets in the Comfort Trust Account exceeds (I) one hundred and five percent (105%) of the Statutory Reserve at the end of any calendar quarter or (II) one hundred and seven percent (107%) of the Statutory Reserve at the end of any calendar quarter following an Overcollateralization Trigger, the Grantor shall have the right to withdraw Assets from the Reinsurance Trust Account, but only to the extent of such excess. The Grantor shall have the right to withdraw Assets from the

7

Reinsurance Trust Account pursuant to the preceding sentence upon the prior written consent of the Beneficiary, which consent shall not be unreasonably withheld or delayed and in each case within three (3) Business Days of a request for consent, and notice to the Trustee substantially in the form attached hereto as <u>Exhibit C</u> (a "<u>Grantor Withdrawal Notice</u>") specifying the Assets and/or cash amount to be withdrawn. Each withdrawal from the Reinsurance Trust Account by the Grantor shall constitute a representation and certification of the Grantor that such withdrawal is being made in accordance with the terms of the Reinsurance Agreement and this Agreement. Following such withdrawal, the aggregate Fair Market Value of all Qualifying Trust Assets held in the Reinsurance Trust Account shall be at least equal to one hundred and two percent (102%) of the Statutory Reserve as of such calendar quarter end referenced in the first sentence of this <u>Section 3.1(e)</u>.

(d)     The Party withdrawing Assets (the "<u>Withdrawing Party</u>") as permitted pursuant to <u>Section 3.1(b) or Section 3.1(c)</u> may designate in the Beneficiary Withdrawal Notice or the Grantor Withdrawal Notice, as applicable (a "<u>Withdrawal Notice</u>"), a third party (the "<u>Designee</u>") to whom Assets specified therein shall be delivered. The Withdrawing Party need present no statement or document other than the Withdrawal Notice in order to withdraw any Assets.

(e)     Subject to Section 3.2 of this Reinsurance Trust Agreement, Trustee shall allow no substitution or withdrawal of any Asset from the Reinsurance Trust Account in the absence of a Withdrawal Notice.



### Section 3.2     Maintenance of the Trust Account.

(a)     Trustee shall surrender for payment all maturing Assets and all Assets called for redemption, deposit the principal amount of the proceeds of any such payment into the Reinsurance Trust Account and give notice via online access or otherwise to Beneficiary and Grantor of such action.

(b)     Subject to the receipt of Beneficiary's prior written consent, Grantor may appoint an investment manager (in such capacity, the "<u>Investment Manager</u>"), to make investment decisions in compliance with the Investment Guidelines with regard to the Assets held by Trustee in the Reinsurance Trust Account; provided, however, that Beneficiary hereby agrees that Standard Advisory Services, Ltd. or any other Affiliate of Grantor may be named Investment Manager without Beneficiary's prior written consent. Grantor shall promptly notify Trustee in writing of the termination of the appointment of any Investment Manager. From time to time, Grantor, or the Investment Manager, acting on behalf of Grantor, may instruct Trustee to invest Assets in the Reinsurance Trust Account in other Qualifying Trust Assets and to open brokerage accounts in the name of the trust with Trustee as signer. Trustee agrees to follow any investment instructions from the Investment Manager and, in the absence of such instructions or instructions from Grantor, Trustee shall not be required to take any action with respect to the investment of the Assets in the Reinsurance Trust Account. Grantor shall be responsible for ascertaining whether investments are "Qualifying Trust Assets" and Trustee shall have no liability with respect to such determination.

(c)     Grantor shall have the right to withdraw from the Reinsurance Trust Account and transfer to Grantor all or any part of the Assets in the Reinsurance Trust Account, provided, that at the time of such withdrawal, Grantor shall, with the prior written consent of

8

Beneficiary, replace the withdrawn Assets with other Qualifying Trust Assets having a Fair Market Value at least equal in Fair Market Value to the Assets withdrawn. Prior to any such substitution, Grantor shall certify to Beneficiary and Trustee in writing that as of the date of any substitution the Fair Market Value of Assets to be deposited into the Reinsurance Trust Account equals or exceeds the Fair Market Value of Assets to be withdrawn from the Reinsurance Trust Account. Trustee shall have no responsibility whatsoever to determine the value of such substituted securities or that such substituted securities constitute Qualifying Trust Assets, and Trustee shall be fully protected in relying upon such certification from Grantor.

(d)     When Trustee is directed to deliver or receive Assets against payment, delivery will be made in accordance with generally accepted market practice.

(e)     Trustee shall keep full and complete records of the administration of the Reinsurance Trust Account. Grantor and Beneficiary may examine such records at any time during regular business hours through any person or persons duly authorized in writing by Grantor or Beneficiary.

**Section 3.3     Trust Income.** All payments of interest, dividends and other income in respect to the Assets in the Reinsurance Trust Account shall be promptly deposited into the Reinsurance Trust Account.

**Article IV**
**Duties of Trustee**

**Section 4.1     Right to Vote Assets and Payments of Dividends and Interest.** Trustee is hereby authorized, without prior notice to Grantor or Beneficiary, to demand payment of and collect all interest or dividends on the Assets comprising the Reinsurance Trust Account, if any. Trustee shall deposit all of such interest or dividends collected in the Reinsurance Trust Account. Subject to the other provisions of this Reinsurance Trust Agreement, Grantor shall have the full and unqualified right to direct Trustee to vote, and to execute consents, bond powers, stock powers, mortgage and title instruments and other instruments of transfer, pledge and release with respect to any Assets comprising the Reinsurance Trust Account.

**Section 4.2     Responsibilities of Trustee.**

(a)     Trustee, in the administration of the Reinsurance Trust Account, is to be bound solely by the express provisions herein and such further written and signed directions as the appropriate Party or Parties may, under the conditions herein provided, deliver to Trustee. Trustee shall be under no obligation to enforce Grantor's obligations under this Reinsurance Trust Agreement, except as otherwise expressly provided herein. Trustee shall be restricted to holding, operating and collecting the Assets comprising the Reinsurance Trust Account and the payment and distribution thereof for the purposes set forth in this Reinsurance Trust Agreement and the conservation and protection of such Assets and the administration thereof in accordance with the provisions of this Reinsurance Trust Agreement. Trustee is prohibited from using the corpus of the Reinsurance Trust Account for the purposes of paying compensation to, or reimbursing the expenses of, Trustee. Upon written request of Grantor or Beneficiary, Trustee further agrees to promptly forward to such Party a certified list and valuation of all Assets held in the Reinsurance Trust Account.

9

(b)     Trustee shall accept and open all mail directed to Grantor or Beneficiary in care of Trustee.

(c)     Trustee shall only be liable for its own negligence, willful misconduct or lack of good faith in connection with its performance under this Reinsurance Trust Agreement.

**Section 4.3     Monthly Report.**  Within five (5) Business Days following the end of each calendar month, Trustee shall provide copies of activity reports to Beneficiary and Grantor, which reports shall show all deposits, withdrawals and substitutions during such calendar month, and a listing of securities and other Assets held and cash and cash equivalent balances in the Reinsurance Trust Account as of the end of such calendar month.  Trustee agrees to provide written notification to Grantor and Beneficiary within five (5) Business Days, which notice may be satisfied via online access or otherwise, of any deposits to or withdrawals from the Reinsurance Trust Account.

**Section 4.4     Reliance on Authority.**  Unless otherwise provided in this Reinsurance Trust Agreement, Trustee is authorized to follow and rely upon all instructions given by officers of Grantor or Beneficiary and by attorneys-in-fact acting under written authority furnished to Trustee by Grantor or Beneficiary, including, without limitation, instructions given by letter, facsimile transmission or electronic media, if Trustee believes such instructions to be genuine and to have been signed, sent or presented by the proper Party or Parties.

**Section 4.5     Charges of Trustee.**  Grantor agrees to pay all reasonable costs, fees and expenses charged by Trustee for acting as Trustee pursuant to this Reinsurance Trust Agreement, including reasonable costs, fees and expenses incurred by Trustee for legal services deemed necessary by Trustee as a result of Trustee's so acting; provided however, that no such costs, fees or expenses shall be paid out of the Assets.  The provisions of this Section 4.5 shall survive the termination of this Reinsurance Trust Agreement or the earlier resignation or removal of Trustee.

**Section 4.6     Indemnification of Trustee.**  Grantor and Beneficiary jointly and severally hereby indemnify Trustee for, and hold it harmless against, any loss, liability, costs or expenses (including attorney's fees and expenses) incurred or made without negligence, willful misconduct or lack of good faith on the part of Trustee, arising out of or in connection with the performance of its obligations hereunder, including, but not limited to, any loss, liability, costs or expenses arising out of or in connection with the status of Trustee and its nominee as the holder of record of the Assets.  Grantor and Beneficiary hereby acknowledge that the foregoing indemnities shall survive the resignation or discharge of Trustee or the termination of this Reinsurance Trust Agreement.

**Section 4.7     Resignation or Removal of Trustee.**  Trustee may resign upon delivery to Beneficiary and Grantor of a written notice of resignation, effective not less than ninety (90) calendar days after delivery to Beneficiary and Grantor in accordance with the terms of Section 6.6 hereof.  Grantor may remove Trustee by delivery to Trustee and Beneficiary of a written notice of removal, effective not less than ninety (90) days after delivery to Trustee and Beneficiary in accordance with the terms of Section 6.6 hereof.  No such resignation or removal shall be effective unless a successor trustee has been duly appointed and approved by

10

Beneficiary and Grantor, or as appointed by a court of competent jurisdiction pursuant to the terms of this Section 4.7, and all Assets in the Reinsurance Trust Account have been duly transferred to the successor trustee. Notwithstanding anything herein to the contrary, if Beneficiary and Grantor have failed to appoint a successor trustee prior to the expiration of ninety (90) days following the delivery of such notice of resignation or removal, the Trustee may petition any court of competent jurisdiction for the appointment of a successor trustee or for other appropriate relief, and any such resulting appointment shall be binding upon Beneficiary and Grantor.

### Section 4.8    Additional Trustee Provisions.

(a)    No provision of this Reinsurance Trust Agreement shall require Trustee to take any action that would result in any violation of applicable law. Anything in this Reinsurance Trust Agreement to the contrary notwithstanding, in no event shall Trustee be liable under or in connection with this Reinsurance Trust Agreement for indirect, special, incidental, punitive or consequential losses or damages of any kind whatsoever, including but not limited to lost profits, whether or not foreseeable, even if Trustee has been advised of the possibility thereof and regardless of the form of action in which such damages are sought.



(b)    Trustee shall not be responsible for the existence, genuineness or value of any of the Assets or for the validity, perfection, priority or enforceability of the liens in any of the Assets, whether impaired by operation of law or by reason of any action or omission to act on its part hereunder, except to the extent such action or omission constitutes negligence, bad faith or willful misconduct on the part of Trustee, for the validity of title to the Assets, for insuring the Assets or for the payment of taxes, charges, assessments or liens upon the Assets.

(c)    Trustee may confer with counsel of its own choice in relation to matters arising under this Reinsurance Trust Agreement and shall have full and complete authorization from the other Parties hereunder for any action taken or suffered by it under this Reinsurance Trust Agreement or under any transaction contemplated hereby in good faith and in accordance with opinion of such counsel.

(d)    Trustee shall not be required to use its own funds in the performance of any of its obligations or duties or the exercise of any of its rights or powers.

### Article V
### Term; Termination

**Section 5.1    Term; Termination.** This Reinsurance Trust Agreement shall be effective as of the Effective Date and until terminated upon the first to occur of:

(a)    The giving of thirty (30) calendar days' advance written notice by Trustee to Beneficiary that the Reinsurance Trust Account contains no Assets; or

(b)    The provision of sixty (60) calendar days' advance written notice sent to Trustee jointly by Grantor and Beneficiary.

**Section 5.2    Effect of Termination.** Upon termination of this Reinsurance Trust Agreement pursuant to Section 5.1 hereof, Trustee shall, with Beneficiary's prior written consent, transfer to Grantor all of the Assets of the Reinsurance Trust Account not previously

11

withdrawn by Beneficiary and Trustee shall take any and all steps necessary to transfer unequivocally all right, title and interest in such Assets and to deliver physical custody, if applicable, in such Assets to Grantor or as otherwise directed by Grantor.

## Article VI
## Miscellaneous Provisions

**Section 6.1     Assignment and Delegation.** This Reinsurance Trust Agreement may not be assigned, and the duties and obligations hereunder may not be delegated, by any Party unless such assignment or delegation is agreed to in advance in writing by all Parties hereto; provided, however, that Grantor shall have the right to assign or delegate its duties and obligations with respect to managing the investments in the Reinsurance Trust Account to an Affiliate without the prior written consent of Beneficiary or Trustee. Any assignment in violation of this Section 6.1 shall be void and shall have no force and effect. This Reinsurance Trust Agreement shall be binding on the Parties, their permitted assignees, delegates and successors.

**Section 6.2     Construction.** The headings of Articles and Sections in this Reinsurance Trust Agreement are provided for convenience only and shall not affect its construction or interpretation. All references to "Articles" and "Sections" refer to the corresponding Articles and Sections of this Reinsurance Trust Agreement. All words used in this Reinsurance Trust Agreement shall be construed to be of such gender or number as the circumstances require. Unless otherwise expressly provided, the word "including" does not limit the preceding words or terms.



**Section 6.3     Counterparts.** This Reinsurance Trust Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original copy of this Reinsurance Trust Agreement and all of which, when taken together, shall be deemed to constitute one and the same agreement. The exchange of copies of this Reinsurance Trust Agreement and of signature pages by facsimile or other electronic transmission shall constitute effective execution and delivery of this Reinsurance Trust Agreement as to the Parties and may be used in lieu of the original agreement for all purposes. Signatures of the Parties transmitted by facsimile shall be deemed to be their original signatures for all purposes.

**Section 6.4     Entire Agreement.** This Reinsurance Trust Agreement supersedes all prior agreements, whether written or oral, among the Parties with respect to its subject matter and constitutes (along with the attached exhibit(s)) a complete and exclusive statement of the terms of the agreement among the Parties with respect to its subject matter. This Reinsurance Trust Agreement may not be amended, supplemented or otherwise modified except by a written agreement that identifies itself as an amendment to this Reinsurance Trust Agreement executed by the Parties.

## Section 6.5     Governing Law; Waiver of Jury Trial.

(a)     This Reinsurance Trust Agreement shall be construed in accordance with the laws of the State of Delaware without giving effect to the principles of conflicts of law thereof.

12

      (b)     EACH PARTY HERETO EXPRESSLY WAIVES THE RIGHT TO TRIAL BY JURY IN RESOLVING ANY CLAIM OR COUNTERCLAIM RELATING TO OR ARISING OUT OF THIS REINSURANCE TRUST AGREEMENT.

      **Section 6.6**    **Notices.** All notices and other communications required or permitted by this Reinsurance Trust Agreement shall be in writing and shall be effective, and any applicable time period shall commence when (a) delivered to the following address by hand or by nationally recognized overnight courier service (cost prepaid) or (b) transmitted electronically to the following facsimile numbers or e-mail addresses with confirmation of receipt of transmission, in each case marked to the attention of the respective person (by name or title) designated below (or to such other address, facsimile number, e-mail address, or person as a Party may designate by notice to the other Parties):

      (a)     If to Beneficiary:



         Universal Life Insurance Company
         PO Box 2145
         San Juan, PR 00922-2145
         Attention: Jose Benitez, President
         Telephone No.:  787-706-7339
         Facsimile No.:  787-625-7095
         E-mail Address:  jobenitez@universalpr.com

         With a copy to:

         Universal Life Insurance Company
         PO Box 71338
         San Juan, PR 00936-8438
         Attention: Josely Vega, Chief Legal Counsel
         Telephone No.:  787-706-7321
         Facsimile No.:  787-620-4264
         E-mail Address:  jvega@universalpr.com

      (b)     If to Grantor:

         Private Bankers Life and Annuity Co., Ltd.
         Canon's Court
         22 Victoria Street
         Hamilton, Bermuda HM 12
         Attention: Scott Boug
         Telephone No.: 919-907-2662
         E-mail Address: scott.boug@globalbankers.com

         With a copy to:

         Global Bankers Insurance Group
         2327 Englert Drive

13

Durham, NC 27713
Attention: Tamre Edwards, General Counsel
Telephone No.: 919-205-0669
E-mail Address: tamre.edwards@globalbankers.com

(c)     If to Trustee:

Wilmington Trust, National Association
Attention: Corporate Trust Administration
Telephone No.: 302-636-5216
Facsimile No.: 302-636-4149
E-mail Address dyoung@wilmingtontrust.com

**Section 6.7     Other Instruments.** The Parties shall promptly execute and deliver all additional instruments and shall promptly take all reasonable actions in order to carry out the purposes of this Reinsurance Trust Agreement.

**Section 6.8     Severability.** If any provision of this Reinsurance Trust Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Reinsurance Trust Agreement shall remain in full force and effect. Any provision of this Reinsurance Trust Agreement held invalid or unenforceable only in part or degree shall remain in full force and effect to the extent not held invalid or unenforceable.

**Section 6.9     Waiver of Breach.** Neither the failure nor any delay on the part of any Party to exercise any right, remedy, power or privilege under this Reinsurance Trust Agreement shall operate as a waiver thereof. No single or partial exercise of any right, remedy, power or privilege shall preclude the further exercise of that right, remedy, power or privilege or the exercise of any other right, remedy, power or privilege. No waiver of any right, remedy, power or privilege with respect to any occurrence shall be construed as a waiver of that right, remedy, power or privilege with respect to any other occurrence. No waiver shall be effective unless it is in writing and signed by the Party granting the waiver.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK;
SIGNATURES APPEAR ON FOLLOWING PAGE]

14

IN WITNESS WHEREOF, the Parties have caused this Reinsurance Trust Agreement to be executed by their respective duly authorized officers on the dates indicated below with an Effective Date of June 30, 2017.

**GRANTOR:**

PRIVATE BANKERS LIFE AND ANNUITY CO., LTD.

By: _____ Date: _____ 6/30/17 _____

Name: Paul Brown

Title: **Director**

**BENEFICIARY:**

UNIVERSAL LIFE INSURANCE COMPANY

By: _____ Date: _____

Name:

Title:

**TRUSTEE:**

WILMINGTON TRUST, NATIONAL ASSOCIATION

By: _____ Date: _____

Name:

Title:

IN WITNESS WHEREOF, the Parties have caused this Reinsurance Trust Agreement to be executed by their respective duly authorized officers on the dates indicated below with an Effective Date of June 30, 2017.

**GRANTOR:**

PRIVATE BANKERS LIFE AND ANNUITY CO., LTD.

By: _____     Date: _____
Name:
Title:

**BENEFICIARY:**

UNIVERSAL LIFE INSURANCE COMPANY

By: _____     Date: _____
Name:
Title:

**TRUSTEE:**

WILMINGTON TRUST, NATIONAL ASSOCIATION

By: _____     Date: _____
Name:         David B. Young
Title:         Vice President

IN WITNESS WHEREOF, the Parties have caused this Reinsurance Trust Agreement to be executed by their respective duly authorized officers on the dates indicated below with an Effective Date of June 30, 2017.

**GRANTOR:**

PRIVATE BANKERS LIFE AND ANNUITY CO., LTD.

By: _____     Date: _____
Name:
Title:

**BENEFICIARY:**

UNIVERSAL LIFE INSURANCE COMPANY

By: _____     Date:  6 - 30 - 17
Name:
Title:  Jose E Benitez
        President

**TRUSTEE:**

WILMINGTON TRUST, NATIONAL ASSOCIATION

By: _____     Date: _____
Name:
Title:

# EXHIBIT A

## INVESTMENT GUIDELINES

The following classes of Assets shall be considered Qualifying Trust Assets with regard to this Reinsurance Trust Agreement:



**Statement of Policy**

Private Bankers Life and Annuity Co., Ltd.'s (the "Company") investment portfolio will be managed to support the Company's commitment to earn consistent and steadily increasing investment income. Our overall objective is to maintain a high quality investment portfolio structured to provide the highest level of investment income consistent with the economic and interest rate environment and respective market sector selection. Additionally, the Company shall ensure it is always in compliance with all applicable regulatory requirements including but not limited to Title Twenty Six Insurance Subtitle 1 Insurance Generally Chapter 6B Investments of the Insurance Code of Puerto Rico ("Chapter 6").

The more specific objectives of the Company's investment strategy are (in priority order):

1.      Safety – to seek capital preservation through appropriate asset allocation, security selection and diversification strategies.

2.      Liquidity – to continuously maintain an ability to meet any foreseeable cash needs of the Company.

3.      Investment Income – to maximize the after-tax, risk-adjusted investment income, either in the form of interest and dividend income or in the form of capital gain, within the constraints set forth in this policy statement.

This is important as it provides a secure, stable source of income and principal preservation while maintaining a strong balance sheet for the benefit of policyholders, regulators, rating agencies and the stakeholder.

The Company will maintain assets in accordance with the Bermuda Monetary Authority's ("BMA") Insurance Act ("the Act"), specifically ensuring that the Company maintains at least the minimum margin of solvency and at least the minimum liquidity ratio.

**Pricing and Valuation**

Valuation procedures, documentation and other relevant information must be clearly presented.

Holdings will be valued according to the Fair Market Value Methods.

All current applicable investment guidelines, limits and restrictions are subject to change by regulator. PBLA must constantly monitor and review Chapter 6 of the Insurance Code of Puerto Rico for any update.

## Appointment of Investment Committee

The Company's Board of Directors (the "BOD") has appointed an Investment Committee (the "Committee"). The Committee, with the approval of the BOD, may engage the services of an investment manager or investment managers to manage all or a portion of the investment portfolio. An investment manager may be an affiliate of the Company. The Committee shall determine investment portfolio strategies for the Company that are within the parameters of this policy. The Committee, with the approval of the BOD, may employ the help of investment manager(s) in developing investment portfolio strategies. The BOD shall be advised and furnished a list of all investment transactions quarterly at its regular BOD meeting to assure adherence to this policy.

The BOD has final responsibility and authority for the overall affairs of the Company including the investment portfolio. This policy has been adopted by the BOD and shall be reviewed and approved by the BOD on an annual basis. Any change in this policy requires BOD approval. This policy is to serve as a general framework within which the portfolio is to be managed. However, requirements of Bermuda and Puerto Rico insurance law are to be followed at all times.

## Investment Portfolio Structure and Compliance Guidelines

The structure of the investment portfolio and the amounts invested will be determined by the President of the Company, Chief Investment Officer of the Company and the Committee. The Committee, with the approval of the BOD, may employ the help of an investment manager or managers in determining the structure of the investment portfolio and the amounts invested. All decisions pertaining to the Company's investment policy will be made in regard to the Company's ongoing liquidity requirements, statutory reserve requirements and tax status. The portfolio shall adhere to Chapter 6 and may include the following security types:

I.    Money Market Securities

II.   U.S. Treasury and Federal Agency Securities

III.  Stripped Principal, Stripped Coupons and Treasury Receipts

V.    Municipal Securities

V.    Corporate Debt Obligations

VI.   Mortgage-Backed, Asset-Backed Securities and Mortgage Loans

VII.  Private or Direct Placement Securities

VIII. Equity Securities – Common and Preferred Stocks

IX.   Wholly Owned Insurance Subsidiaries

X.    Real Estate

XVI.    Investments outside of the U.S.

Should the Company be notified of non-compliance with these guidelines, the Company shall have thirty (30) days from the time of the notification to cure the non-compliance.

## Appendix A – Compliance Considerations – Puerto Rico Regulations

| Asset Type Limits | Limit (%) |
|---|---|
| % Preferred Debt | 100 |
| % Cash Equivalents | 100 |
| % Corporate Debt | 40 |
| % Preferred Equity | 40 |
| % Common Equity | 30 |
| % Unregistered Equity | 5 |
| % Combined of Preferred, Common, and Unregistered Equity | 40 |
| | |
| **Rating Based Limits (applicable to certain asset classes as provided in Chapter 6)** | |
| % High grade (A- and better) | 40 |
| % Medium grade (BBB- to BBB+) | 20 |
| % Low rated (below BBB-) | 0 |
| % Unrated (applies to certain asset classes as per Chapter 6) | 5 |
| | |
| **Foreign Investment Limits** | |
| % Canadian Investments | 20 |
| % Total foreign issuers (excludes Canada) | 20 |
| % Per foreign jurisdiction, SVO 1 rating (excludes Canada) | 5 |
| | |
| **Foreign currency limits** | |
| Total Portfolio | 5 |
| | |
| **Issuer based limits (excludes preferred debt)** | |
| % Assets issued by a single entity | 5 |
| % Voting shares of a corporation | 5 |
| | |
| **Additional Investment Authority** | |
| % of admitted assets | 5 |

## Appendix B – Target Portfolio

| Asset Type Target | Target (%) |
|---|---|
| % Preferred Debt | 35 |
| % Cash Equivalents | 15 |
| % Corporate Debt | 40 |
| % Preferred Equity | 10 |
| % Common Equity | 0 |
| % Unregistered Equity | 0 |



| Rating Based Target (for credit investments) | |
|---|---|
| % High grade (A- and better) | 40 |
| % Medium grade (BBB- to BBB+) | 20 |
| % Low rated (below BBB-) | 0 |
| % Unrated (applies to certain asset classes as per Chapter 6) | 0 |

| Foreign Investment Targets | |
|---|---|
| % Canadian Investments | 5 |
| % Total foreign issuers (excludes Canada) | 15 |
| % Per foreign jurisdiction, SVO 1 rating (excludes Canada) | 5 |

| Foreign currency targets | |
|---|---|
| Total Portfolio | 1 |

## EXHIBIT B

### BENEFICIARY WITHDRAWAL NOTICE

From: Universal Life Insurance Company ("Beneficiary")
To:    [_____] (the "Trustee")
Date: [ ]

Re:    Trust Agreement dated as of [DATE], among Private Bankers Life and Annuity Co, Ltd. (the "Grantor"), the Beneficiary, and the Trustee (as amended, modified, or supplemented from time to time, the "Reinsurance Trust Agreement")

To Whom It May Concern:

We hereby give you notice pursuant to Section 3.1(b) of the Reinsurance Trust Agreement that the Beneficiary is entitled to withdraw the [cash or Assets with Fair Market Value in the amount of $_____] from the Reinsurance Trust Account for the following purposes permitted under Section 3.1(a) of the Trust Agreement:

*[Specify basis for issuance of Beneficiary Withdrawal Notice]*.

Payment or delivery should be immediately made to *[Insert account information]* by the following method:

*[Describe method of cash transfer and/or Assets to be withdrawn and delivery instructions]*.

Capitalized terms used herein but not defined herein shall have their respective meanings in the Reinsurance Trust Agreement.

Sincerely,
Universal Life Insurance Company

By:   _____
Name:
Title:

## EXHIBIT C

## GRANTOR WITHDRAWAL NOTICE

From: Private Bankers Life and Annuity Co, Ltd. ("Grantor")
To:     [_____] (the "Trustee")
Date: [ ]

Re:     Trust Agreement dated as of [DATE], among Grantor, Universal Life Insurance Company, and the Trustee (as amended, modified, or supplemented from time to time, the "Reinsurance Trust Agreement")

To Whom It May Concern:

We hereby give you notice pursuant to Section 3.1(c) of the Reinsurance Trust Agreement that the Grantor is entitled to withdraw the [cash or Assets with Fair Market Value in the amount of $_____] from the Reinsurance Trust Account for the following purposes permitted under Section 3.1(e) of the Trust Agreement:

> [*Specify basis for issuance of Beneficiary Withdrawal Notice]*].

Payment or delivery should be immediately made to [*Insert account information*] by the following method:

> [*Describe method of cash transfer and/or Assets to be withdrawn and delivery instructions*].

Capitalized terms used herein but not defined herein shall have their respective meanings in the Reinsurance Trust Agreement.


Sincerely,
Private Bankers Life and Annuity Co., Ltd.

By:     _____
Name:
Title:

Consented to by:

Universal Life Insurance Company

By:     _____
Name:
Title:
Date:

EXHIBIT C – COMFORT TRUST AGREEMENT

COMFORT TRUST AGREEMENT

BY AND AMONG

UNIVERSAL LIFE INSURANCE COMPANY,

PRIVATE BANKERS LIFE AND ANNUITY CO., LTD.

AND

WILMINGTON TRUST, NATIONAL ASSOCIATION



# TABLE OF CONTENTS

Article I Definitions .................................................................................................................. 2

Article II Creation of Trust Account; Deposit of Assets ......................................................... 5

      Section 2.1     Creation of Trust Account ........................................................ 5

      Section 2.2     Deposit of Assets ...................................................................... 5

Article III Withdrawal or Transfer of Assets; Maintenance of the Trust Account; Trust Income .. 7

      Section 3.1     Withdrawal and Transfer of Assets .......................................... 7

      Section 3.2     Maintenance of the Trust Account ............................................ 8

      Section 3.3     Trust Income ............................................................................ 9

Article IV Duties of Trustee ................................................................................................... 9

      Section 4.1     Right to Vote Assets and Payments of Dividends and Interest ... 9

      Section 4.2     Responsibilities of Trustee ....................................................... 9

      Section 4.3     Monthly Report ...................................................................... 10

      Section 4.4     Reliance on Authority ............................................................ 10

      Section 4.5     Charges of Trustee ................................................................. 10

      Section 4.6     Indemnification of Trustee ..................................................... 10

      Section 4.7     Resignation or Removal of Trustee ........................................ 10

      Section 4.8     Additional Trustee Provisions ............................................... 11

Article V Term; Termination .................................................................................................. 11

      Section 5.1     Term; Termination .................................................................. 11

      Section 5.2     Effect of Termination ............................................................. 11

Article VI Miscellaneous Provisions ..................................................................................... 12

      Section 6.1     Assignment and Delegation .................................................... 12

      Section 6.2     Construction ............................................................................ 12

      Section 6.3     Counterparts ........................................................................... 12

      Section 6.4     Entire Agreement ................................................................... 12

      Section 6.5     Governing Law ....................................................................... 12

      Section 6.6     Notices ................................................................................... 13

      Section 6.7     Other Instruments .................................................................. 14

      Section 6.8     Severability ............................................................................ 14

      Section 6.9     Waiver of Breach ................................................................... 14

dms.us.53161234.02

# COMFORT TRUST AGREEMENT

This COMFORT TRUST AGREEMENT (this "Comfort Trust Agreement") is made and entered into by and among UNIVERSAL LIFE INSURANCE COMPANY, a Puerto Rico stock life insurance company ("Beneficiary"), PRIVATE BANKERS LIFE AND ANNUITY CO., LTD., a Bermuda stock life reinsurance company ("Grantor"), and Wilmington Trust, National Association, a national banking association ("Trustee"). Beneficiary, Grantor and Trustee are sometimes hereinafter referred to individually as a "Party" and collectively as the "Parties."

## AGREEMENT

WHEREAS, Grantor and Beneficiary have entered into that certain Coinsurance Reinsurance Agreement, dated as of June 30, 2017 (the "Reinsurance Agreement"), pursuant to which Grantor has agreed to provide security to the Beneficiary for the payment of amounts due under the Reinsurance Agreement by Grantor to the Beneficiary;



WHEREAS, Grantors and Beneficiary desire to enter into this Comfort Trust Agreement and create a trust account (the "Comfort Trust Account") with the Trustee for the benefit of the Beneficiary to hold cash and assets (the "Assets") as security for the payment of certain amounts due under the Reinsurance Agreement by Grantor to the Beneficiary;

WHEREAS, the Trustee has agreed to act as Trustee hereunder, and to hold Assets in the Comfort Trust Account for the sole use and benefit of the Beneficiary in accordance with the terms and conditions of this Comfort Trust Agreement; and

NOW, THEREFORE, in consideration of the mutual benefits to be received by the Parties and the mutual covenants and agreements contained herein, the Parties agree as follows:

## Article I
## Definitions

As used in this Comfort Trust Agreement, the following terms shall have the meanings set forth herein:

"Affiliate" of any Person means another Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with, such first Person. For purposes of this definition, "control", when used with respect to any Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities by contract or otherwise, and the terms "controlling" and "controlled" have the meanings correlative to the foregoing.

"Applicable Law" means any law, statute, ordinance, code, written rule or regulation, order, writ, injunction, judgment, decree, ruling, constitution, or treaty enacted, promulgated, issued, enforced, or entered by any Governmental Entity applicable to any Person or such Person's businesses, properties, or assets, as may be amended from time to time.

2

"Assets" shall have the meaning ascribed to it in the Recitals.

"Beneficiary" shall have the meaning ascribed to it in the Preamble and shall include any successor of Beneficiary by operation of law, including, without limitation, any liquidator, rehabilitator, receiver or conservator.

"Designee" shall have the meaning ascribed to it in Section 3.1(e) hereof.

"Beneficiary Withdrawal Notice" shall have the meaning ascribed to it in Section 3.1(a) hereof.

"Book Value" shall mean, with respect to assets in the trust accounts, at any date of determination, the amount stated for such assets on Grantor's statutory financial statements determined in accordance with then applicable statutory accounting principles and the requirements of the Applicable Laws of their respective domiciliary jurisdictions.

"Business Day" means any day other than a Saturday, Sunday or any other day on which banking institutions in Durham, North Carolina, Hamilton, Bermuda or San Juan, Puerto Rico are required o authorized by applicable law to be closed.

"Comfort Trust Account" means the trust account established pursuant to Section 2.1. The name of the Comfort Trust Account shall be: PBLA ULICO 2017 Comfort Trust and its Tax Identification Number shall be: xx-xxxxxxx.

"Comfort Trust Agreement" shall have the meaning ascribed to it in the Preamble.

"Cure Period" shall mean (i) a period of thirty (30) calendar days following notice from the Beneficiary in accordance with Section 2.2(e) hereof during which the Grantor shall be allowed to add Assets to the Reinsurance Trust Account or the Comfort Trust Account, as applicable, in order to bring the value of Assets in the applicable trust account into compliance with the requirements of Section 3.2 of this Comfort Trust Agreement, (ii) a period of ten (10) calendar days following notice from the Beneficiary in accordance with Section 2.2(f) hereof during which the Grantor shall be allowed to add Assets to the Reinsurance Trust Account or the Comfort Trust Account, as applicable, in order to bring the value of Assets in the applicable trust account into compliance with the requirements of Section 3.2 of this Comfort Trust Agreement or (iii) such other cure period provided in any provision of this Comfort Trust Agreement.

"Effective Date" shall have the meaning ascribed to it on the signature page hereto.

"Fair Market Value" shall mean, with respect to any asset, the fair market value thereof as determined by Grantor in good faith in accordance with the Fair Market Value Methods.

"Fair Market Value Methods" means the methodologies, procedures and policies that the Grantor uses as of the relevant date of determination to determine the fair market value of an asset in its general account for financial reporting purposes; provided, however, that to the extent that the foregoing methodologies, procedures and policies do not contemplate or are not

3

applicable to a particular asset class, the Fair Market Value Methods applicable to such asset shall be determined using the asset classifications prescribed by the Financial Accounting Standards Board as follows: (i) Level 1 assets will be valued using unadjusted, quoted prices for identical assets in an active market; (ii) Level 2 assets will be valued using a model that has been verified by a qualified independent securities valuation firm and the inputs to that model will be observable either directly or indirectly for substantially the full term of the asset; and (iii) Level 3 assets will be valued using a model that has been verified by a qualified independent securities valuation firm and the inputs to that model will reflect management's assumptions that reflect reasonable assumptions a market participant would use in the pricing the same asset. For the purposes of this Reinsurance Trust Agreement, the Parties acknowledge and agree that Cap-Val-American Business Appraisers, LLC and FactSet Research Systems, Inc. will each be an acceptable "qualified independent securities valuation firm" for purposes of determining Fair Market Value hereunder.

"Grantor" shall have the meaning ascribed to it in the Preamble.

"Grantor Withdrawal Notice" shall have the meaning ascribed to it in Section 3.1(e) hereof.

"Governmental Entity" means any national, state, municipal or local government, any instrumentality, subdivision, court, arbitrator or arbitrator panel, regulatory or administrative agency or commission, or other authority thereof, or any regulatory or quasi-regulatory organization or private body exercising any regulatory, taxing, importing or other governmental or quasi-governmental authority.

"Insurance Policy" shall have the meaning provided for such term in the Reinsurance Agreement.

"Investment Guidelines" means the investment guidelines attached hereto as Exhibit A.

"Investment Manager" shall have the meaning ascribed to it in Section 3.2(b) hereof.

"Overcollateralization Trigger" shall have the meaning provided for such term in the Reinsurance Agreement.

"Party" or "Parties" shall have the meaning ascribed to it in the Preamble.

"Person" means any individual, corporation, partnership, limited partnership, joint venture, Limited Liability Company, trust or unincorporated organization or Governmental Entity or any other entity.

"Qualifying Trust Assets" means cash (United States legal tender), certificates of deposit (issued by a United States bank and payable in United States legal tender), and investments permitted by the Puerto Rico Insurance Code; provided, however, that such investments are issued by an institution that is not the parent, a subsidiary or an affiliate of either Grantor or Beneficiary; and, provided further, that the investments comply with the Investment

4

Guidelines, as the same may be amended from time to time upon written notice by Beneficiary and Grantor to Trustee.

"Recapture Triggering Event" shall have the meaning provided for such term in the Reinsurance Agreement.

"Reinsurance Agreement" shall have the meaning ascribed to it in the Preamble.

"Reinsurance Trust Account" means the trust account established pursuant to Section 2.1. The name of the Reinsurance Trust Account shall be: PBLA ULICO 2017 and its Tax Identification Number shall be: xx-xxxxxxx.

"Reinsurance Trust Agreement" means the reinsurance trust agreement entered into by and among the Grantor, the Beneficiary and the Trustee dated as of June 30, 2017.

"Statutory Reserve" shall have the meaning provided for such term in the Reinsurance Agreement.

"Trustee" shall have the meaning ascribed to it in the Preamble.

## Article II
## Creation of Trust Account; Deposit of Assets

### Section 2.1    Creation of Trust Account.

(a)    Grantor hereby establishes the Comfort Trust Account with Trustee for the sole use and benefit of Beneficiary, under the terms set forth herein. Trustee shall administer the Comfort Trust Account in its name as Trustee for the sole use and benefit of Beneficiary. The Comfort Trust Account shall be subject to withdrawal by Beneficiary solely as provided herein. Trustee hereby accepts the Comfort Trust Account upon the terms set forth in this Comfort Trust Account.

(b)    Prior to depositing the Assets in the Comfort Trust Account, and from time to time thereafter as required, Grantor shall execute or cause the execution of assignments, endorsement in blank, or transfer legal title to Trustee of all shares, obligations or other Assets requiring assignments, so that Beneficiary, or Trustee upon direction by Beneficiary, may whenever necessary negotiate any such Assets, without the consent or signature from Grantor or any other person or entity. Any Assets received by Trustee which are not in such proper negotiable form shall not be accepted by Trustee and shall be returned to Grantor as unacceptable. Trustee may hold Assets of the Comfort Trust Account in bearer form or in its own name or that of a nominee.

### Section 2.2    Deposit of Assets.

(a)    On or before the Effective Date, Grantor shall deposit in the Comfort Trust Account Assets that comply with the Investment Guidelines (the "Qualifying Trust Assets") with an aggregate Book Value equal to three percent (3%) of the Statutory Reserve as of the Effective Date. The Assets deposited in the Comfort Trust Account shall be valued according to their current Book Value, shall consist only of Qualifying Trust Assets and shall be

5

invested in accordance with the Investment Guidelines or as otherwise mutually agreed in writing by Grantor and Beneficiary.

(b)     Trustee will accept and credit to the Comfort Trust Account all Assets which from time to time are delivered to it for deposit in the Comfort Trust Account by or on behalf of Grantor or Beneficiary. Trustee may deposit any Qualifying Trust Assets in the Comfort Trust Account in a book-entry account maintained at the Federal Reserve Bank of New York or in depositories selected with due care (such as The Depository Trust Company). Trustee is authorized and shall have the power to receive such Assets and to hold, invest, reinvest and dispose of the same for the uses and purposes of and according to the provisions herein set forth. All Assets shall be maintained by Trustee in the Comfort Trust Account separate and distinct from all other assets under the control of or on the books of Trustee and shall, to the extent applicable, be received and continuously kept in a safe place at Trustee's office within the United States of America

(c)     Grantor shall ensure that (i) any Assets transferred to Trustee for deposit in the Comfort Trust Account will be in such form that Beneficiary, or Trustee upon direction by Beneficiary, may whenever necessary negotiate any such Assets, without consent or signature from Grantor or any other person or entity in accordance with the terms of this Comfort Trust Account, (ii) all Assets transferred to Trustee for deposit in the Comfort Trust Account will consist only of Qualifying Trust Assets, and (iii) each such Asset shall be at the time of transfer free and clear of all claims, liens, interests and encumbrances whatsoever (other than those arising under this Comfort Trust Account).

(d)     Grantor shall have the responsibility to determine whether the Assets in the Comfort Trust Account are sufficient to secure Grantor's obligations to Beneficiary. Furthermore, Trustee shall have no responsibility whatsoever to determine whether Assets transferred to the Comfort Trust Account constitute Qualifying Trust Assets.

(e)     If, at the end of any calendar quarter, the sum of (i) the aggregate Fair Market Value of the Qualifying Trust Assets in the Reinsurance Trust Account and (ii) the aggregate Book Value of the Qualifying Trust Assets in the Comfort Trust Account is less than (A) one hundred and five percent (105%) of the Statutory Reserve or (B) one hundred and seven percent (107%) of the Statutory Reserves following an Overcollateralization Trigger, as of such calendar quarter end, then, within the applicable Cure Period, the Grantor shall cause to be deposited into the Reinsurance Trust Account and/or Comfort Trust Account, as applicable, such additional Assets as are necessary to ensure that (A) the aggregate Fair Market Value of the Qualifying Trust Assets in the Reinsurance Trust Account is no less than one hundred and two percent (102%) of the Statutory Reserve and (B) the aggregate Book Value of the Qualifying Trust Assets in the Comfort Trust Account is no less than (I) three percent (3%) of the Statutory Reserve or (II) five percent (5%) of the Statutory Reserves following an Overcollateralization Trigger.

(f)     If, at the end of any calendar quarter, the sum of (i) the aggregate Fair Market Value of the Qualifying Trust Assets in the Reinsurance Trust Account and (ii) the aggregate Book Value of the Qualifying Trust Assets in the Comfort Trust Account is less than one hundred percent (100%) of the Statutory Reserve as of such calendar quarter end, then, within the applicable Cure Period, the Grantor shall cause to be deposited into the Reinsurance Trust Account and/or Comfort Trust Account such additional Assets as are necessary to ensure that (A) the aggregate Fair Market Value of the Qualifying Trust Assets in the Reinsurance Trust Account

6

is no less than one hundred and two percent (102%) of the Statutory Reserve and (B) the aggregate Book Value of the Qualifying Trust Assets in the Comfort Trust Account is no less than (I) three percent (3%) of the Statutory Reserve or (II) five percent (5%) of the Statutory Reserves following an Overcollateralization Trigger.

**Article III**
**Withdrawal or Transfer of Assets; Maintenance of the Trust Account; Trust Income**

**Section 3.1**     **Withdrawal and Transfer of Assets.**

(a)    Beneficiary shall be permitted to withdraw Assets from the Comfort Trust Account only if (i) a Recapture Triggering Event has occurred and is continuing and (ii) Grantor has not paid an amount in full that is due and owing (or, if part of the amount is disputed, the undisputed portion) to Beneficiary under the Reinsurance Agreement and any applicable payment period respect thereof (or, to the extent of the portion of the payment under dispute, the dispute resolution period afforded Grantor has expired); and then only for the purpose reimbursing Beneficiary for undisputed amounts due by, but not yet recovered from Grantor under the Reinsurance Agreement in order to satisfy liabilities of Grantor under the Reinsurance Agreement.



(b)    Any such withdrawal made pursuant to Section 3.1(a) shall be limited to Assets having a Book Value not in excess of the undisputed amount then in default, and may be utilized and applied by the Beneficiary or any successor by operation of law (including any liquidator, rehabilitator, receiver, or conservator of the Beneficiary) without diminution because of insolvency on the part of the Beneficiary or Grantor only for such purpose. The Beneficiary shall have the right to withdraw Assets from the Comfort Trust Account with a Book Value not in excess of the amount the Beneficiary is permitted to withdraw from the Comfort Trust Account under the preceding two sentences upon written notice to the Trustee and the Grantor (a "Beneficiary Withdrawal Notice") in a form attached hereto as Exhibit B specifying the invested Assets or cash amount to be withdrawn. Each withdrawal from the Comfort Trust Account by the Beneficiary (i) shall constitute a representation and certification of the Beneficiary that such withdrawal is being made in accordance with the terms of the Reinsurance Agreement and this Comfort Trust Account, and (ii) shall be deemed to satisfy, to the extent of such withdrawn amount, the obligations of the Grantor in respect of which such withdrawal is made. If, notwithstanding the foregoing, a withdrawal is made in excess of the amount permitted by Section 3.1(a), such excess amount shall be deemed maintained in constructive trust for the benefit of the Grantor and promptly (but no more than three (3) Business Day) returned to the Grantor.

(c)    If (A) the aggregate Book Value of the Assets at the end of any calendar quarter exceeds (i) three percent (3%) of the Statutory Reserve as of such calendar quarter end or (ii) five percent (5%) of the Statutory Reserve as of such calendar quarter end following an Overcollateralization Trigger, and (B) the sum of (x) the aggregate Fair Market Value of the Assets in the Reinsurance Trust Account and (y) the aggregate Book Value of the Assets in the Comfort Trust Account exceeds (I) one hundred and five percent (105%) of the Statutory Reserve at the end of any calendar quarter or (II) one hundred and seven percent (107%) of the Statutory Reserve at the end of any calendar quarter following an Overcollateralization Trigger, the Grantor shall have the right to withdraw Assets from the Comfort Trust Account, but only to

7

the extent of such excess. The Grantor shall have the right to withdraw Assets from the Comfort Trust Account pursuant to the preceding sentence upon the prior written consent of the Beneficiary, which consent shall not be unreasonably withheld or delayed and in each case within two (2) Business Days of a request for consent, and notice to the Trustee substantially in the form attached hereto as Exhibit C (a "Grantor Withdrawal Notice") specifying the Assets and/or cash amount to be withdrawn. Each withdrawal from the Comfort Trust Account by the Grantor shall constitute a representation and certification of the Grantor that such withdrawal is being made in accordance with the terms of the Reinsurance Agreement and this Agreement. Following such withdrawal, the aggregate Book Value of all Qualifying Trust Assets held in the Comfort Trust Account shall be at least equal to five percent (5%) of the Statutory Reserve as of such calendar quarter end referenced in the first sentence of this Section 3.1(e).

(d)     The Party withdrawing Assets (the "Withdrawing Party") as permitted pursuant to Section 3.1(b) or Section 3.1(d) may designate in the Beneficiary Withdrawal Notice or the Grantor Withdrawal Notice, as applicable (a "Withdrawal Notice"), a third party (the "Designee") to whom Assets specified therein shall be delivered. The Withdrawing Party need present no statement or document other than the Withdrawal Notice in order to withdraw any Assets.

(e)     Subject to Section 3.2 of this Comfort Trust Account, Trustee shall allow no substitution or withdrawal of any Asset from the Comfort Trust Account in the absence of a Withdrawal Notice.



### Section 3.2     Maintenance of the Trust Account.

(a)     Trustee shall surrender for payment all maturing Assets and all Assets called for redemption, deposit the principal amount of the proceeds of any such payment into the Comfort Trust Account and give notice via online access or otherwise to Beneficiary and Grantor of such action.

(b)     Subject to the receipt of Beneficiary's prior written consent, Grantor may appoint an investment manager (in such capacity, the "Investment Manager"), to make investment decisions in compliance with the Investment Guidelines with regard to the Assets held by Trustee in the Comfort Trust Account; provided, however, that Beneficiary hereby agrees that Standard Advisory Services, Ltd. or any other Affiliate of Grantor may be named Investment Manager without Beneficiary's prior written consent. Grantor shall promptly notify Trustee in writing of the termination of the appointment of any Investment Manager. From time to time, Grantor, or the Investment Manager, acting on behalf of Grantor, may instruct Trustee to invest Assets in the Comfort Trust Account in other Qualifying Trust Assets and to open brokerage accounts in the name of the trust with Trustee as signer. Trustee agrees to follow any investment instructions from the Investment Manager and, in the absence of such instructions or instructions from Grantor, Trustee shall not be required to take any action with respect to the investment of the Assets in the Comfort Trust Account. Grantor shall be responsible for ascertaining whether investments are "Qualifying Trust Assets" and Trustee shall have no liability with respect to such determination. Grantor shall have the right to withdraw from the Comfort Trust Account and transfer to Grantor all or any part of the Assets in the Comfort Trust Account, provided, that at the time of such withdrawal, Grantor shall, with the prior written consent of Beneficiary, replace the withdrawn Assets with other Qualifying Trust Assets having a Book Value at least equal in Book Value to the Assets withdrawn. Prior to any such

8

Case 1:20-cv-00000-LCB-JEP   Document 5   Filed 07/27/20   Page 84 of 123

substitution, Grantor shall certify to Beneficiary and Trustee in writing that as of the date of any substitution, the Book Value of Assets to be deposited into the Comfort Trust Account equals or exceeds the Book Value of Assets to be withdrawn from the Comfort Trust Account. Trustee shall have no responsibility whatsoever to determine the value of such substituted securities or that such substituted securities constitute Qualifying Trust Assets, and Trustee shall be fully protected in relying upon such certification from Grantor.

(c)     When Trustee is directed to deliver or receive Assets against payment, delivery will be made in accordance with generally accepted market practice.

(d)     Trustee shall keep full and complete records of the administration of the Comfort Trust Account. Grantor and Beneficiary may examine such records at any time during regular business hours through any person or persons duly authorized in writing by Grantor or Beneficiary.

Section 3.3     Trust Income. All payments of interest, dividends and other income in respect to the Assets in the Comfort Trust Account shall be promptly deposited into the Comfort Trust Account.

Article IV
Duties of Trustee

Section 4.1     Right to Vote Assets and Payments of Dividends and Interest. Trustee is hereby authorized, without prior notice to Grantor or Beneficiary, to demand payment of and collect all interest or dividends on the Assets comprising the Comfort Trust Account, if any. Trustee shall deposit all of such interest or dividends collected in the Comfort Trust Account. Subject to the other provisions of this Comfort Trust Agreement, Grantor shall have the full and unqualified right to direct Trustee to vote, and to execute consents, bond powers, stock powers, mortgage and title instruments and other instruments of transfer, pledge and release with respect to any Assets comprising the Comfort Trust Account.

Section 4.2     Responsibilities of Trustee.

(a)     Trustee, in the administration of the Comfort Trust Account, is to be bound solely by the express provisions herein and such further written and signed directions as the appropriate Party or Parties may, under the conditions herein provided, deliver to Trustee. Trustee shall be under no obligation to enforce Grantor's obligations under this Comfort Trust Agreement, except as otherwise expressly provided herein. Trustee shall be restricted to holding, operating and collecting the Assets comprising the Comfort Trust Account and the payment and distribution thereof for the purposes set forth in this Comfort Trust Agreement and the conservation and protection of such Assets and the administration thereof in accordance with the provisions of this Comfort Trust Agreement. Trustee is prohibited from using the corpus of the Comfort Trust Account for the purposes of paying compensation to, or reimbursing the expenses of, Trustee. Upon written request of Grantor or Beneficiary, Trustee further agrees to promptly forward to such Party a certified list and valuation of all Assets held in the Comfort Trust Account.

(b)     Trustee shall accept and open all mail directed to Grantor or Beneficiary in care of Trustee.

9

(c)     Trustee shall only be liable for its own negligence, willful misconduct or lack of good faith in connection with its performance under this Comfort Trust Agreement.

**Section 4.3     Monthly Report.** Within five (5) Business Days following the end of each calendar month, Trustee shall provide copies of activity reports to Beneficiary and Grantor, which reports shall show all deposits, withdrawals and substitutions during such calendar month, and a listing of securities and other Assets held and cash and cash equivalent balances in the Comfort Trust Account as of the end of such calendar month. Trustee agrees to provide written notification to Grantor and Beneficiary within five (5) Business Days of any deposits to or withdrawals from the Comfort Trust Account.

**Section 4.4     Reliance on Authority.** Unless otherwise provided in this Comfort Trust Agreement, Trustee is authorized to follow and rely upon all instructions given by officers of Grantor or Beneficiary and by attorneys-in-fact acting under written authority furnished to Trustee by Grantor or Beneficiary, including, without limitation, instructions given by letter, facsimile transmission or electronic media, if Trustee believes such instructions to be genuine and to have been signed, sent or presented by the proper Party or Parties.

**Section 4.5     Charges of Trustee.** Grantor agrees to pay all reasonable costs, fees and expenses charged by Trustee for acting as Trustee pursuant to this Comfort Trust Agreement, including reasonable costs, fees and expenses incurred by Trustee for legal services deemed necessary by Trustee as a result of Trustee's so acting; provided however, that no such costs, fees or expenses shall be paid out of the Assets. The provisions of this Section 4.5 shall survive the termination of this Comfort Trust Agreement or the earlier resignation or removal of Trustee.

**Section 4.6     Indemnification of Trustee.** Grantor and Beneficiary jointly and severally hereby indemnify Trustee for, and hold it harmless against, any loss, liability, costs or expenses (including attorney's fees and expenses) incurred or made without negligence, willful misconduct or lack of good faith on the part of Trustee, arising out of or in connection with the performance of its obligations hereunder, including, but not limited to, any loss, liability, costs or expenses arising out of or in connection with the status of Trustee and its nominee as the holder of record of the Assets. Grantor and Beneficiary hereby acknowledge that the foregoing indemnities shall survive the resignation or discharge of Trustee or the termination of this Comfort Trust Agreement.

**Section 4.7     Resignation or Removal of Trustee.** Trustee may resign upon delivery to Beneficiary and Grantor of a written notice of resignation, effective not less than ninety (90) calendar days after delivery to Beneficiary and Grantor in accordance with the terms of Section 6.6 hereof. Grantor may remove Trustee by delivery to Trustee and Beneficiary of a written notice of removal, effective not less than ninety (90) days after delivery to Trustee and Beneficiary in accordance with the terms of Section 6.6 hereof. No such resignation or removal shall be effective unless a successor trustee has been duly appointed and approved by Beneficiary and Grantor, or as appointed by a court of competent jurisdiction pursuant to the terms of this Section 4.7, and all Assets in the Comfort Trust Account have been duly transferred to the successor trustee. Notwithstanding anything herein to the contrary, if Beneficiary and Grantor have failed to appoint a successor trustee prior to the expiration of ninety (90) days

10

following the delivery of such notice of resignation or removal, the Trustee may petition any court of competent jurisdiction for the appointment of a successor trustee or for other appropriate relief, and any such resulting appointment shall be binding upon Beneficiary and Grantor..

### Section 4.8    Additional Trustee Provisions.

(a)    No provision of this Comfort Trust Agreement shall require Trustee to take any action which would result in any violation of applicable law. Anything in this Comfort Trust Agreement to the contrary notwithstanding, in no event shall Trustee be liable under or in connection with this Comfort Trust Agreement for indirect, special, incidental, punitive or consequential losses or damages of any kind whatsoever, including but not limited to lost profits, whether or not foreseeable, even if Trustee has been advised of the possibility thereof and regardless of the form of action in which such damages are sought.

(b)    Trustee shall not be responsible for the existence, genuineness or value of any of the Assets or for the validity, perfection, priority or enforceability of the liens in any of the Assets, whether impaired by operation of law or by reason of any action or omission to act on its part hereunder, except to the extent such action or omission constitutes negligence, bad faith or willful misconduct on the part of Trustee, for the validity of title to the Assets, for insuring the Assets or for the payment of taxes, charges, assessments or liens upon the Assets.



(c)    Trustee may confer with counsel of its own choice in relation to matters arising under this Comfort Trust Agreement and shall have full and complete authorization from the other Parties hereunder for any action taken or suffered by it under this Comfort Trust Agreement or under any transaction contemplated hereby in good faith and in accordance with opinion of such counsel.

(d)    Trustee shall not be required to use its own funds in the performance of any of its obligations or duties or the exercise of any of its rights or powers.

### Article V
### Term; Termination

**Section 5.1    Term; Termination.** This Comfort Trust Agreement shall be effective as of the Effective Date and until terminated upon the first to occur of:

(a)    The giving of thirty (30) calendar days' advance written notice by Trustee to Beneficiary that the Comfort Trust Account contains no Assets; or

(b)    The provision of sixty (60) calendar days' advance written notice sent to Trustee jointly by Grantor and Beneficiary.

**Section 5.2    Effect of Termination.** Upon termination of this Comfort Trust Agreement pursuant to Section 5.1 hereof, Trustee shall, with Beneficiary's prior written consent, transfer to Grantor all of the Assets of the Comfort Trust Account not previously withdrawn by Beneficiary and Trustee shall take any and all steps necessary to transfer unequivocally all right, title and interest in such Assets and to deliver physical custody, if applicable, in such Assets to Grantor or as otherwise directed by Grantor.

11

## Article VI
## Miscellaneous Provisions

**Section 6.1     Assignment and Delegation.** This Comfort Trust Agreement may not be assigned, and the duties and obligations hereunder may not be delegated, by any Party unless such assignment or delegation is agreed to in advance in writing by all Parties hereto; provided, however, that Grantor shall have the right to assign or delegate its duties and obligations with respect to managing the investments in the Comfort Trust Account to an Affiliate without the prior written consent of Beneficiary or Trustee. Any assignment in violation of this Section 6.1 shall be void and shall have no force and effect.. This Comfort Trust Agreement shall be binding on the Parties, their permitted assignees, delegates and successors.

**Section 6.2     Construction.** The headings of Articles and Sections in this Comfort Trust Agreement are provided for convenience only and shall not affect its construction or interpretation. All references to "Articles" and "Sections" refer to the corresponding Articles and Sections of this Comfort Trust Agreement. All words used in this Comfort Trust Agreement shall be construed to be of such gender or number as the circumstances require. Unless otherwise expressly provided, the word "including" does not limit the preceding words or terms.

**Section 6.3     Counterparts.** This Comfort Trust Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original copy of this Comfort Trust Agreement and all of which, when taken together, shall be deemed to constitute one and the same agreement. The exchange of copies of this Comfort Trust Agreement and of signature pages by facsimile or other electronic transmission shall constitute effective execution and delivery of this Comfort Trust Agreement as to the Parties and may be used in lieu of the original agreement for all purposes. Signatures of the Parties transmitted by facsimile shall be deemed to be their original signatures for all purposes.

**Section 6.4     Entire Agreement.** This Comfort Trust Agreement supersedes all prior agreements, whether written or oral, among the Parties with respect to its subject matter and constitutes (along with the attached exhibit(s)) a complete and exclusive statement of the terms of the agreement among the Parties with respect to its subject matter. This Comfort Trust Agreement may not be amended, supplemented or otherwise modified except by a written agreement that identifies itself as an amendment to this Comfort Trust Agreement executed by the Parties.

**Section 6.5     Governing Law; Waiver of Jury Trial.**

(a)     This Reinsurance Trust Agreement shall be construed in accordance with the laws of the State of Delaware without giving effect to the principles of conflicts of law thereof. [

(b)     EACH PARTY HERETO EXPRESSLY WAIVES THE RIGHT TO TRIAL BY JURY IN RESOLVING ANY CLAIM OR COUNTERCLAIM RELATING TO OR ARISING OUT OF THIS REINSURANCE TRUST AGREEMENT.

12

**Section 6.6    Notices.** All notices and other communications required or permitted by this Comfort Trust Agreement shall be in writing and shall be effective, and any applicable time period shall commence when (a) delivered to the following address by hand or by nationally recognized overnight courier service (cost prepaid) or (b) transmitted electronically to the following facsimile numbers or e-mail addresses with confirmation of receipt of transmission, in each case marked to the attention of the respective person (by name or title) designated below (or to such other address, facsimile number, e-mail address, or person as a Party may designate by notice to the other Parties):

    (a)    If to Beneficiary:



            Universal Life Insurance Company
            PO Box 2145
            San Juan, PR 00922-2145
            Attention: Jose Benitez, President
            Telephone No.: 787-706-7339
            Facsimile No.: 787-625-7095
            E-mail Address: jobenitez@universalpr.com

            With a copy to:

            Universal Life Insurance Company
            PO Box 71338
            San Juan, PR 00936-8438
            Attention: Josely Vega, Chief Legal Counsel
            Telephone No.: 787-706-7321
            Facsimile No.: 787-620-4264
            E-mail Address: jvega@universalpr.com

    (b)    If to Grantor:

            Private Bankers Life and Annuity Co., Ltd.
            Canon's Court
            22 Victoria Street
            Hamilton, Bermuda HM 12
            Attention: Scott Boug
            Telephone No.: 919-907-2662
            E-mail Address: scott.boug@globalbankers.com

            With a copy to:

            Global Bankers Insurance Group
            2327 Englert Drive
            Durham, NC 27713
            Attention: Tamre Edwards, General Counsel
            Telephone No.: 919-205-0669

13

E-mail Address: tamre.edwards@globalbankers.com

(c)     If to Trustee:

Wilmington Trust, National Association
Attention: Corporate Trust Administration
Telephone No.:  302-636-5216
Facsimile No.:  302-636-4149
E-mail Address dyoung@wilmingtontrust.com

    **Section 6.7  Other Instruments.** The Parties shall promptly execute and deliver all additional instruments and shall promptly take all reasonable actions in order to carry out the purposes of this Comfort Trust Agreement.

    **Section 6.8  Severability.** If any provision of this Comfort Trust Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Comfort Trust Agreement shall remain in full force and effect. Any provision of this Comfort Trust Agreement held invalid or unenforceable only in part or degree shall remain in full force and effect to the extent not held invalid or unenforceable.

    **Section 6.9  Waiver of Breach.** Neither the failure nor any delay on the part of any Party to exercise any right, remedy, power or privilege under this Comfort Trust Agreement shall operate as a waiver thereof. No single or partial exercise of any right, remedy, power or privilege shall preclude the further exercise of that right, remedy, power or privilege or the exercise of any other right, remedy, power or privilege. No waiver of any right, remedy, power or privilege with respect to any occurrence shall be construed as a waiver of that right, remedy, power or privilege with respect to any other occurrence. No waiver shall be effective unless it is in writing and signed by the Party granting the waiver.



[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK;
SIGNATURES APPEAR ON FOLLOWING PAGE]

14

IN WITNESS WHEREOF, the Parties have caused this Comfort Trust Agreement to be executed by their respective duly authorized officers on the dates indicated below with an Effective Date of June 30, 2017.

**GRANTOR:**

PRIVATE BANKERS LIFE AND ANNUITY CO., LTD.

By: _____     Date: _____
Name:
Title:

**BENEFICIARY:**

UNIVERSAL LIFE INSURANCE COMPANY

By: _____     Date: _____6 - 30 - 17_____
Name:
Title: Jose C. Benitco
       President

**TRUSTEE:**

WILMINGTON TRUST, NATIONAL ASSOCIATION

By: _____     Date: _____
Name:
Title:

IN WITNESS WHEREOF, the Parties have caused this Comfort Trust Agreement to be executed by their respective duly authorized officers on the dates indicated below with an Effective Date of June 30, 2017.

**GRANTOR:**

PRIVATE BANKERS LIFE AND ANNUITY CO., LTD.

By: _____      Date: _____6/30/17_____

Name: Paul Brown

Title: **Director**

**BENEFICIARY:**

UNIVERSAL LIFE INSURANCE COMPANY

By: _____      Date: _____

Name:

Title:

**TRUSTEE:**

WILMINGTON TRUST, NATIONAL ASSOCIATION

By: _____      Date: _____

Name:

Title:

IN WITNESS WHEREOF, the Parties have caused this Comfort Trust Agreement to be executed by their respective duly authorized officers on the dates indicated below with an Effective Date of June 30, 2017.

**GRANTOR:**

PRIVATE BANKERS LIFE AND ANNUITY CO., LTD.

By: _____    Date: _____
Name:
Title:

**BENEFICIARY:**

UNIVERSAL LIFE INSURANCE COMPANY

By: _____    Date: _____
Name:
Title:

**TRUSTEE:**

WILMINGTON TRUST, NATIONAL ASSOCIATION

By: _____    Date: _____
Name:
Title:          David B. Young
               Vice President

## EXHIBIT A

### INVESTMENT GUIDELINES

The Assets held in the Comfort Trust Account with a Book Value equal to three percent (3%) of Statutory Reserves or five percent (5%) of Statutory Reserves following an Overcollateralization Trigger will be Assets permissible under Chapter 6 of Puerto Rico Insurance Code, but shall not be subject to any applicable investment position limits thereunder.

# EXHIBIT B

## BENEFICIARY WITHDRAWAL NOTICE

From: Universal Life Insurance Company ("Beneficiary")
To:    [_____] (the "Trustee")
Date: [ ]

Re:    Trust Agreement dated as of [DATE], among Private Bankers Life and Annuity Co, Ltd. (the "Grantor"), the Beneficiary, and the Trustee (as amended, modified, or supplemented from time to time, the "Comfort Trust Agreement")

To Whom It May Concern:

We hereby give you notice pursuant to Section 3.1(b) of the Comfort Trust Agreement that the Beneficiary is entitled to withdraw the [cash or Assets with Book Value in the amount of $_____] from the Comfort Trust Account for the following purposes permitted under Section 3.1(a) of the Trust Agreement:

*[Specify basis for issuance of Beneficiary Withdrawal Notice]*].

Payment or delivery should be immediately made to [*Insert account information*] by the following method:

[*Describe method of cash transfer and/or Assets to be withdrawn and delivery instructions*].

Capitalized terms used herein but not defined herein shall have their respective meanings in the Comfort Trust Agreement.

Sincerely,
Universal Life Insurance Company

By:    _____
Name:
Title:

## EXHIBIT C

## GRANTOR WITHDRAWAL NOTICE

From: Private Bankers Life and Annuity Co, Ltd. ("Grantor")
To:    [_____] (the "Trustee")
Date: [ ]

Re:    Trust Agreement dated as of [DATE], among Grantor, Universal Life Insurance Company, and the Trustee (as amended, modified, or supplemented from time to time, the "Comfort Trust Agreement")

To Whom It May Concern:

We hereby give you notice pursuant to Section 3.1(c) of the Comfort Trust Agreement that the Grantor is entitled to withdraw the [cash or Assets with Book Value in the amount of $_____] from the Comfort Trust Account for the following purposes permitted under Section 3.1(e) of the Trust Agreement:

*[Specify basis for issuance of Beneficiary Withdrawal Notice]*].

Payment or delivery should be immediately made to [*Insert account information*] by the following method:

[*Describe method of cash transfer and/or Assets to be withdrawn and delivery instructions*].

Capitalized terms used herein but not defined herein shall have their respective meanings in the Comfort Trust Agreement.

Sincerely,
Private Bankers Life and Annuity Co., Ltd.

By:    _____
Name:
Title:


Consented to by:

Universal Life Insurance Company

By:    _____
Name:
Title:
Date:

# EXHIBIT D –SETTLEMENT REPORTS

**D-1    MONTHLY SETTLEMENT REPORT**

***Settlement Sheet (Schedule 1: ULICO Fixed Annuities - Inforce)***
***Universal Life Insurance Company and Private Bankers Life and Annuity Co., Ltd.***
*Coinsurance Reinsurance Agreement*

*For the month ending:*
*Prepared by:*
*Phone Number:*

| Inforce: |
|---|

| Amounts Due to Reinsurer | Gross | Quota Share | Settlement Amount | |
|---|---|---|---|---|
| A. Premiums | | | | |
| A.1 Received for contracts issued | | 75% | | |
| Total Premium Due | _____ | | _____ | A |
| B. Surrender Charges | | | | |
| B.1 Surrender Charge Revenue | | 75% | | |
| Total Surrender Charge Due | _____ | | _____ | B |
| C. Commissions Previously Paid to the Company (current period) | | | | C |
| D. GLWB Rider Fees | _____ | 100% | _____ | D |
| *Total due to Reinsurer* | | | _____ | X=A+B+C+D |

**Amounts Due to Company**

| | Gross | Quota Share | Settlement Amount | |
|---|---|---|---|---|
| E. Benefits | | | | |
| E.1 Death | | 75% | | |
| E.2 Free Look Cancellations | | 75% | | |
| E.3 Full Surrender | | 75% | | |
| E.4 Partial Withdrawal | | 75% | | |
| E.5 GLWB Income Paid | | 100% | | |
| E. Total Benefits | _____ | | _____ | E |
| F. Expenses | | | | |
| F.1 No Trail Commissions | | 75% | | |
| F.2 Trail Commissions / Up Front | | 75% | | |
| F.3 Trail Commissions / Subsequent * | | 75% | | |
| F.4 Trail Commissions / Level ** | | 75% | | |
| F.5 Maintenance Expenses (50 bps per annum on Account Value) | | 75% | | |
| F.6 Non-Refundable Acquisition Expense Allowance (2.5% of new premium) | | 75% | | |
| F.7 Maintenance Expenses ($6.25 Per Policy Inforce) | | 100% | | |
| F.8 Production Bonus (first dollar level) | | 75% | | |
| F. Total Expenses | _____ | | _____ | F |
| G. Premiums previously paid to the Reinsurer (current period) | | | | G |
| *Total due to Company* | | | _____ | Y=E+F+G |
| **Net Amount due to Reinsurer/(Company)** | | | _____ | X-Y |

Prepared By: _____
Date: _____

Approved By: _____
Date: _____

*Trail commission payable on a quarterly basis starting 13th month after issue
** Level trail commission to be included on quarter end months only

Complete seriatim support to be provided (quarterly for reserves)

*Settlement Sheet (Schedule 2: ULICO Fixed Annuities New Business)*
*Universal Life Insurance Company and Private Bankers Life and Annuity Co., Ltd.*
*Coinsurance Reinsurance Agreement*

*For the month ending:*
*Prepared by:*
*Phone Number:*

| New Business: |
|---|

**Amounts Due to Reinsurer**

| | Gross | Quota Share | Settlement Amount |
|---|---|---|---|
| A. Premiums | | | |
| A.1   Received for contracts issued | | 75% | |
|          Total Premium Due | | | A |
| | | | |
| B. Surrender Charges | | | |
| B.1   Surrender Charge Revenue | | 75% | |
|          Total Surrender Charge Due | | | B |
| | | | |
| C.  Commissions Previously Paid to the Company (current period) | | | C |
| | | | |
| D.  GLWB Rider Fees | | 100% | D |
| | | | |
| *Total due to Reinsurer* | | | X=A+B+C+D |

**Amounts Due to Company**

| | Gross | Quota Share | Settlement Amount |
|---|---|---|---|
| E.  Benefits | | | |
| E.1   Death | | 75% | |
| E.2   Free Look Cancellations | | 75% | |
| E.3   Full Surrender | | 75% | |
| E.4   Partial Withdrawal | | 75% | |
| E.5   GLWB Income Paid | | 100% | |
| E. Total Benefits | | | E |
| | | | |
| F.  Expenses | | | |
| F.1   No Trail Commissions | | 75% | |
| F.2   Trail Commissions / Up Front | | 75% | |
| F.3   Trail Commissions / Subsequent * | | 75% | |
| F.4   Trail Commissions / Level ** | | 75% | |
| F.5   Maintenance Expenses (50 bps per annum on Account Value) | | 75% | |
| F.6   Non-Refundable Acquisition Expense Allowance (2.5% of new premium) | | 75% | |
| F.7   Maintenance Expenses ($6.25 Per Policy Inforce) | | 100% | |
| F.8   Production Bonus (first dollar level) | | 75% | |
| F. Total Expenses | | | F |
| | | | |
| G.  Premiums previously paid to the Reinsurer (current period) | | | G |
| | | | |
| *Total due to Company* | | | Y=E+F+G |
| | | | |
|    **Net Amount due to Reinsurer/(Company)** | | | X-Y |

Prepared By:   _____
Date:   _____

Approved By:   _____
Date:   _____

*Trail commission payable on a quarterly basis starting 13th month after issue
** Level trail commission to be included on quarter end months only

Complete seriatim support to be provided (quarterly for reserves)

D-2 CLOSING STATEMENT

# Settlement Sheet (Closing Settlement)

**Universal Life Insurance Company and Private Bankers Life and Annuity Co., Ltd.**

Coinsurance Reinsurance Agreement

|  |  |
|---|---|
| *As at:* | Closing |
| *Prepared by:* | Richard Leiser-Banks |
| *Phone Number:* | 919-205-8266 |

| | | Gross | Quota Share | Settlement Amount | |
|---|---|---|---|---|---|

*Amounts Due to Reinsurer*

A.  Statutory Reserve on pre-2017 block as of March 31, 2017*

| A.1 | In-Force Fixed Annuity Business Statutory Reserve | 655,645,676.43 | 75% | 491,734,257.32 | |
| A.2 | GLWB Rider Statutory Reserve | 248,714.00 | 100% | 248,714.00 | |
| | | | | 491,982,971.32 | *ULICO transfers all recaptured assets into the Trust(s)* |

B.  Settlement amounts due from ULICO

| B.1 | Aggregate net settlement amounts on 2017 new business block arising from January 1, 2017 through May 31, 2017 | | | 37,124,242.66 | *ULICO pays directly into Trust(s)* |

C.  Investment Income

| C.1 | Investment income earned on transferred assets from April 1, 2017 to May 31, 2017 | | | 2,264,305.00 | *ULICO pays directly into Trust(s)* |

**Total ULICO obligation at Closing** — 531,371,518.98

*Amounts Due to Company*

| | | | cede rate: | | |
| D. | Ceding Commission | | | | |
| D.1 | Non-refundable ceding commission based on statutory reserve | | 6.1% | 30,010,961.25 | *PBLA pays directly to ULICO* |
| E. | Settlement amounts due to ULICO | | | | |
| E.1 | Aggregate net settlement amounts on pre-2017 block arising from April 1, 2017 through May 31, 2017 | | | 616,104.79 | *PBLA pays directly to ULICO* |

**Total PBLA obligation at Closing** — 30,627,066.04

Prepared By: _____

Date: _____

Approved By: _____

Date: _____

\* Complete scriatim support to be provided.

Case 1:20-cv-00681-LCB-JEP   Document 5   Filed 07/27/20   Page 102 of 123

## D-3    REPORTING REQUIREMENTS

ULICO will maintain adequate records to administer the reinsurance accounts and will cede reinsurance under this Agreement on a bordereau self-administration basis. ULICO will provide PBLA with an activity report on mutually agreed upon electronic media, substantially in conformity with the following:

A)  Monthly In-force Listing

Within 10 days after the close of each calendar month, ULICO will provide PBLA with a seriatim report of transactions on all reinsured policies, riders and endorsements which should include the following information:

| 1 | Contract Type | 10 | Surrender Charge |
|---|---|---|---|
| 2 | Contract Number | 11 | Transaction Month* |
| 3 | Issue Date | 12 | Issue Year* |
| 4 | Transaction Date | 13 | Block* |
| 5 | Transaction Number | 14 | Commission Type |
| 6 | Transaction Description | 15 | Transaction Group |
| 7 | Transaction Amount | 16 | Commission Rate |
| 8 | Contract Terms | 17 | Commission ceded* |
| 9 | Tax Status | | |

* May be derived from other entries



B)  Monthly Chargebacks Listing

Within 10 days after the close of each calendar month, ULICO will provide PBLA with a seriatim report of chargebacks on all reinsured policies, riders and endorsements which should include the following information:

| 1 | Contract Type | 8 | Block* |
|---|---|---|---|
| 2 | Contract Number | 9 | Commission Type |
| 3 | Transaction Date | 10 | Commission Percentage |
| 4 | Transaction Type | 11 | Commission Expense* |
| 5 | Premium | 12 | Agent |
| 6 | Issue Date | 13 | Months* |
| 7 | Issue Year* | | |

* May be derived from other entries

C) Monthly Movements in Policy Counts

Within 10 days after the close of each calendar month, ULICO will provide PBLA with a report of policy movements on all reinsured policies, riders and endorsements which should include policy counts of the following movement types:

| 1 | Initial Premium |
|---|---|
| 2 | Cash Surrender |
| 3 | Free Look Cancellation |
| 4 | Death Benefit |

D) Monthly Deposit Listing

Within 10 days after the close of each calendar month, ULICO will provide PBLA with a seriatim report of deposits on all reinsured policies, riders and endorsements which should include the following information:

| 1 | Contract Number | 6 | Credited Rate |
|---|---|---|---|
| 2 | Effective Date | 7 | Guarantee Period |
| 3 | Issue Age | 8 | Original Deposit Date |
| 4 | Gender | 9 | Renewal Date |
| 5 | Net Deposit | 10 | Investment Value |

E) Monthly Reserve Listing



Within 10 days after the close of each calendar month, ULICO will provide PBLA with a seriatim report of reserves on all reinsured policies, riders and endorsements which should include the following information:

| 1 | Tax Status | 7 | Statutory Reserve |
|---|---|---|---|
| 2 | Product | 8 | Account Value |
| 3 | Contract Number | 9 | DAC |
| 4 | Effective Date | 10 | SIA |
| 5 | Net Deposit | 11 | Status |
| 6 | Bonus | 12 | Explanatory Notes |

# EXHIBIT C

In the Matter of the Arbitration Between:
-----------------------------------------------------------x
Universal Life Insurance Company,

                Petitioner,            Klaus H. Kunze, Umpire
                                    David A. Thirkill, Arbitrator
     v.                        Daniel E. Schmidt, IV, Arbitrator

PB Life and Annuity Co., Ltd., f/k/a Private
Bankers Life and Annuity Co., Ltd.,

                Respondent.
-----------------------------------------------------------x

## ARBITRATION AWARD

This all-neutral Panel was formed on April 21, 2020 pursuant to Section 10.1 of the

Coinsurance Reinsurance Agreement ("Reinsurance Agreement") by and between Petitioner

Universal Life Insurance Company ("ULICO") and Respondent PB Life and Annuity Co., Ltd.,

f/k/a Private Bankers Life and Annuity Co., Ltd. ("PBLA").

ULICO is an insurance company domiciled in the unincorporated territory of the United

States, Puerto Rico. It is regulated by the Office of the Commissioner of Insurance of Puerto

Rico. Its insurance laws, rules and regulations conform to those of the National Association of

Insurance Commissioners ('NAIC").

PBLA is a reinsurance company domiciled in Bermuda. It is neither an 'authorized

reinsurer' nor a 'certified reinsurer'[1] Rather it is an 'unathorized reinsurer".

Insurance companies, like ULICO, must post ceded reserves (including for expected

outstanding claims) on their Finacial Statements in the amount that will be recoverable from a

---

[1] An authorized reinsurer is a reinsurer that is licensed as an insurer or reinsurer in the ceding insurer's state of domicile. An authorized reinsurer may also be licensed as an insurer or reinsurer in a state which employs "substantially similar" credit for reinsurance regulations as the ceding insurer's state of domicile. An insurer or reinsurer may also be considered authorized if it is accredited (or equivalent; e.g. trusteed, qualified, approved, accepted) in the ceding insurer's state of domicile.
http://thoughtleadership.aonbenfield.com/Documents/20150203_ab_guide_to_certified_and_authorized_reinsurers.pdf

1

reinsurer. An authorized reinsurer must make provisions for the sum of those items on its own

Financial Statement but otherwise do nothing more.  On the other hand, an unauthorized

reinsurer would be wise to make the same provisions, but must provide collateral in at least the

value of the sum ceded to it and additionally, such additional sum(s) as may be required by the

Insurance Regulations in the state of domicile as described in the regulations of the state or

domicile of the insurer.  Essentially, any collateral asset in the Trust Fund must (i) be equal in

value to that required and (ii) conform to the requirements of Puerto Rico regulations.

ULICO's complaint (stated in its Preliminary Statement in its Motion for a Prelimary

Award for Collateral), is essentially that an award is necessary because PBLA's controlling

owner has drained over $524 million in cash-equivalent assets (assets that conform to Puerto

Rican regulations) from the trust account and replaced them with assets that do not conform.

ULICO commenced arbitration on February 24, 2020.  Section 10.1 (a) of the

Reinsurance Agreement states that the arbitration proceeding shall be conducted in accordance

with the Commercial Arbitration Rules of the American Arbitration Association ("AAA Rules"),

and Section 10.1 (d) instructs the arbitrators to enter an award that will "do justice" between the

parties and that the award shall be supported by a written opinion.  That Section also states that

the Panel "shall not be bound by legal rules of procedure and may receive evidence in such a

way as to do justice between the Parties."

PBLA refused to participate in the formation of the Panel. Mr. Thirkill was appointed by

ULICO and Mr. Schmidt by the American Arbitration Association. Messrs. Thirkill and Schmidt

then chose Mr. Kunze to be the umpire, in accordance with the terms of the arbitration clause in

the Reinsurance Agreement.

2

Shortly after its formation the Panel noted that "parties that have contracted to arbitrate their disputes are deemed to intend to move expeditiously" and proceeded to organize the arbitration. The Panel requested the parties to submit position statements and to discuss the other agenda items prior to the organizational meeting. PBLA objected on various grounds, advising that it "does not consent to arbitration" and that it had filed suit in the US District of the Southern District of New York ("the Court") to enjoin this arbitration.

After acknowledging PBLA's reservation of rights, the Panel set a telephonic organizational meeting for April 29 to, among other things, set a briefing schedule to hear ULICO's Motion for a Preliminary Award requiring PBLA to post Collateral ("Motion").

On April 27, the Panel was informed that the Court had denied PBLA's emergency motion to enjoin the arbitration proceeding and that the Judge had asked that no Panel ruling regarding the Motion would occur before May 27, to which the Panel agreed. The Court issued its Opinion & Order on May 12 granting ULICO's motion to compel arbitration and denied PBLA's motion for a permanent injunction.

Following the receipt of PBLA's Response to the Motion on May 20 as scheduled, and having noted a reference therein to the issue of arbitrability, the Panel advised the Parties on May 24 that it had determined that "the Reinsurance Agreement, including the arbitration clause and Section 4.2(a), survived the passage of the Trust Agreement and that the present dispute between ULICO and PBLA that implicates both the Trust Agreement and the Reinsurance Agreement comes within the scope of the arbitration clause".

ULICO duly presented its Reply in Support of its Motion and, two days later, on May 29 a telephonic hearing on that motion occurred. Both parties were given a fair opportunity to add by way of argument to that presented in their respective briefs. Both sides had supplied, by way

3

of evidence, many exhibits. ULICO also provided sworn witness statements from ULICO's Chief Actuary and its Chief Investments Officer. Questions were asked by the Panel. The oral argument lasted two hours, and both sides were encouraged to respond to each other's presentations and to answer questions from panel members; oral argument ended only after both sides had the full opportunity to explain their positions and advised they had nothing further to add.

Following the oral argument, the Panel commenced deliberation. The Panel concluded that the question of the value of the assets in the Trust Fund is, of course, important (ULICO has argued $500M were of no value and PBLA argued the opposite), but if such assets do not conform to the requirements of the Applicable Laws of Puerto Rico then ULICO would not receive full credit in its statutory financial statements as required by Section 4.1 (a) of the Reinsurance Agreement.

After review and discussion, the Panel is persuaded that ULICO's assertions in respect of the assets (both as regards value and conformity) are correct and that ULICO has established an immediate need for the requested relief, so as to protect its policyholders and itself. The Panel is also persuaded that PBLA has had more than ample time to present to this Panel standard financial information to counter ULICO's positions.

More specifically, ULICO through its Chief Investments Officer clearly and convincingly explained that ULICO has raised material issues concerning the type and value of the subject assets since late 2018; that PBLA's responses were neither timely, consistent, nor accurate; and that such responses directly led to ULICO's demand for arbitration in January 2020.

Furthermore, ever since these issues were raised by ULICO over 18 months ago, PBLA had every incentive and opportunity to obtain and present reports to ULICO and then to this

4

Panel that clearly explained the true nature and fair market value of these assets and put forth its position as to whether the assets do conform to regulations..

Instead, PBLA presented outdated information that fails to support its claims and the requirement that these investments (in order of priority) are safe, liquid, and generate investment income, and their exhibits also fail to support its claims regarding control of assets.

This situation alone is sufficient for this Panel to grant ULICO's request. ULICO's complaints have been that PBLA replaced assets that do conform to regulatory requirements with assets that do not comply. PBLA is an 'unauthorized reinsurer' and has been repeatedly requested by ULICO to replace such non conforming assets. Based on the evidence, the Panel concludes that PBLA has singularly failed to 'take such steps as may be required' of it to ensure that ULICO receive full credit on its financial statements, quite the opposite.

The Panel noted that the vast majority of the financial information provided by PBLA predated the March 18, 2019 indictment of Mr. Lindberg and others connected with him. Since this indictment, the North Carolina Insurance Department ("Department") has taken over four domiciliary insurance companies that are affiliates of PBLA, entered into a Memorandum of Understanding in June 2019 with Mr. Lindberg (and others) that has led to litigation between the parties in 2020; furthermore, on March 5, 2020, Mr. Lindberg and a consultant were found guilty of public corruption and bribery and are awaiting sentencing.

The Panel also notes the critical comments and serious actions against ULICO taken by A.M. Best, one of the best known and respected rating agencies of insurance companies, solely as a result of the uncertain status of the subject assets. The Panel is convinced that enforcement of its ruling on the Motion is needed to forestall another downgrade or similar harmful action.

In the circumstances, the Panel concluded that ordering PBLA to replace the non-conforming assets with conforming ones would simply cause more delay and obfuscation on the part of PBLA and cause irreparable harm to ULICO. On the other hand, if the assets currently in the Trust Fund were indeed of value (as PBLA continued to assert), but just do not meet the requirements of Puerto Rico Law credit for reinsurance, then no harm would come to PBLA.

The Panel therefore concluded that ULICO's suggestion that cash be paid in to a segregated account under the supervision of the Panel would conform to the meaning and intent of the agreement the Parties had made and expressed in the Reinsurance Agreement "to take such steps as may be required of it to ensure that ULICO receive full credit on its financial statements".

Accordingly, and after deliberation and consideration of all documents, arguments, and evidence submitted by ULICO and PBLA, including but not limited to ULICO's May 6, 2020 motion for preliminary relief, PBLA's May 20, 2020 opposition to ULICO's motion, and ULICO's reply dated May 27, 2020, together with all the exhibits and witness evidence included with the parties' submissions, and after a hearing on May 29, 2020, the Panel hereby renders an Arbitration Award as follows:

1. PBLA shall pay to ULICO the amount of $524,009,051.26 within ten (10) business days of the date of this Arbitration Award. After such date, interest shall run at 6% per annum.

2. ULICO shall identify to PBLA a segregated bank account, separate from its other accounts, and provide the relevant account information to PBLA, for the purpose of receiving by wire transfer from PBLA the amount described in Paragraph 1 of this Award (the "Segregated Account").

6

3.    The funds in this Segregated Account shall be used strictly for the purpose of securing PBLA's obligations under the Reinsurance Agreement and, if necessary, for ULICO's payment of any liabilities incurred pursuant to ULICO's obligations as respects business ceded to that Reinsurance Agreement.

4.    The parties are directed to confer and determine with specificity the supervisory role of the panel regarding the segregated bank account. If they should fail to agree, the Panel will make such decision.

5.    ULICO has funded and agreed to continue to fund the fees of the arbitrators while PBLA refuses to pay its 50% share. ULICO has paid administrative cost associated with the April 29 and May 29 hearings. These fees and costs should be equally shared between ULICO and PBLA. ULICO is hereby authorized to charge such costs and fees to PBLA and to send PBLA regular bills and PBLA must pay such bills. If PBLA shall fail to pay such bills, interest may be accrued at the New York statutory rate.

6.    Applications for reimbursement of the parties' legal fees are reserved for further proceedings.

7.    This Award is preliminary to resolution of the remaining disputes between the parties and the Panel expressly reserves jurisdiction to hear those remaining disputes. The Panel directs the parties to meet and confer and propose to the Panel a pleading, discovery and hearing this, stating the time they think is needed for a full hearing on the merits.


Dated:    June 2, 2020

For the Panel:

Klaus H. Kunze, Umpire

7

# EXHIBIT D



Clyde & Co US LLP
The Chrysler Building
405 Lexington Avenue
New York, NY 10174
T: (212) 710-3900
www.clydeco.com

Michael.Knoerzer@clydeco.us

June 9, 2020

**VIA FEDEX**

Greg E. Lindberg
2222 Sedwick Road
Durham, NC 27713

**Re:** **Notice and Demand Under June 30, 2017 Guaranty Agreement Between Greg E. Lindberg, Universal Life Insurance Company, and Private Bankers Life and Annuity Co., Ltd.**

Dear Mr. Lindberg:

We are counsel for Universal Life Insurance Company ("ULICO"). As you are no doubt aware, ULICO is engaged in an arbitration against PB Life and Annuity Co., Ltd., f/k/a Private Bankers Life and Annuity Co., Ltd. ("PBLA") arising out of their Coinsurance Reinsurance Agreement dated June 30, 2017 (the "Reinsurance Agreement"). On June 2, 2020, the panel of arbitrators overseeing the arbitration issued an arbitration award ordering PBLA to deposit the amount of $524,009,051.26 into a segregated account designated by ULICO within 10 business days of the date of the award, or June 16, 2020. ULICO has designated the following account for the ordered deposit:

| | |
|---|---|
| Bank Account: | PNC Bank |
| | Pittsburgh, PA |
| | ABA 031000053 |
| | TMI Trust Company |
| | Acct-5303762486 |

Payment Instructions:

*If sent by ACH:*   ABA 054000030

*If sent out of the US:*   SWIFT Code PNCCUS33

We call your attention to the Guaranty Agreement, effective June 30, 2017, which you executed and which is attached as Exhibit G to the Reinsurance Agreement (the "Guaranty"). A copy of the Guaranty is attached for your convenience. Through this Guaranty, you agreed to

Clyde & Co US LLP is a Delaware limited liability partnership with offices in
Atlanta, Chicago, Los Angeles, Miami, New Jersey, New York, Orange County, San Francisco and Washington D.C.
Clyde & Co US LLP is affiliated with Clyde & Co LLP, a limited liability partnership registered in England and Wales.



guaranty the "full and prompt payment when due of [PBLA's] obligations under the Reinsurance Agreement (the 'Guaranteed Obligations'). This Guaranty is an agreement of payment and not merely of collection." (§ 2.1(a)). Upon the written demand of ULICO, the Guaranty obliges you to "pay the full amount or any portion of the Guaranteed Obligations that are then due and payable and have not been paid within thirty (30) calendar days of the due date." (§ 2.1(b)).

ULICO hereby notifies you that it is exercising its rights under the Guaranty to "proceed directly and at once" to collect from you the full amount owed by PBLA (§ 2.1(c)), to the extent that PBLA fails to comply with the arbitrators' order that it deposit a total of $524,009,051.26 into the designated account by June 16, 2020. For the avoidance of doubt, ULICO considers you personally liable for PBLA's obligations under the arbitration award, including any interest that accrues. Should PBLA fail or refuse to honor its obligations, and should you subsequently fail to honor your obligations under the Guaranty, ULICO will pursue all available remedies.

Please do not hesitate to have your counsel contact the undersigned should you have any questions.

Sincerely,

Michael Knoerzer

Enclosure

## GUARANTY AGREEMENT

**THIS GUARANTY AGREEMENT,** (this **"Agreement"**), is made and entered into as of June 30, 2017 by **Greg E. Lindberg,** an individual resident of North Carolina (the **"Guarantor"**), in favor **Universal Life Insurance Company,** a Puerto Rico life insurance company (the **"Company"**), with respect to certain obligations of **Private Bankers Life and Annuity Co., Ltd.** a Bermuda Class E insurer (the **"Reinsurer"**). Capitalized terms used but not otherwise defined herein have the meanings set forth in the Reinsurance Agreement.

## RECITALS

**WHEREAS,** effective on the date hereof, Company and Reinsurer have entered that certain Coinsurance Reinsurance Agreement dated June 30, 2017 pursuant to which, among other things, Company has agreed to cede to Reinsurer, and Reinsurer has agreed to reinsure, certain of the liabilities arising out of, relating to or in connection with the liabilities reinsured thereunder on the terms and subject to the conditions set forth therein (the **"Reinsurance Agreement"**);

**WHEREAS,** the Reinsurer is ultimately controlled by the Guarantor and the Guarantor shall derive substantial direct or indirect benefit from the transactions contemplated by the Reinsurance Agreement; and

**WHEREAS,** in order to induce Company to enter into the Reinsurance Agreement, the Guarantor has agreed to enter into this Agreement;

**NOW, THEREFORE,** in consideration of the foregoing, the covenants and agreements set forth herein and other good and valuable consideration, the adequacy and receipt of which are hereby acknowledged, and intending to be legally bound hereby, the Guarantor hereby agrees as follows:

## 1   DEFINITIONS

**1.1   Definitions.** The following terms shall have the respective meanings set forth below throughout this Agreement.

**"Affiliate"** means, with respect to any Person, at the time in question, any other Person controlling, controlled by or under direct or indirect common control with such Person. For this purpose, "control" means the power to direct the management and policies of a Person through the ownership of securities, by contract or otherwise and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

**"Agreement"** has the meaning set forth in the preamble of this Agreement.

**"Business Day"** means any day other than a Saturday, Sunday or a day on which commercial banks in Durham, North Carolina, Hamilton, Bermuda and San Juan, Puerto Rico are required or authorized by law to be closed.

**"Company"** has the meaning set forth in the preamble of this Agreement.

**"Guaranteed Obligations"** has the meaning set forth in Section 2.1(a).

**"Guarantor"** has the meaning set forth in the preamble of this Agreement.

**"Guaranty"** has the meaning set forth in <u>Section 2.1(a)</u>.

**"Person"** means any natural person, corporation, partnership, limited liability company, trust, joint venture or other entity, including any governmental body or other regulatory authority.

**"Reinsurance Agreement"** has the meaning set forth in the recitals of this Agreement.

**"Reinsurer"** has the meaning set forth in the preamble of this Agreement.

**"Representatives"** means, with respect to any Person, such Person's officers, directors, employees, agents, advisors and other representatives.

## 2    <u>GUARANTY</u>

### 2.1    <u>Guaranty.</u>

**(a)**    Guarantor hereby guarantees (the **"Guaranty"**) the Reinsurer's full and prompt payment when due of Reinsurer's obligations under the Reinsurance Agreement (the **"Guaranteed Obligations"**). This Guaranty is an agreement of payment and not merely of collection. The obligations of the Guarantor under this Guaranty shall remain in full force and effect until the date on which the Reinsurer achieves a long-term credit rating of (i) Baa3 or above from Moody's Investors Service, (ii) BBB- or above from Standard & Poor's Financial Services LLC, (iii) BBB- or above from Fitch Ratings Inc. or (iv) B++ from AM Best Company.

**(b)**    The Guarantor shall, solely following the failure of the Reinsurer to pay its obligations under the Reinsurance Agreement and upon the written demand of the Company, pay the full amount or any portion of the Guaranteed Obligations that are then due and payable and have not been paid within thirty (30) calendar days of the due date.

**(c)**    The Guaranty is a guaranty of payment and collection, and upon any failure of the Reinsurer to pay any Guaranteed Obligation as set forth above, the Company may, at its option, proceed directly and at once, with notice, against Guarantor to collect and recover the full amount of the Reinsurer's liability to pay the Guaranteed Obligations (or any portion thereof) then due and owing, and otherwise enforce its rights under this Agreement. The Guaranty is a continuing guaranty and the obligations of the Guarantor hereunder are and shall be absolute under any and all circumstances, irrespective of, and the Guarantor hereby waives any defense he may have relating to, (i) any lack of validity, legality or enforceability of this Agreement, (ii) any change in time, manner or place of payment of or other term of any Guaranteed Obligation, or any other amendment or waiver of or consent to departure from this Agreement, (iii) any change, restructuring, sale, disposition of all or substantially all of the assets and liabilities of, or termination of the corporate structure or existence of, the Reinsurer, or any dissolution, liquidation, conservation, rehabilitation, bankruptcy, statutory reorganization, receivership, insolvency, compulsory composition, or similar proceeding affecting the Reinsurer or any of its assets or any resulting release or discharge of any obligation of the Reinsurer under the Primary Guaranty or the Reinsurance Agreement, or (iv) any defense, set-off, waiver, release, statute of limitations, incapacity, illegality or unenforceability or other circumstance which might otherwise constitute a discharge of or defense available to the Guarantor (other than a defense of discharge arising

from the payment or performance in full of the Guaranteed Obligations).

(d)     The Guarantor hereby expressly waives promptness, diligence, demand, presentment, notice of dishonor, exchange, release, non-payment, non-performance or other default with respect to the Guaranteed Obligations.

(e)     To the extent that the Guarantor shall have made any payments under this Section 2.1, any rights to subrogation, reimbursement, indemnity, set-off, contribution and any other claim which the Guarantor may have as a result of any such payment shall be deferred, postponed and subordinated to the prior indefeasible payment or performance in full of the Guaranteed Obligations. If all or any part payment applied to the Guaranteed Obligations is or must be recovered, rescinded or returned to the Reinsurer, the Guarantor or any other Person because of a dissolution, liquidation, conservation, rehabilitation, bankruptcy, statutory reorganization, receivership, compulsory composition, or similar proceeding affecting any party, such Guaranteed Obligations shall be deemed to have continued in existence and this Section 2.1 shall continue in effect as to such Guaranteed Obligations, all as though such payment had not been made. The Company shall not be obligated to file any claim relating to the Guaranteed Obligations in the event the Reinsurer becomes subject to a bankruptcy, reorganization or similar proceeding, and the failure of the Company to so file shall not affect the Guarantor's obligations hereunder.

(f)     For the avoidance of doubt, but subject to this Section 2.1, the payment or performance of a Guaranteed Obligation by the Guarantor pursuant to the Guaranty shall be deemed to satisfy the Reinsurer's obligation to perform or pay such Guaranteed Obligation under the Reinsurance Agreement. The Company shall not be entitled to obtain payment or performance of a Guaranteed Obligation from the Reinsurer to satisfy a Guaranteed Obligation to the extent that such Guaranteed Obligation has theretofore been paid in full by the Guarantor under the Guaranty.

(g)     The Guaranty shall be effective upon delivery to the Company, without further act, condition, or acceptance by the Company, shall be binding upon the Guarantor and the successors and assigns of the Guarantor and shall inure to the benefit of the Company and its endorsees, successors and permitted assigns of this Guaranty.

**3     REPRESENTATIONS AND WARRANTIES**

**3.1     Representations and Warranties.** As of the date hereof, the Guarantor represents and warrants that:

(a)     the execution, delivery, and performance of this Guaranty has been duly authorized by all necessary action on his part;

(b)     he has executed and delivered this Guaranty and this Guaranty is the legal, valid, and binding obligation of the Guarantor, enforceable against him in accordance with its terms subject to the effect of applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance or similar laws relating to or affecting creditors' rights generally, and to the effect of general principles of equity;

(c)     neither the execution nor delivery of this Guaranty nor compliance with the terms hereof, conflicts with, results in a material breach or violation of the terms of (i) any judgment, order,

agreement, indenture, instrument, governmental permit, or other authorization or obligation to which the Guarantor is a party or by which the Guarantor is bound, or (ii) any federal, state, or local law, statute, ordinance, rule, or regulation applicable to the Guarantor;

**(d)** except for the consent or non-objection of the North Carolina Department of Insurance (which consent or non-objection has been granted or has occurred, as applicable) no consent, authorization, approval, filing or registration with, any U.S. governmental authority or any party to any contract, agreement or instrument to which the Guarantor is a party or by which the Guarantor is bound, is required for the execution, delivery, performance, or compliance with the terms hereof by the Guarantor; and

**(e)** there is no pending, or to the best of his knowledge, threatened, litigation against the Guarantor in any court or before any commission or regulatory body which challenges the validity or enforceability of this Guaranty.

## 4    <u>MISCELLANEOUS</u>

**4.1**    <u>Notices.</u> Any notice, request, demand, waiver, consent, approval or other communication required or permitted to be given hereunder shall be in writing and shall be delivered personally, sent by registered or certified mail, postage prepaid, or sent by a standard overnight courier of national reputation with written confirmation of delivery. Any such notice shall be deemed given when so delivered personally on the date received (provided that any notice received after 5:00 p.m. (addressee's local time) shall be deemed given at 9:00 a.m. (addressee's local time) on the next Business Day), or if mailed, on the date shown on the receipt therefor, or if sent by overnight courier, on the date shown on the written confirmation of delivery. Such notices shall be given to the following address:

To Company:

Universal Life Insurance Company
PO Box 2145
San Juan, PR 00922-2145
Attention: Jose Benitez, President
Telephone No.: 787-706-7339
Facsimile No.: 787-625-7095
E-mail Address: jobenitez@universalpr.com

With a copy to:

Universal Life Insurance Company
PO Box 71338
San Juan, PR 00936-8438
Attention: Josely Vega, Chief Legal Counsel
Telephone No.: 787-706-7321
Facsimile No.: 787-620-4264
E-mail Address: jvega@universalpr.com

To the Guarantor:

> Greg E. Linberg
> 2222 Sedwick Road
> Durham, NC 27713

The Company and the Guarantor may, by notice given in accordance with this <u>Section 4.1,</u> designate another address or Person for receipt of notices hereunder.

**4.2     Entire Agreement.** This Agreement constitutes the entire agreement among the Guarantor and the Company with respect to the subject matter hereof and thereof and supersedes all prior negotiations, discussions, writings, agreements and understandings, oral and written, among the parties with respect to the subject matter hereof and thereof.

**4.3     Waivers and Amendment.** This Agreement may not be amended, superseded or canceled, and the terms hereof may not be waived, except by instrument in writing signed by the Company and the Guarantor, or, in the case of a waiver, by the Company, provided that any such amendment, supersession or cancellation has been previously approved by the Commissioner. Any change or modification to this Agreement not in compliance with the previous sentence shall be invalid *ab initio.* No delay on the part of the Company in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other such right, power or privilege. No waiver of any breach of this Agreement shall be held to constitute a waiver of any other or subsequent breach.

**4.4     Successors and Assigns.** The obligations of the Guarantor under this Agreement shall not be subject to assignment without the prior written consents of the Company, and any attempted assignment without the prior written consents of the Company shall be void *ab initio.* The terms of this Agreement shall be binding upon and inure to the benefit of and be enforceable by and against the successors and permitted assigns of the Guarantor and the Company.

**4.5     Headings.** The headings of this Agreement are for convenience of reference only and shall not define or limit any of the terms or provisions hereof.

**4.6     Construction; Interpretation.** The Guarantor and the Company have participated jointly in the negotiation and drafting of this Agreement. In the event of an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by such parties and no presumption of burden of proof shall arise favoring or disfavoring either party by virtue of the authorship of any of the provisions of this Agreement. When a reference is made to an Article, Section or Exhibit such reference shall be to an Article, Section or Exhibit of or to this Agreement unless otherwise indicated. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation." The word "Agreement," means this Agreement as amended or supplemented, together with all Exhibits attached hereto or incorporated by reference, and the words "hereof," "herein," "hereto," "hereunder" and other words of similar import shall refer to this Agreement in its entirety and not to any particular Article, Section or provision of this Agreement. The references to "dollars" or "$" shall be to United States dollars. Reference to any Applicable Law means such Applicable Law as amended, modified, codified,

replaced or reenacted, and all rules and regulations promulgated thereunder and references to any contract or agreement are to the contract or agreement as amended, modified, supplemented or replaced from time to time, unless otherwise stated. The word "or" shall not be exclusive unless expressly specified herein. The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms.

**4.7     Governing Law and Jurisdiction.**

**(a)**     This Agreement and any disputes or claims arising out of or in connection with its subject matter shall be governed by and construed in accordance with the law of North Carolina.

**(b)**     The courts of North Carolina have exclusive jurisdiction to settle any dispute arising from or connected with this Agreement (a **"Dispute"**) including a Dispute regarding the existence, validity or termination of this Agreement or the consequences of its nullity. The Guarantor and the Company agree, irrevocably and for all purposes, that the courts of North Carolina are the most appropriate and convenient courts to settle any Dispute and no party shall advance any argument to the contrary in any court.

**4.8     Severability.** Any term or provision of this Agreement which is invalid or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Agreement or affecting the validity or enforceability of any of the terms or provisions of this Agreement in any other jurisdiction, so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. If any provision of this Agreement is so broad as to be unenforceable, that provision shall be interpreted to be only so broad as is enforceable. Upon such determination that any term or other provision is invalid or unenforceable, the Guarantor and the Company shall negotiate in good faith so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated by this Agreement be consummated as originally contemplated to the greatest extent possible.

**4.9     Incontestability.** In consideration of the covenants and agreements contained herein, the Guarantor hereby agrees that this Agreement, and each and every provision hereof, is and shall be enforceable by the Company according to its terms, and each party hereby agrees that it shall not contest in any respect the validity or enforceability hereof.

**4.10     Expenses.** Except as otherwise provided herein, the Guarantor and the Company hereto shall each bear their respective costs and expenses incurred in connection with the negotiation, preparation, execution, performance and enforcement of this Agreement and the transactions contemplated hereby, including all fees and expenses of counsel, actuaries and other Representatives.

**4.11     Remedies Not Exclusive.** No remedy herein conferred upon or reserved to the Company in this Guaranty is intended to be exclusive of any other available remedy or remedies, but each and every such remedy shall be cumulative and shall be in addition to every other remedy given under this Guaranty or now or hereafter existing at law or in equity.

**4.12     Waiver of Jury Trial.** The Guarantor hereto hereby waives, to the fullest extent permitted by law, any right to a trial by jury in respect of any litigation arising directly or indirectly out

of, under, or in connection with this Guaranty, whether in tort, contract, or equity.

    **4.13**    <u>Termination.</u>    This Guaranty will automatically terminate without action by the Guarantor or the Company upon the earlier to occur of (i) the satisfaction in full by the Reinsurer or Guarantor of all of the Guaranteed Obligations or (ii) the Reinsurer achieving the ratings identified in Section 2.1(a)(i), (ii), (iii) or (iv).

    **(The remainder of this page is intentionally left blank; Signature Page follows.)**

**IN WITNESS HEREOF**, the Guarantor has caused this Agreement to be duly executed as of the day and year first set forth above.

By: _____
Name:  Greg E. Lindberg