IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNIVERSAL LIFE INSURANCE COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 1:20CV681 |
| GREG E. LINDBERG, | ) ) | |
| Defendant. | ) ) | |

ORDER AND RECOMMENDATION OF
UNITED STATES MAGISTRATE JUDGE

In this case, Plaintiff Universal Life Insurance Company ("Plaintiff" or "ULICO") brings claims for breach of contract related to a personal Guaranty that Defendant Greg Lindberg ("Defendant" or "Lindberg") executed in favor of Plaintiff. In the Guaranty, Defendant agreed to personally pay the debts and obligations of one of his affiliated companies, Private Bankers Life & Annuity, Ltd. ("PBLA"), with respect to an agreement between Plaintiff and PBLA. A Judgment has been entered by the Southern District of New York requiring PBLA to pay Plaintiff $524 million, and Plaintiff now seeks to recover from Defendant Lindberg pursuant to the Guaranty. This matter is presently before the Court on Plaintiff's Motion for Summary Judgment [Doc. #106]. Also before the Court is Plaintiff's Supplemental Motion for Prejudgment Attachment [Doc. #63]. For the reasons set forth below, the Court will recommend that Plaintiff's Motion for Summary Judgment be granted. Additionally, the Court will terminate the Motion for Prejudgment Attachment in light of the Court's Recommendation that Plaintiff's Motion for Summary Judgment be granted, so that the remaining issues raised can be addressed in light of the current status of the case.

## I.    BACKGROUND

Plaintiff ULICO is a stock life insurance company organized under the laws of Puerto Rico, with its principal place of business in Puerto Rico. (First Amended Complaint [Doc. #59] ¶1; Stipulation [Doc. #17] ¶8.) Defendant Greg Lindberg is an individual resident of the United States, but not a resident of North Carolina or of Puerto Rico. (Stipulation [Doc. #17] ¶9.) North Carolina law controls the Guaranty Agreement underlying the breach of contract claim in this case, and the Parties have agreed to proceed in this District. (Id. ¶¶3-7.) Because the Parties are diverse in citizenship and the amount in controversy exceeds $75,000, this Court has jurisdiction over the Parties pursuant to 28 U.S.C. § 1332.

The record before the Court reflects the following. Plaintiff is an insurance company that, as a matter of regular business practice, entered into reinsurance agreements with other insurance companies, in order to spread the risk and assure the existence of sufficient assets to cover its policies and satisfy its regulatory requirements. In late 2016, Plaintiff decided to terminate its reinsurance agreement with Beechwood Bermuda International Ltd. ("BBIL") and seek another reinsurance arrangement. In February 2017, Plaintiff's reinsurance broker sent a request for proposal to Defendant Lindberg's insurance business, Eli Global/Global Growth ("Global"). That request for proposal noted that Plaintiff ULICO would recapture assets held in trust by BBIL and use those assets as consideration and statutorily required reserves for the new reinsurance agreement. Global undertook due diligence and Defendant Lindberg selected certain assets of the BBIL trust to be recaptured. On June 30, 2017, the Parties reached an agreement and Plaintiff entered into a Reinsurance Agreement with one of Defendant Lindberg's affiliated companies, Private Bankers Life & Annuity, Ltd.

2

("PBLA"). (Reinsurance Agreement [Doc. #59-2]). At the time of PBLA's reinsurance negotiations with Plaintiff, Defendant Lindberg had ultimate control over PBLA and was the indirect owner of 100% of the equity of PBLA. (Guaranty Agreement [Doc. #59-1] at 1); (Def. Dep. at 132-33 [Doc. #106-7 at 24-25]). Under the terms of the Reinsurance Agreement, PBLA reinsured 75% of Plaintiff's fixed deferred annuity policies and accepted 75% of the risk for those policies in exchange for 75% of the total policy premiums, less PBLA's portion of policyholder payments and administrative expenses. (Reinsurance Agreement §§ 2.1, 3.1.) PBLA also agreed to maintain in a trust account the required statutory reserves for these policies. (Reinsurance Agreement § 2.2.)

Also on June 30, 2017, the same day that Plaintiff ULICO and PBLA entered into the Reinsurance Agreement, Defendant Lindberg entered into a Guaranty Agreement with Plaintiff. Defendant Lindberg executed the Guaranty in favor of Plaintiff ULICO with respect to the obligations of PBLA under the Reinsurance Agreement. Under the terms of the Guaranty Agreement, Defendant Lindberg personally guaranteed PBLA's "full and prompt payment when due of [PBLA's] obligations under the Reinsurance Agreement," and if PBLA failed "to pay its obligations under the Reinsurance Agreement," Defendant Lindberg agreed to "pay the full amount or any portion of the Guaranteed Obligation that are then due and payable." (Guaranty Agreement § 2.1.) Specifically, the Guaranty provides as follows, where Defendant Lindberg is the Guarantor, PBLA is the Reinsurer, and Plaintiff ULICO is the Company:

## 2. **GUARANTY**

### 2.1 **Guaranty**

(a)    Guarantor hereby guarantees (the "Guaranty") the Reinsurer's full and prompt payment when due of Reinsurer's obligations under the Reinsurance Agreement (the Guaranteed Obligations"). This Guaranty is an agreement of payment and not merely of collection. The obligations of the Guarantor under the Guaranty shall remain in full force and effect until the date on which the Reinsurer achieves a long-term credit rating of (i) Baa3 or above from Moody's Investors Service, (ii) BBB- or above from Standard & Poor's Financial Services LLC, (iii) BBB- or above from Fitch Ratings Inc. or (iv) B++ from AM Best Company.

(b)    The Guarantor shall, solely following the failure of the Reinsurer to pay its obligations under the Reinsurance Agreement and upon the written demand of the Company, pay the full amount or any portion of the Guaranteed Obligations that are then due and payable and have not been paid within thirty (30) calendar days of the due date.

(c)    The Guaranty is a guaranty of payment and collection, and upon any failure of the Reinsurer to pay any Guaranteed Obligation as set forth above, the Company may, at its option, proceed directly and at once, with notice, against Guarantor to collect and recover the full amount of the Reinsurer's liability to pay the Guaranteed Obligations (or any portion thereof) then due and owing, and otherwise enforce its rights under this Agreement. The Guaranty is a continuing guaranty and the obligations of the Guarantor hereunder are and shall be absolute under any and all circumstances, irrespective of, and the Guarantor hereby waives any defense he may have relating to, (i) any lack of validity, legality or enforceability of this Agreement, (ii) any change in time, manner or place of payment of or other terms of any Guaranteed Obligation, or any other amendment or waiver of or consent to departure from this Agreement, (iii) any change, restructuring, sale, disposition of all or substantially all of the assets and liabilities of, or termination of the corporate structure or existence of, the Reinsurer, or any dissolution, liquidation, conservation, rehabilitation, bankruptcy, statutory reorganization, receivership, insolvency, compulsory composition, or similar proceeding affecting the Reinsurer or any of its assets or any resulting release or discharge of any obligation of the Reinsurer under the Primary Guaranty or the Reinsurance Agreement, or (iv) any defense, set-off, waiver, release, statute of limitations, incapacity, illegality or unenforceability or other circumstance which might otherwise constitute a discharge of or defense available to the Guarantor (other than a defense of discharge arising from the payment or performance in full of the Guaranteed Obligations).

(Guaranty Agreement § 2.1.)

On February 24, 2020, Plaintiff initiated arbitration proceedings against PBLA in the Southern District of New York. (SDNY Judgment [Doc. #24-1] at 4.) Plaintiff's chief complaint at the arbitration proceeding was "essentially that an award is necessary because PBLA's controlling owner [Defendant Greg Lindberg] has drained over $524 million in cash-equivalent assets (assets that conform to Puerto Rican regulations) from the trust account and replaced them with assets that do not conform." (Id.) The Arbitration Panel was ultimately "persuaded that ULICO's assertions in respect of the assets (both with regard to value and conformity) are correct and that ULICO has established an immediate need for the requested relief, so as to protect its policyholders and itself." (Id. at 6.) Additionally, the Arbitration Panel stated that the information that PBLA presented during arbitration was "outdated" and failed to show the requisite safety, liquidity, and investment income generation to satisfy the trust asset regulations by which it was bound. (Id. at 7.) The arbitration panel also noted that on March 5, 2020, Defendant Lindberg and a consultant were found guilty of public corruption and bribery and were awaiting sentencing. Finally, the panel concluded that PBLA would be required to pay cash into a segregated account to "conform to the meaning and intent of the agreement the Parties had made and expressed in the Reinsurance Agreement." (Id. at 7-8.) The panel noted that "if the assets currently in the Trust Fund are indeed of value (as PBLA continued to assert), but just do not meet the requirements of Puerto Rico Law credit for reinsurance, then no harm would come to PBLA." (Id.)

At the conclusion of the arbitration proceedings, the Arbitration Panel ordered PBLA to pay Plaintiff $524,009,051.26 within ten days of the entry of the award, with interest running at 6% per annum after that date. (Id. at 8.) The Arbitration Panel noted explicitly that the arbitration award "shall be used strictly for the purpose of securing PBLA's obligations under the Reinsurance Agreement." (Id. at 9.) On July 30, 2020, the United States District Court for the Southern District of New York confirmed the arbitration award and denied PBLA's motion to vacate the award, and on August 11, 2020, that court issued a final judgment in favor of Plaintiff and against PBLA in the amount of $524,009,051.26, plus any interest in accordance with the arbitration award. (Id. at 2.) On September 8, 2020, PBLA filed a Notice of Appeal of the Judgment. PB Life and Annuity Co. Ltd. v. Universal Life Ins. Co., 1:20CV2284 (S.D.N.Y. [Doc. #54]). On November 5, 2021, Plaintiff and PBLA filed a joint stipulation withdrawing the appeal. Id. (S.D.N.Y. [Doc. #62]). Thus, the Judgment in favor of Plaintiff and against PBLA is final and no longer the subject of a pending appeal. To date, PBLA has not paid ULICO the $524,009,051.26 as set out in the Judgment, but continues to maintain that the value is reflected in assets held in the Trust Account. (Answer to First Amended Complaint and First Amended Counterclaim ("Answer") [Doc. #60] at 3); (Def. Br. [Doc. #108] at 8 n.3) ("Lindberg has consistently admitted only that PBLA did not pay ULICO an *additional* $524 million (on top of the assets ULICO maintains in the Trust Account and values at $590 million) before ULICO filed this lawsuit").

Plaintiff has moved for summary judgment, seeking entry of judgment against Defendant Lindberg according to the terms of the Guaranty. Defendant Lindberg initially

6

raised a defense and counterclaim of fraudulent inducement and negligent misrepresentation regarding the value of assets recaptured from the BBIL trust. However, Defendant has not responded to Plaintiff's Motion for Summary Judgment on those defenses and counterclaims, and it appears that those defenses and counterclaims have been abandoned. Defendant instead contends in response to the Motion for Summary Judgment that the arbitration award is not within the scope of the Guaranty Agreement. Defendant also raises additional contentions, including a defense of payment based on his contention there are factual issues regarding whether the arbitration award has been satisfied by the assets in the PBLA ULICO Trust Account. Defendant also seeks to raise a defense of set-off, and argues that the Guaranty terminated when the Reinsurance Agreement was entered. Finally, Defendant raises a defense and counterclaim for unjust enrichment, contending that Plaintiff should not be able to recover both the cash payment awarded by the arbitration panel and the value of the PBLA ULICO Trust assets.

## II.    PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

### A.    Applicable Legal Standard

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). A genuine issue of fact exists if the evidence presented could lead a reasonable fact-finder to return a verdict in favor of the non-moving party. Id. at 255. The party seeking summary judgment bears the initial burden of coming

forward and demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party must then present specific facts demonstrating a genuine issue of material fact which requires trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When making a summary judgment determination, the court must view the evidence and draw all reasonable inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 247. However, the party opposing summary judgment may not rest on mere allegations or denials, and the court need not consider "unsupported assertions" or "self-serving opinions without objective corroboration." Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 962 (4th Cir. 1996); see also Anderson, 477 U.S. at 248-49. Moreover, a mere scintilla of evidence supporting the non-moving party's case is insufficient to defeat a motion for summary judgment. See, e.g., Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994) (citing Anderson, 477 U.S. at 248).

B.    Discussion

Plaintiff moves for summary judgment with respect to its breach of contract claim, as well as each of Defendant's asserted counterclaims and affirmative defenses. The Court turns first to Plaintiff's breach of contract claim, and then to Defendant's arguments regarding the counterclaims and affirmative defenses that he has put forward. For the reasons set forth below, the Court will recommend that Plaintiff's Motion for Summary Judgment be granted.

1. <u>Plaintiff's Breach of Contract Claim</u>

North Carolina law governs the Guaranty Agreement as well as "any disputes or claims arising out of or in connection with its subject matter." (Guaranty Agreement §4.7(a).) "A guaranty of payment is an absolute promise to pay the debt of another if the debt is not paid by the principal debtor." <u>Grout Dr. Glob. Franchise Corp. v. Groutman, Inc.</u>, No. 7:14-CV-105-BO, 2015 WL 2353698, at *3 (E.D.N.C. May 15, 2015) (quoting <u>Craftique, Inc. v. Stevens and Co., Inc.</u>, 321 N.C. 564, 566, 364 S.E.2d 129, 131 (1988) (internal quotation marks omitted)). The elements of breach of guaranty, therefore, are the same as the elements for breach of contract: the existence of a valid contract and a breach of the contract's terms. <u>Id.</u> (citing <u>Poor v. Hill</u>, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000)). "When the terms of a guaranty are clear and unambiguous, its meaning is a matter of law for the court." <u>Craftique</u>, 321 N.C. at 566, 364 S.E.2d at 131.

Here, the Parties agree that a valid Guaranty Agreement exists between the Parties. (Guaranty Agreement); (Pl. Br. [Doc. #107 at 16); (Def. Br. [Doc. #108] at 4) ("In connection with the Reinsurance Agreement, Lindberg signed a guaranty dated June 30, 2017 . . . . The Guaranty guarantees only PBLA's payment obligations under the Reinsurance Agreement").[1] The Court therefore limits its analysis to the second element: whether Defendant breached the Guaranty Agreement.

---

[1] Defendant appears to have abandoned his position that the Guaranty Agreement is voidable because its execution was procured by fraudulent inducement due to misrepresentations by Plaintiff regarding the value of certain trust assets. <u>Compare</u> Answer at 6, 14-16 (asserting affirmative defense and counterclaim of fraudulent inducement) <u>with</u> Def. Br. at 4, 8-9 (acknowledging the validity of the guaranty agreement as valid, addressing its terms, and arguing that "the arbitration award is not an obligation under the Reinsurance Agreement" and that "there is an issue of material fact whether the obligations that *do* fall within the scope of the Guaranty have been satisfied"). <u>See</u> Part II.B.2.a, <u>infra</u>.

9

With respect to the second element, whether Defendant breached the contract, courts must necessarily look to the language of the contract terms. If the language of the contract is "clear and unambiguous, construction of the agreement is a matter of law for the court and the court cannot look beyond the terms of the contract to determine the intentions of the parties." Harper v. Vohra Wound Physicians of NY, PLLC, 270 N.C. App. 396, 400, 841 S.E.2d 580, 583-84 (2020) (quoting Lynn v. Lynn, 202 N.C. App. 423, 431, 689 S.E.2d 198, 205 (2010)). If, however, the terms of the contract are ambiguous, "'interpretation of the contract is a matter for the jury.'" Id. (quoting Dockery v. Quality Plastic Custom Molding, Inc., 144 N.C. App. 419, 422, 547 S.E.2d 850, 852 (2001)). Contractual terms are ambiguous "'when either the meaning of words or the effect of provisions is uncertain or capable of several reasonable interpretations.'" Id. (quoting Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC, 365 N.C. 520, 525, 723 S.E.2d 744, 748 (2012)). "'Stated differently, a contract is ambiguous when the writing leaves it uncertain as to what the agreement was.'" Id. (quoting Salvaggio v. New Breed Transfer Corp., 150 N.C. App. 688, 690, 564 S.E.2d 641, 643 (2002)).

In this case, the language of the Guaranty Agreement unambiguously states: "Guarantor [Defendant Lindberg] hereby guarantees ('the Guaranty') the Reinsurer's [PBLA's] full and prompt payment when due of Reinsurer's obligations under the Reinsurance Agreement (the 'Guaranteed Obligations')." (Guaranty § 2.1(a).) Specifically, the "Guarantor [Defendant Lindberg] shall, solely following the failure of the Reinsurer [PBLA] to pay its obligations under the Reinsurance Agreement and upon the written demand of the Company [Plaintiff ULICO], pay the full amount or any portion of the

10

Guaranteed Obligations that are then due and payable and have not been paid within thirty (30) calendar days of the due date." (Id. § 2.1(b).) Thus, in order for Defendant to incur an obligation under the Guaranty, there must be an amount owed under the Reinsurance Agreement which PBLA failed to pay. Defendant argues that these conditions have not been met because, as Defendant asserts, the arbitration award does not fall within the scope of the Guaranty Agreement because it is not an obligation under the Reinsurance Agreement. (Def. Br. at 8.) However, the District Court for the Southern District of New York which confirmed the arbitration proceedings specifically ordered PBLA to pay the awarded sum to ULICO pursuant to the terms of the Reinsurance Agreement. That Judgment was based on an arbitration award specifically enforcing PBLA's obligations under the Reinsurance Agreement, and pursuant to a provision of the Reinsurance Agreement specifically requiring arbitration of any disputes "arising under or relating to this Reinsurance Agreement." (Reinsurance Agreement § 10.1.) Thus, the arbitration award clearly reflects an obligation of PBLA pursuant to the Reinsurance Agreement, and the Guaranty Agreement specifically includes all of PBLA's "obligations under the Reinsurance Agreement." Defendant's assertion that the arbitration award falls outside of the scope of the Guaranty Agreement that he executed in Plaintiff's favor is baseless and without merit.

With respect to PBLA's debt, on June 2, 2020, the Arbitration Panel issued an order directing PBLA to pay Plaintiff $524,009,051.26 within ten days of the entry of the award, with interest running at 6% per annum after that date. (SDNY Judgment at 8.) Next, on August 11, 2020, the United States District Court for the Southern District of New York issued a final judgment for that amount against PBLA. (Id.) The following year, on

November 5, 2021, Plaintiff and PBLA jointly entered a stipulated withdrawal of the pending appeal of that order and judgment in the Second Circuit Court of Appeals. When PBLA failed to pay, Plaintiff acted according to its rights under the Guaranty Agreement by "proceed[ing] directly and at once, with notice, against Guarantor to collect and recover the full amount of the Reinsurer's liability to pay the Guaranteed Obligations (or any portion thereof) then due and owing, and otherwise enforce its rights under this Agreement." (Guaranty § 2.1(c)); (Demand Letter [Doc. #59-4]). The record reflects that Plaintiff has not received any payment of that judgment against PBLA, either from PBLA or Defendant Lindberg. (Ramirez Decl. [Doc. #106-1] ¶9.) Accordingly, there is no ambiguity and no genuine issue of material fact as to these issues on Plaintiff's breach of contract claim, and the Court next considers the affirmative defenses and counterclaims raised by Defendant.

2.    Defendant's Affirmative Defenses and Counterclaims

Defendant sets forth multiple affirmative defenses and counterclaims in opposition to Plaintiff's Motion for Summary Judgment. Defendant initially asserted the affirmative defenses of fraudulent inducement and negligent misrepresentation, but abandoned these defenses in subsequent briefing. Compare Answer at 14 with Def. Br. (failing to address Plaintiff's motion for summary judgment as to the counterclaims for fraudulent inducement and negligent representation). In addition, Defendant also asserts various defenses to Plaintiff's breach of contract claim, including unjust enrichment, payment, a right to offset, and termination of the Guaranty Agreement immediately upon its execution. The Court addresses each of these arguments below.

12

a) *Fraudulent Inducement and Negligent Misrepresentation*

Defendant initially raised fraudulent inducement and negligent misrepresentation as affirmative defenses and counterclaims to Plaintiff's Amended Complaint. (Answer [Doc. #60] at 6, 14-16); (Transcript of May 25, 2021 Hearing [Doc. #66] at 87-88) ("Mr. Lindberg has put an affidavit in the record that there were material misrepresentations to him . . . . So if he was fraudulently induced to enter into the Guaranty Agreement, he is allowed to raise those defenses and put on evidence as to those defens[es]"). However, Defendant does not address Plaintiff's arguments with respect to these issues in his Response Brief in Opposition to Plaintiff's Motion for Summary Judgment.

"When a party fails to respond to a summary judgment motion regarding a claim, the party essentially concedes that summary judgment in favor of the moving party is appropriate." Harris v. hhgregg, Inc., No. 1:11CV813, 2013 WL 1331166, at *4 (M.D.N.C. Mar. 29, 2013) (citing Brand v. N.C. Dep't of Crime Control & Pub. Safety, 352 F.Supp.2d 606, 618 (M.D.N.C. 2004)). As recently explained in Hadley v. City of Mebane:

> The Rules of Practice and Procedure of the United States District Court for the Middle District of North Carolina (the "Local Rules") govern submissions to the court. Local Rule 7.3(k) states that "[t]he failure to file a brief or response within the time specified in this rule shall constitute a waiver of the right thereafter to file such brief or response, except upon a showing of excusable neglect." Local Rule 7.2(a) requires that response briefs shall contain an "argument, which shall refer to all statutes, rules and authorities relied upon." This court has construed these rules to cover unresponded-to arguments as well.

No. 1:18CV366, 2020 WL 1539724, at *6 (M.D.N.C. Mar. 31, 2020); see also, e.g., Stevens v. Cabarrus Cty. Bd. of Educ., 514 F. Supp. 3d 797, 806 n.3 (M.D.N.C. 2021); Oliver v. Baity, 208 F. Supp. 3d 681, 690 (M.D.N.C. 2016) ("Courts have recognized that a party's failure to

address an issue in its opposition brief concedes the issue"); <u>Kinetic Concepts, Inc. v. Convatec Inc.</u>, No. 1:08CV00918, 2010 WL 1667285, at *7-8 (M.D.N.C. Apr. 23, 2010) (collecting cases). Defendant's failure to address Plaintiff's arguments regarding Defendant's fraudulent inducement and negligent misrepresentation counterclaims and affirmative defenses constitutes a concession that Plaintiff is entitled to summary judgment as to those defenses and counterclaims.

Moreover, the Court has reviewed Plaintiff's Motion for Summary Judgment as to these counterclaims and affirmative defenses and concludes that summary judgment is appropriate. <u>See</u> <u>Robinson v. Wix Filtration Corp. LLC</u>, 599 F.3d 403, 409 n.8 (4th Cir. 2010) ("[I]n considering a motion for summary judgment, the district court '*must* review the motion, even if unopposed, and determine from what it has before it whether the moving party is entitled to summary judgment as a matter of law.'" (quoting <u>Custer v. Pan Am. Life Ins. Co.</u>, 12 F.3d 410, 416 (4th Cir. 1993) (emphasis in original)). The Court will address each conceded issue in turn.[2]

(1)     <u>Fraudulent Inducement</u>

Under North Carolina law, the "essential elements of fraud in the inducement are: (1) false representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." <u>Ward v. Fogel</u>, 237 N.C. App. 570, 581, 768 S.E.2d 292, 301 (2014) (brackets omitted); <u>Packrite, LLC v. Graphic Packaging Int'l, Inc.</u>, No. 1:17CV1019, 2018 WL

---

[2] The Court notes that even if Defendant's failure to respond to Plaintiff's arguments did not constitute a concession that summary judgment in favor of Plaintiff is appropriate, the Court's Recommendation as to these matters would not change based on the record before the Court.

14

4112827, at *4 (M.D.N.C. Aug. 29, 2018) (applying elements of fraudulent inducement under North Carolina law to proceedings in this Court). Defendant's fraudulent inducement claim centers on the valuations of certain BBIL assets that were recaptured and included in the PBLA ULICO Trust. (Ans. at 6); (Pl. Reply [Doc. #109] at 3-4). Essentially, Defendant's position was that Plaintiff "overstated the value of the trust account that PBLA inherited to induce PBLA into the reinsurance transaction and Lindberg's guaranty." (Ans. at 6.)

However, according to the members of Defendant Lindberg's due diligence team, Defendant Lindberg actively participated in the due diligence process of evaluating the assets in the BBIL ULICO trust; Defendant gave considerable thought to his comfort level with the investments as they were at the time that the Reinsurance Agreement and Guaranty Agreement were executed. (Herwig Dep. at 23 [Doc. #106-6 at 7].) Some of the assets in the trust may have been "troubled" at the time of the due diligence proceedings. (Bostic Dep. at 34-36 [Doc. #106-2 at 12-14].) However, PBLA made independent valuations of the trust assets during its due diligence and valuation negotiations with BBIL. (Brown Dep. at 26-27, 29 [Doc. #106-3 at 12-14].) Before the Parties executed the Guaranty Agreement and Plaintiff executed the Reinsurance Agreement with PBLA, Duff & Phelps—an independent valuation firm—evaluated the investments in the trust assets as of two separate dates: September 30, 2016 and December 31, 2016. Duff & Phelps issued professional opinions of the values of those investments on both occasions. (Ramirez Decl. ¶¶ 3-5 [Doc. #106-1].) Plaintiff relied on these professional opinions, and members of Defendant's management team also recognized the valuations as reasonable opinions on which to rely.

15

(Id. ¶¶5, 8); (Hensley Dep. at 25-26 [Doc. #106-5 at 8-9].)  According to Defendant's team members, at the close of negotiations and the due diligence period, Defendant's corporate entities (including PBLA and Eli Global/Global Growth) "only took on the assets [they] were comfortable with" and Defendant was personally involved in deciding which assets he was willing to acquire for PBLA from the BBIL ULICO trust.  (Herwig Dep. at 23, 27-28 [Doc. #106-6 at 7, 9-10].)

Defendant Lindberg also took active measures to acquire more control over one of the companies held in the Reinsurance Trust: an energy company called Agera Energy, LLC. (Brown. Dep. at 52 [Doc. #106-3 at 24].)  After the Reinsurance Agreement closed, Eli Global had voting control over AGH Parent, LLC, which held a note convertible to approximately 95% of the equity of Agera Holdings, LLC, which owned 100% of Agera Energy, LLC.  (Bostic Dep. at 44, 49 [Doc. #106-2 at 18-19].)  Before the note conversion, Defendant Lindberg decided to loan $35 million to Agera through one of his other companies.  (Bostic Dep. at 64-65 [Doc. #106-2 at 30-31].)  After the promissory note conversion was approved on April 20, 2018, Defendant had total control over Agera and took steps to install new officers at the company.  (Bostic Dep. at 49-51 [Doc. #106-2 at 19-21].)  Following the note conversion, Agera suffered write-downs: first in 2018 after customer contracts did not yield sufficient profits and adverse weather events affected revenue; and again in 2019 after Defendant halted cash flow to Agera following his federal indictment.  (Bostic Dep. at 54-57 [Doc. #106-2 at 24-27].)  Agera filed for bankruptcy on October 4, 2019.  In re Agera Energy, LLC, No. 19-23802 (Bankr. S.D.N.Y.).

The record before the Court contains no evidence of a misrepresentation of material fact by Plaintiff, much less evidence of a misrepresentation reasonably calculated to deceive or any intent to deceive on Plaintiff's part. The members of Defendant's former management and executive teams testified consistently that they were not aware of any misrepresentation or false statement by Plaintiff. (See, e.g., Herwig Dep. at 34 [Doc. #106-6 at 12].) Additionally, the record reflects that the due diligence investment information concerning the Agera assets came from other sources, not from Plaintiff. (Herwig Dep. at 35, 37-39 [Doc. #106-6 at 13-16].) Furthermore, nothing in the record reflects any actual intent to deceive on Plaintiff's part. Therefore, in light of the evidence tending to show that Plaintiff did not misrepresent material facts at all, much less with the requisite reasonable calculation of deception that fraudulent inducement requires, the Court concludes that Defendant has not met his burden with respect to the first three elements.[3]

With respect to the fourth and fifth elements, nothing in the record indicates that Defendant was in fact deceived or that he sustained damages resulting from a misrepresentation by Plaintiff. Rather, as set out above, the record reflects that Plaintiff did not actually misrepresent or intend to misrepresent the status of the Agera investments to Defendant, Defendant's management and executive officers, or any of Defendant's corporations. Additionally, to the extent that Defendant incurred financial losses relating to the Agera investments, the record reflects that the decrease in value to the Agera investments occurred long after Defendant Lindberg, through corporations that he operated,

---

[3] In his deposition testimony Defendant stated that "by 2019 it was clear to me that the Agera books and records were false." (Def. Dep. at 67 [Doc. #106-7 at 14].) However, nothing in the record supports this assertion.

assumed near total control of Agera and the company suffered write-downs due to adverse weather events and unprofitable energy contracts. (Bostic Dep. at 54-57 [Doc. #106-2 at 24-27].) Viewing the record in the light most favorable to Defendant, there is no genuine dispute of material fact with respect to the essential elements of Defendant's fraudulent inducement affirmative defense and counterclaim. Moreover, Defendant has effectively conceded that Plaintiff is entitled to judgment in its favor as to this matter. Therefore, summary judgment for Plaintiff is proper as to this issue.

(2)    Negligent Misrepresentation

"It has long been held in North Carolina that the tort of negligent misrepresentation occurs when (1) a party justifiably relies, (2) to his detriment, (3) on information prepared without reasonable care, (4) by one who owed the relying party a duty of care." Brinkman v. Barrett Kays & Assocs., P.A., 155 N.C. App. 738, 742, 575 S.E.2d 40, 43-44 (2003) (internal quotation omitted); Fitzgerald Fruit Farms LLC v. Aseptia, Inc., 527 F. Supp. 3d 790, 799 (E.D.N.C. 2019) (stating elements of negligent misrepresentation under North Carolina law and noting that such a claim "does not require the intent to deceive, but may rest on the failure to use reasonable care in making representations or omissions") (quotation omitted), aff'd sub nom. Fitzgerald Fruit Farms, LLC v. Harris, 858 F. App'x 625 (4th Cir. 2021).

First, with respect to the first and second elements, there is no evidence in the record that Defendant justifiably relied on any information that Plaintiff provided prior to executing the Reinsurance Agreement and the Guaranty Agreement. Rather, the record before the Court reflects that Defendant and his affiliate corporations conducted their own due

18

diligence process during which Defendant, Chris Herwig, and others associated with Global Growth "focused quite a bit on Agera[.]" (Hensley Dep. at 14 [Doc. #106-5 at 3].) Defendant actively and personally participated in his own, independent corporate due diligence process before executing the Reinsurance Agreement and the Guaranty Agreement, and he has not presented any evidence that he justifiably relied to his detriment on information that Plaintiff provided. Defendant's negligent misrepresentation counterclaim and defense thus fails on the first two elements.

Second, with respect to the third and fourth elements, nothing in the record suggests that Plaintiff prepared the financial information relating to the Agera investments, nor that Plaintiff—nor any other involved party— breached a duty of care to Defendant with respect to that information. Rather, the record reflects that the valuations were prepared by BBIL and that Defendant, PBLA, and other corporate entities associated with Defendant worked to prepare their own internal valuations during the due diligence period. (Brown Dep. at 26-27 [Doc. #106-3 at 12-13].) Additionally, the record reflects that Duff & Phelps (a third-party valuation firm) conducted an independent valuation of Agera before Plaintiff and PBLA executed the Reinsurance Agreement and Plaintiff and Defendant executed the Personal Guaranty on June 30, 2017. (Bostic Dep. at 23-24 [Doc. #106-2 at 8-9].) Defendant has not pointed to any alleged misrepresentations by Duff & Phelps, nor by any of the other valuation firms involved in the Reinsurance Agreement due diligence phase. Accordingly, even if Defendant's negligent misrepresentation counterclaim and affirmative defense did not fail on the first and second elements, Defendant is equally unable to show the third and fourth elements. Viewing the record in the light most favorable to Defendant

19

and seeing no genuine issue of material fact as to these elements, the Court concludes that summary judgment for Plaintiff is proper as to this issue.

In summary, as set out above, Defendant's failure to respond to Plaintiff's arguments supporting summary judgment with respect to the affirmative defenses and counterclaims of fraudulent inducement and negligent misrepresentation constitute a concession that summary judgment in favor of Plaintiff is appropriate on those matters. Additionally, the Court concludes that Defendant has failed to present a genuine issue of material fact as to fraudulent inducement and negligent misrepresentation. Accordingly, the Court will recommend that Plaintiff's motion for summary judgment be granted as to Defendant's counterclaims and affirmative defenses of fraudulent inducement and negligent misrepresentation.

    *b)*  *Payment*

Defendant also asserts the affirmative defense of payment, stating that there is a genuine issue of fact as to whether the arbitration award in favor of Plaintiff has been satisfied. (Def. Br. at 9.) "In North Carolina, if an action is brought for breach of contract for the payment of money, payment is an affirmative defense, and it is well settled that the defense of payment must be established by the party pleading it as a defense." Smith Bros. Trucking of Mt. Airy v. Baker Truck Brokerage, Inc., No. 1:07-CV-623, 2008 WL 4681641, at *3 (M.D.N.C. Oct. 21, 2008) (citing Lett v. Markham, 266 N.C. 318, 319–20, 145 S.E.2d 907, 908 (1966); Iredell County v. Gray, 265 N.C. 542, 544, 144 S.E.2d 600, 601 (1965)).

Here, as the party asserting the affirmative defense of payment, Defendant bears the burden to "offer evidence in support" of his claim. Sea-Roy Corp. v. Parts R Parts, Inc., No.

20

1:94CV00059, 1997 WL 1046282, at *28 (M.D.N.C. Dec. 2, 1997) (discussing affirmative defense of payment), aff'd, 173 F.3d 851 (4th Cir. 1999). To that end, Defendant asserts that "there is a genuine issue of material fact whether the arbitration award has been satisfied" because Plaintiff "has reported that its regulators have continued to grant credit for its reinsurance as of December 31, 2020, more than six months after the arbitration award and this lawsuit." (Def. Br. at 8-9.) However, Defendant acknowledges that "PBLA did not pay ULICO an *additional* $524 million (on top of the assets ULICO maintains in the Trust Account and values at $590 million) before ULICO filed this lawsuit." (Id. at 8 n.3.) Rather, Defendant's position is that the balance of Plaintiff's Trust Account invalidates the amount awarded by the arbitration panel and later the judgment entered against PBLA by the District Court for the Southern District of New York. This contention is without merit and without factual support. The record before the Court reflects no evidence in support of Defendant's contention that the arbitration award has been satisfied. Rather, the record reflects numerous refusals by PBLA and Defendant to pay Plaintiff in satisfaction of the arbitration award under the terms of the Guaranty Agreement. Specifically, the record contains multiple instances of Defendant's refusal to acknowledge the validity of both the arbitration award and his personal obligation to make payments in satisfaction of that award under the Guaranty Agreement. The District Court for the Southern District of New York confirmed the arbitration award finding that the Trust Account did not satisfy PBLA's obligations under the Reinsurance Agreement, and specifically required PBLA to pay $524,009,051.26 in cash to meet its obligations under the Reinsurance Agreement. That

requirement has not been satisfied.[4]  Viewing the record in the light most favorable to Defendant, there no issue of material fact as to Defendant's assertion of the affirmative defense of payment so as to create a triable issue for the jury.  The Court will accordingly recommend that summary judgment be entered in favor of Plaintiff as to Defendant's defense of payment.

### c)  Defendant's Other Arguments

Defendant makes several additional arguments in opposition to Plaintiff's Motion for Summary Judgment.  First, Defendant appears to attack the validity of the final judgment against PBLA and in favor of Plaintiff issued by the district court in the Southern District of New York at the conclusion of the arbitration proceeding.  However, the arbitration proceeding and subsequent final judgment issued in the Southern District of New York are a separate matter to the breach of contract claim underlying the claims, counterclaims, and affirmative defenses at issue here.  As part of the Guaranty Agreement, Defendant expressly waived all defenses except for the "defense of discharge arising from payment or performance in full of the Guaranteed Obligations."  (Guaranty Agreement § 2.1(c).)  Thus, by the express terms of the Guaranty Agreement, Defendant waived the right to assert any defenses.  Moreover, even if not waived, any collateral attack that Defendant may now wish

---

[4] Notably, the arbitration panel found that regardless of the value of the assets in the Trust Account, the assets in the Trust Account failed to conform to the requirements of Puerto Rico law, and specifically that PBLA failed to show that the investments were safe, liquid, and generate investment income, as required. Thus, the arbitration panel required PBLA to provide cash payment to fulfill its obligations under the Reinsurance Agreement.  (Arbitration Award [Doc. #24-1].)  As discussed above, PBLA is now obligated to comply with the arbitration award to fulfill its obligations under the Reinsurance Agreement, and Defendant Lindberg is likewise so obligated pursuant to the Guaranty.  The assets in the Trust Account do not represent a cash payment as required by the arbitration panel and the judgment of the Southern District of New York. Moreover, even if this Court did consider the assets in the Trust Account, Defendant Lindberg has not presented evidence that the assets are liquid or comply with the requirements of Puerto Rico law.

to stage on the final judgment in the arbitration proceeding is barred by the preclusive doctrine of *res judicata*. Because Defendant and PBLA were in privity at the time of the arbitration proceedings in the Southern District of New York, Defendant is precluded from mounting a collateral attack on the final judgment against PBLA which resulted from those proceedings. "'[T]he meaning of privity for the purposes of res judicata is somewhat elusive . . . [privity] denotes a mutual or successive relationship to the same rights of property.'" Mangum v. Town of Wrightsville Beach, No. 7:19-CV-29-FL, 2019 WL 6190648, at *5 (E.D.N.C. Nov. 20, 2019) (quoting Hales v. North Carolina Ins. Guar. Ass'n, 337 N.C. 329, 333, 445 S.E. 2d 590, 593-94 (1994)). North Carolina has adopted the following provisions of the Restatement of Judgments:

> This Court, in the case of Light Co. v. Insurance Co., 238 N.C. 679, 79 S.E.2d 167, speaking through Devin, C.J., said: "The principle invoked is stated in Restatement of Judgments, sec. 84, as follows: 'A person who is not a party but who controls an action, individually or in cooperation with others, is bound by the adjudications of litigated matters as if he were a party if he has a proprietary interest or financial interest in the judgment or In the determination of a question of act or a question of law with reference to the same subject matter, or transactions; if the other party has notice of his participation, the other party is equally bound.'"

Smoky Mountain Enterprises, Inc. v. Rose, 283 N.C. 373, 376-77, 196 S.E.2d 189, 192 (1973) (corporation and corporate president in privity for *res judicata* purposes where president owned all of the stock in the corporation, and president "was personally in control of" the separate actions with "the same proprietary interest or financial interest in the judgment in both cases, and was equally concerned with the determination of questions of fact or questions of law" in each action). Here, Defendant owned PBLA and the corporate entities structured between PBLA and Defendant. (Def. Dep. at 133 [Doc. #107-7 at 25].)

23

Defendant decided when and how PBLA defended itself against claims. (Brown Dep. at 67 [Doc. #106-3 at 31].) Defendant had an economic interest in the cost, defense, and result of the arbitration proceeding. (Def. Dep. at 137 [Doc. #106-7 at 26].) The Court therefore concludes that to the extent that Defendant seeks to present a collateral attack on the final judgment resulting from the arbitration proceeding in the Southern District of New York, any such attempt is barred by the preclusive doctrine of *res judicata*, and is also waived by the waiver of defenses included in the Guaranty Agreement, as noted above.

Next, Defendant asserts that he is entitled to set-off based on the value of the PBLA ULICO Trust Account. (Def. Br. at 13-14.) "The common law right of setoff allows banks, as debtors of their general depositors, to setoff against the deposits any matured debts the depositors owe them." Roberts v. First-Citizens Bank & Tr. Co., 124 N.C. App. 713, 717-18, 478 S.E.2d 809, 812 (1996). The right to set-off may be waived. Id. Here, Defendant waived any right to set-off when he executed the Guaranty Agreement. (Guaranty Agreement § 2.1.) Where, as here, the "explicit terms" of the Guaranty Agreement clearly and unambiguously "waived any defenses other than full payment of the debt," such a waiver is enforceable against a party in breach of the contract as to any of the waived defenses. Emerald Portfolio, LLC v. Outer Banks/Kinnakeet Assocs., LLC, 249 N.C. App. 246, 252–54, 790 S.E.2d 721, 725–26 (2016) (enforcing complete waiver of defenses in a breach of contract dispute involving a guaranty agreement where the guarantor waived all defenses other than payment). In Emerald Portfolio, the North Carolina Court of Appeals upheld summary judgment in favor of the plaintiff in a suit seeking to collect on a guaranty, holding that:

> A guaranty of payment is an absolute and unconditional promise to pay the debt at maturity if not paid by the principal debtor. Under the general rules of contract construction, where an agreement is clear and unambiguous, no genuine issue of material fact exists and summary judgment is appropriate. In contrast, an ambiguity exists in a contract if the language of the contract is fairly and reasonably susceptible to either of the constructions asserted by the parties. Ray Hollowell's execution of the guaranty was a contractual promise to pay outstanding debts if the principal, here OBKA, failed to do so. The explicit terms of said contract, which were clear and unambiguous and must be construed as such, waived any defenses other than full payment of the debt. Accordingly, the unenforceability of the obligation by Emerald against OBKA is no defense for Ray Hollowell as guarantor, and the guaranty may be enforced.

Id. In the present case, the Guaranty Agreement expressly created a "continuing" obligation pursuant to which Defendant's obligations "are and shall be absolute under any circumstances." (Guaranty Agreement § 2.1(c).) Additionally, Defendant expressly waived all defenses including "set-off, waiver, release . . . or other circumstance which might otherwise constitute a discharge of or defense available to the Guarantor" except for the "defense of discharge arising from payment or performance in full of the Guaranteed Obligations." (Id.) Accordingly, Defendant has waived the defense of set-off by the explicit terms of the Guaranty Agreement.

Finally, in his brief in Response to Plaintiff's Motion for Summary Judgment, Defendant claims that he has no obligation to Plaintiff under the Guaranty Agreement because the Guaranty Agreement terminated upon its execution. In support of this assertion, Defendant argues that "the guaranty terminates once and for all when PBLA's payment obligations are satisfied" and "PBLA's payment obligations were satisfied when it entered into the reinsurance agreement with [Plaintiff]." (Def. Br. at 2.) Defendant thus contends that the Guaranty terminated on the day it was signed, June 30, 2017, because the

25

Reinsurance Agreement was signed that day. The record before the Court does not support this conclusory assertion. See also J.M. Smith Corp. v. Matthews, 123 N.C. App. 771, 774, 474 S.E.2d 798, 800-01 (1996) ("As a general rule, where no time is fixed for the termination of a contract it will continue for a reasonable time, taking into account the purposes that the parties intended to accomplish.") (quotation omitted). Rather, the Guaranty Agreement reflects a *continuing* responsibility on Defendant's behalf to personally pay ULICO in the event that PBLA fails to satisfy its obligations under the Reinsurance Agreement. (Guaranty Agreement § 2.1(b).) Additionally, the Guaranty Agreement clearly sets out certain long-term credit ratings which, if PBLA achieved, would terminate the Guaranty Agreement. (Id. § 2.1(a).) Otherwise, the Guaranty Agreement specifically contemplates a "continuing" requirement that Defendant personally guarantee any of PBLA's unpaid obligations to Plaintiff under the Reinsurance Agreement. (Id. § 2.1(c).) Nothing in the record before the Court supports Defendant's assertion that the Guaranty Agreement terminated the same day it was entered, upon execution of the Reinsurance Agreement. To the extent that Defendant seeks to raise this argument as a defense, the Court will recommend that summary judgment be granted in favor of Plaintiff as to this issue.[5]

---

[5] Defendant also appears to raise a separate contention that the Reinsurance Agreement was satisfied as of December 31, 2020 because PBLA had met its obligations under the Reinsurance Agreement. However, as discussed at length above, Defendant Lindberg waived all such defenses by the express terms of the Guaranty. In addition, the arbitration panel and the District Court for the Southern District of New York have made a final determination regarding PBLA's obligations under the Reinsurance Agreement, and Defendant may not attempt to collaterally attack that determination here, based on both *res judicata* and Defendant Lindberg's express waiver of defenses by the terms of the Guaranty, as discussed above. To the extend Defendant may have asserted any other affirmative defenses, they are likewise barred by the express terms of the Guaranty Agreement waiving all such defenses.

d)    *Unjust Enrichment*

Finally, Defendant asserts a counterclaim against Plaintiff for unjust enrichment, and argues that Plaintiff ULICO should not be able to recover and retain both the $524 million cash payment and the value of the PBLA ULICO Trust Account. In support of this contention, Defendant contends that "Lindberg conferred a non-gratuitous benefit on ULICO by causing PBLA to replace worthless assets with valuable investments" in the Trust Account. (Def. Br. at 14.)

Under North Carolina law, an unjust enrichment claim requires a party to "prove that it conferred a benefit on another party, that the other party consciously accepted the benefit, and that the benefit was not conferred gratuitously or by an interference in the affairs of the other party." Shipp v. Goldade, No. 519CV85, 2020 WL 1429248, at *5 (W.D.N.C. Mar. 19, 2020) (quoting Southeastern Shelter Corp. v. BTU, Inc., 154 N.C. App. 321, 330, 572 S.E.2d 200, 206 (2002)). However, a claim for unjust enrichment cannot survive where an express contract governs a party's claim. Booe v. Shadrick, 322 N.C. 567, 570, 369 S.E.2d 554, 556 (1988)). "An unjust enrichment claim is neither in tort nor in contract" but rather a "contract implied in law." Southeastern Shelter Corp., 154 N.C. App. at 330-31, 572 S.E.2d at 206. Therefore, "[i]f there is a contract between the parties, the contract governs the claim and the law will not imply a contract." Id.; Triad Packaging, Inc. v. SupplyOne, Inc., 597 F. App'x 734, 739 (4th Cir. 2015) ("The equitable claim of unjust enrichment provides relief where one party confers a benefit on the other party but the injured party cannot make out a claim for breach of contract. Such a claim is often referred to as one in quasi-contract or a contract implied in law. Critically, however, for a claim in quasi-contract to sound, no

express contract must exist: If there is a contract between the parties the contract governs the claim and the law will not imply a contract." (internal citations and quotations omitted)).

Here, Defendant argues that "the existence of a contract does not defeat [Defendant's] unjust enrichment claim where recovery under the contract remains in dispute. (Def. Br. at 14.) In support of his position Defendant cites Benchmark Electronics, Inc. v. Cree, Inc., No. 1:16CV529, 2018 WL 472819 (M.D.N.C. Jan. 18, 2018), in which this Court denied summary judgment on an unjust enrichment claim on the grounds that "*if the factfinder concludes* that the parties entered into an express agreement" as to the subject matter of the claim, the claim "would be barred as a matter of law." 2018 WL 472819, at *13 (emphasis added). But in the present case, the existence of an express contract between the Parties is not disputed.[6] Because the existence of the Guaranty Agreement is uncontested, a factfinder need not "conclude that the parties entered into an express agreement" as in Benchmark Elecs., 2018 WL 472819, at *13. Rather, the uncontested existence of the Guaranty precludes Defendant's crossclaim for unjust enrichment. See also MedShift, LLC v. Charles W. Morgan Pelle, LLC, No. 3:20-CV-00434-RJC-DSC, 2022 WL 392507, at *10-*11 (W.D.N.C. Feb. 8, 2022) (stating that the "conduct at issue is governed by an express contract between the parties", finding defendant's defenses "unavailing", and granting summary judgment on unjust enrichment claim).

---

[6] To the extent that Defendant seeks to otherwise call the validity of the Guaranty Agreement into question, the Court notes that the Guaranty Agreement specifically waives defenses, as discussed above, and further provides that:

> **4.9 Incontestability.** In consideration of the covenants and agreements contained herein, the Guarantor hereby agrees that this Agreement, and each and every provision hereof, is and shall be enforceable by the Company according to its terms, and each party hereby agrees that it shall not contest in any respect the validity or enforceability hereof.

(Guaranty Agreement § 4.9.)

Further, with respect to Defendant Lindberg's contention that Plaintiff is not entitled to a "double recovery," the Court notes that the express agreement between the Parties specifically addresses the possibility of a future action for set-off or reimbursement to the extent Defendant Lindberg complains that Plaintiff is not entitled to recover both the $524 million cash and retain the assets of the PBLA ULICO Trust Account. Specifically, the Guaranty Agreement provides that:

> (e)   To the extent that the Guarantor [Defendant Lindberg] shall have made any payments under this Section 2.1, any rights to subrogation, reimbursement, indemnity, set-off, contribution and any other claim which the Guarantor may have as a result of any such payment shall be deferred, postponed and subordinated to the prior indefeasible payment or performance in full of the Guaranteed Obligations.

(Guaranty Agreement § 2.1(e).)   Thus, under this provision, any action for set-off or reimbursement would have to be raised *after* Defendant Lindberg satisfies his Guaranty obligations by making the cash payment ordered in the judgment against PBLA.  In this regard, Plaintiff ULICO acknowledged during a prior hearing in this case that it is not seeking any type of windfall here and would not intend to retain both the judgment award and the current holdings of the PBLA ULICO Trust.  After Defendant Lindberg satisfies the Guaranteed Obligations by making the payment ordered against PBLA in the Southern District of New York and guaranteed by the present Guaranty Agreement, and if ULCIO does not otherwise return the assets in the PBLA ULICO Trust Account, Defendant Lindberg can bring a claim under § 2.1(e) of the Guaranty as may be appropriate to address any remaining issues in this regard as to a set-off, reimbursement, or unjust enrichment in order to seek return of the assets in the Trust Account.  However, under the express terms of the Guaranty Agreement, those claims and defenses may not be raised until after

29

Defendant Lindberg pays in full the guaranteed obligations required by the judgment against PBLA under the Reinsurance Agreement.

For all of the reasons stated above, the Court concludes that a review of the record in the light most favorable to Defendant reflects no genuine issues of material fact with respect to Plaintiff's breach of contract claim and Defendant's assorted affirmative defenses and counterclaims. Accordingly, the Court will recommend that Plaintiff's Motion for Summary Judgment be granted as to Plaintiff's breach of contract claim as well as Defendant's affirmative defenses and counterclaims.

III.     PLAINTIFF'S MOTION FOR PREJUDGMENT ATTACHMENT

Plaintiff previously filed a Motion for Prejudgment Attachment of Defendant's Assets and for Preliminary Injunction. On May 25, 2021, the Parties appeared before the Court for a hearing on all motions pending as of that date, which included Plaintiff's Motion for Prejudgment Attachment and Preliminary Injunction. At the hearing, the Court "authorized a period of discovery during which Plaintiff could seek to specifically identify assets within the state that may be subject to attachment." (Order [Doc. #77] at 3.) Plaintiff filed a Supplemental Motion for Prejudgment Attachment [Doc. #63] and supporting brief [Doc. #64] on June 21, 2021. Interested Party BP Energy Company ("BP") filed an Objection to Plaintiff's Motion for Prejudgment Attachment [Doc. #68],[7] and Defendant filed a Response in Opposition to Plaintiff's Supplemental Motion [Doc. #69].

The Court notes that in Plaintiff's Supplemental Motion, the requested relief appears to include both a charging order and garnishment, specifically regarding Defendant

---

[7] BP also filed a Supplemental Response [Doc. #83] on August 19, 2021.

Lindberg's ownership interest in hundreds of companies. (Supp. Br. [Doc. #64] at 6, 8-9.) Defendant's objection to Plaintiff's Supplemental Motion notes that these forms of relief were not discussed by the Parties at the May 25, 2021 hearing, nor were they addressed in Plaintiff's original Motion for Prejudgment Attachment and Preliminary Injunction. (Def. Br. Opp. Pl. Supp. Mot. [Doc. #69] at 2-3, 12.) In response, Plaintiff notes that a charging order and garnishment "are the appropriate steps under North Carolina law for attaching payments and distributions" to Defendant by LLCs in which he has an ownership interest. (Pl. Rep. [Doc. #74] at 6.) Furthermore, in its third-party Objection to Plaintiff's Supplemental Motion, BP seeks to inform the Court that "the pre-judgment attachment of essentially all property owned by [Defendant] in this judicial district" would "seriously impair the efforts and rights of judgment creditors, such as BP, who have already obtained enforceable judgments [against Defendant] from enforcing and collecting those judgments under applicable North Carolina law." (BP Opp. [Doc. #68] ¶¶6-7.) In response, Plaintiff argues that BP has failed "to establish that it has perfected any lien or commenced execution on any of [Defendant's] property[.]" (Pl. Rep. at 9.)

Having considered these filings, the Court notes that it appears Plaintiff may be seeking different relief than originally discussed regarding the prejudgment stage, that the primary matters in dispute related to that requested relief, that there may be a need for further proceedings or a hearing to address the disputed issues, and that in the circumstances it may be appropriate and more efficient for the Parties and the Court to consider these requests in light of the present Recommendation and any entry of Judgment. Therefore, in light of the Court's Recommendation that Plaintiff's Motion for Summary Judgment be

granted, it may not be necessary to resolve those issues as a matter of prejudgment attachment, and may be more appropriate to address them as new requests in light of the present status of the case and any entry of Judgment pursuant to this Recommendation. Therefore, the Court will allow Plaintiff to file a renewed Motion if prejudgment attachment is still necessary, or to instead seek the requested relief as to any Judgment in this case. The Court will terminate the pending Supplement to the Motion for Prejudgment Attachment, without prejudice to Plaintiff filing a new Motion for prejudgment attachment or instead seeking the requested relief on enforcement of any Judgment entered in this case pursuant to the present Recommendation.

IV.     CONCLUSION

IT IS THEREFORE ORDERED that Plaintiff's Supplement to the Motion for Prejudgment Attachment [Doc. #63] is terminated, without prejudice to Plaintiff filing a new motion for prejudgment attachment or instead seeking the requested relief on enforcement of any Judgment entered in this case pursuant to the present Recommendation.

IT IS RECOMMENDED Plaintiff's Motion for Summary Judgment [Doc. #106] be granted as to Plaintiff's breach of contract claim and as to Defendant's affirmative defenses and counterclaims, and that judgment be entered requiring Defendant Lindberg to pay to Plaintiff the amount of $524,009,051.26 plus any applicable interest, as reflected in the Final Judgment of the United States District Court for the Southern District of New York against PBLA, personally guaranteed by Defendant Lindberg in the Guaranty Agreement.

This, the 31st day of March, 2022.

        /s/ Joi Elizabeth Peake
United States Magistrate Judge

32