IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNIVERSAL LIFE INSURANCE COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 1:20CV681 |
| GREG E. LINDBERG, | ) ) ) | |
| Defendant, | ) | |

<u>ORDER AND RECOMMENDATION OF
UNITED STATES MAGISTRATE JUDGE</u>

This matter is before the Court on a Motion to Stay Enforcement of Judgment under
Federal Rule of Civil Procedure Rule 62 [Doc. #140], and a Motion to Approve $25 Million
Supersedeas Bond and Stay under Federal Rule of Civil Procedure 62(b) and 62(f) [Doc. #146],
following several hearings and supplemental briefing.

I.      BACKGROUND

Judgment was entered in this case on May 3, 2022, for $524,009,051.26 against
Defendant Greg Lindberg on his personal Guaranty of the payment obligations of Private
Bankers Life & Annuity Co., Ltd. (PBLA).  Defendant filed a Motion for Reconsideration,
which was ultimately denied.  While the Motion for Reconsideration was pending, Plaintiff
proceeded with execution of the Judgment in state court in Durham County, and Defendant
filed a Motion in this Court for recognition of an automatic stay under Rule 62(a) and 62(f)
[Doc. #140] and a subsequent Motion for setting of a bond under Rule 62(f) using provisions
of North Carolina state law or alternatively under Rule 62(b) at less than the full judgment

amount [Doc. #146]. In response, Plaintiff argued that the automatic stay had expired, that Rule 62(f) did not apply, and that bond should be set under Rule 62(b) as the full amount of the judgment debt. The Court set the matter for an evidentiary hearing and examination of Judgment Debtor under Rule 62 to consider the setting of a bond under the Parties' competing contentions.

Prior to the initial hearing date, which was set for December 20, 2022, the Parties reached an agreement (which they called the "Side Agreement") to request continuance of the hearing subject to certain terms and conditions that have effectively operated as the terms for staying the matter while the motions are pending before the Court. As part of the Side Agreement, Plaintiff received $25 million in cash, as well as Defendant's interests in shares of one of his businesses (AAPC) and other promises for future distributions. In addition to the Side Agreement, Defendant also remains subject to an injunction entered by the state court in Durham County during the execution proceedings, as well as a TRO by the state court in Wake County in a separate proceeding, all of which provide some limitation on Defendant's potential dissipation of assets. However, Plaintiff contends that these measures are not sufficient and that bond must be set at the full $524 million judgment to secure a stay of execution.

By agreement of the Parties, the hearing to consider the setting of a bond was continued and re-set for March 7 and 8, 2023. Following the hearing, the Court allowed the Parties time to submit post-hearing briefing. In the meantime, the Motion for Reconsideration was denied, and Defendant subsequently filed an appeal of the $524 million Judgment. On May 22, 2023, this Court ordered the Parties to provide supplemental briefing [Doc. #234]

addressing whether Defendant would be able to secure a $524 million bond to stay execution, including the effects that could not be undone if the bond could not be posted, as well as the feasibility of another arrangement for substitute security to preserve Defendant's current ability to satisfy the judgment while the case is on appeal, and the availability of other options that the Court could consider to potentially provide an alternative means to secure a stay.

Having considered all of the briefing, and for the reasons discussed below, the Court concludes that Defendant's Motion to Stay and Motion to Approve $25 Million Supersedeas Bond are moot to the extent they relate to the pre-appeal period. The Court further concludes that Rule 62(f) does not apply and recommends that bond be set under Rule 62(b) with two options: (1) $524 million, reflecting the full judgment amount plus $25 million to secure at least part of the interest, but with credit for $25 million paid under the Side Agreement; or alternatively, (2) $225 million, reflecting the full judgment amount plus $25 million to secure at least part of the interest, but with a reduction to take into account the $25 million under the Side Agreement as well as other payments and security if Defendant remains in compliance with the Wake County TRO, the Durham County injunction, and the terms of the Side Agreement, as further discussed below.

## II. MOTION TO RECOGNIZE AUTOMATIC STAY

Defendant first filed a Motion to Recognize Automatic Stay or Entry of Discretionary Stay [Doc. #140], arguing that under Rule 62(f) and North Carolina state law, a stay of execution was in place while the Motion for Reconsideration was pending. In response, Plaintiff argued that Rule 62(f) would not apply, and that to stay execution a bond must be set under Rule 62(b). The relevant provisions of Rule 62 provide as follows:

(a) <u>Automatic Stay.</u>  Except as provided in Rule 62(c) and (d), execution on a judgment and proceedings to enforce it are stayed for 30 days after its entry, unless the court orders otherwise.

(b) <u>Stay by Bond or Other Security.</u>  At any time after judgment is entered, a party may obtain a stay by providing a bond or other security.  The stay takes effect when the court approves the bond or other security and remains in effect for the time specified in the bond or other security.

. . . .

(f) <u>Stay in Favor of a Judgment Debtor Under State Law.</u>  If a judgment is a lien on the judgment debtor's property under the law of the state where the court is located, the judgment debtor is entitled to the same stay of execution the state court would give.

The Supreme Court has outlined the general framework regarding stays under Rule 62(a) and 62(b), noting that:

> [T]he Federal Rules of Civil Procedure generally stay the execution or enforcement of a district court judgment for only 30 days after its entry.  Fed. Rule Civ. Proc. 62(a).  Unless a further stay is granted, the prevailing party can attempt to execute on that judgment while an appeal is pending.  To prevent complications arising from pre-appeal enforcement of judgments, Federal Rule of Civil Procedure 62(b) provides that a party "may obtain a stay by providing a bond or other security."  These bonds are often called supersedeas bonds, tracking the name of a traditional writ that was used to stay the execution of a legal judgment.

<u>City of San Antonio v. Hotels.com, L.P.</u>, 141 S. Ct. 1628, 1632 (2021) (internal citation omitted).  Thus, under Rule 62(a), an automatic stay was only in effect for 30 days after entry of judgment.  Defendant nevertheless contends that the automatic stay continued to apply under Rule 62(f) while the Motion for Reconsideration was pending.

In considering this contention, the Court notes that Rule 62(f) by its terms only applies "[i]f a judgment is a lien on the judgment debtor's property under the law of the state where the court is located," and if it applies, "the judgment debtor is <u>entitled to the same stay of</u>

4

execution <u>the state court would give</u>." Defendant argues that Plaintiff registered the Judgment in Durham County and Orange County, and that it has become a lien on his real property there, which based on earlier filings appears to be worth approximately $3 to $4 million. Defendant contends that because the Judgment is a lien on his real property in North Carolina under N.C. Gen. Stat. § 1-234 and § 1-313(1), he was entitled to the application of North Carolina Rule of Civil Procedure 62(a) and North Carolina Rule of Appellate Procedure 3(c)(3) regarding stay of execution and setting of bond while the Motion for Reconsideration was pending, not only as to his real property in North Carolina but as to the entire $524 million Judgment.

However, the language of Rule 62(f) is most reasonably read to provide the same stay of execution that the state would give with respect to the property on which there is a lien (in this case a lien on real property representing a small fraction of the total judgment). Therefore, to the extent that Defendant contends that a lien on a piece of property imports all of the state procedures for stays of execution and setting of bond, the Court rejects that contention. Where state law creates a lien, the judgment debtor is entitled to the protections of state law regarding the property subject to that lien, but other than enforcement of the lien, the federal rules provide the framework for stays of execution and setting of bond. <u>See</u> <u>Van Huss v. Landsberg</u>, 262 F. Supp. 867 (W.D. Mo. 1967) (noting that "the blunt question is, if the State law imposes a judgment lien upon a certain class of property and grants a stay of execution as to all property, does Rule 62(f) entitle a judgment debtor in the federal courts of that State to a stay of execution as to all of his property or only as to the property upon which the State law imposes the lien?" and adopting analysis that "the Federal Statute only allowed a stay of

5

execution in conformance with the State law <u>as to the property upon which the State law granted a lien</u>" and concluding that "Rule 62(f) is intended to only give an automatic stay in accordance with State law in those cases in which the judgment creditor has the security of his lien against real estate. Rule 62, taken in its entirety, indicates a policy against any unsecured stay of execution after the expiration of the time for filing a motion for new trial." (emphasis added)); <u>see also</u> <u>Wilmer v. Bd. of Cnty. Comm'rs</u>, 844 F. Supp. 1414, 1418 n.2 (D. Kan. 1993) ("A judgment lien in Kansas attaches only to real property owned by the judgment debtor in the county in which the judgment was rendered. Even if a lien did arise against the county's real property, the stay pursuant to Rule 62(f) would apply only to that property. The fact that state law may provide for a stay of execution against personal property is immaterial since Rule 62(f) is intended to only give an automatic stay in accordance with state law in those cases in which the judgment creditor has the security of his lien. The policy here is against any unsecured stay of execution." (internal citations omitted)).

Further, it is clear in this case that the lien is not adequate to the secure the Judgment, and does not satisfy the purpose and intent of Rule 62. <u>See</u> <u>Butler v. Ross</u>, No. 16cv1282(DLC), 2017 WL 6210843, at *2 (S.D.N.Y. Dec. 7, 2017) ("Rule 62(f) adopts the stay provisions of the forum state only where the underlying judgment is 'a lien upon the property of the judgment debtor' in that state (i.e., where there is the functional equivalent of a bond in terms of security). Under Rule 62(f), then, a lien serves similar purposes as a <u>supersedeas</u> bond, to ensure that the prevailing party can recover in full. If a debtor can escape posting a bond under Rule 62(f), it is not because he is free from any encumbrance on his property, but because posting a bond would serve redundant purposes to a lien upon the debtor's

6

property."); <u>FDIC v. Ann-High Assocs.</u>, No. 97-6095, 1997 WL 1877195 (2d Cir. Dec. 2, 1997) ("A more flexible and, in our view, more appropriate approach is to determine whether a particular federal judgment can be adequately secured by a lien under the state's lien law as a matter of fact. This approach has been followed by a number of courts interpreting Rule 62(f). Under this approach, in order to avoid posting a supersedeas bond a judgment debtor must demonstrate not only (1) that state law entitles it to appeal without a bond and (2) that a judgment can be made a lien against a judgment debtor's property under the state's lien law, but also (3) that the circumstances are such that the judgment creditor can readily establish a lien that will be adequate to secure the judgment." (internal citations and footnote omitted)). Therefore, the Court rejects Defendant's contention that the lien on two pieces of real property worth less than $4 million resulted in a stay of execution under Rule 62(f) as to the full $524 million judgment.

Finally, and in any event, the Court notes that Defendant's Motion to Recognize Stay was related to the application of Rule 62(f) while the Motion for Reconsideration was pending. At this point, the Motion for Reconsideration has been denied. Therefore, the Motion to Recognize Stay is moot and can be denied as such.[1]

---

[1] To the extent that Defendant contends that the Motion is not moot because he is still affected by the steps previously taken by Plaintiff to execute on the Judgment while the Motion for Reconsideration was pending, the Court finds that Rule 62(f) would not apply here to invalidate those steps, for the reasons set out above. Indeed, the Court concludes that the provisions of the Durham County injunction have been necessary to limit Defendant's dissipation of assets pending posting of a bond. In the circumstances, the Court declines Defendant's request to apply Rule 62(f) to invalidate those proceedings. In addition, to the extent Defendant contends that Rule 62(f) should have provided Defendant with the protections of state law, the Court notes that the Durham County court did not view the liens on the two pieces of real property as resulting in a stay of execution of the entire Judgment, and this Court's determination is consistent with that view in any event.

7

III.    MOTION TO APPROVE $25 MILLION SUPERSEDEAS BOND AND STAY
        UNDER RULE 62(b) AND 62(f)

Defendant also filed a separate Motion to Stay and Set Bond arguing that under Rule 62(f), the Court should set a bond using state parameters, specifically capped at $25 million under N.C. Gen. Stat. § 1-289. Alternatively, Defendant asks the Court to set the bond under Rule 62(b) at an amount lower than the judgment, asserting that Plaintiff's ability to collect is already protected by state court orders preventing dissipation of assets. In response, Plaintiff contends that N.C. Gen. Stat. § 1-289 does not apply, but even if it did a bond in excess of $25 million would be appropriate in this case because Defendant is dissipating, secreting, or diverting assets outside of the jurisdiction of the courts of North Carolina or the federal courts of the United States other than in the ordinary course of business for the purpose of evading the judgment.

The relevant provisions of N.C. Gen. Stat. § 1-289 provide as follows:

(a) If the appeal is from a judgment directing the payment of money, [the appeal] does not stay the execution of the judgment unless a written undertaking is executed on the part of the appellant, by one or more sureties, as set forth in this section.

. . . .

(b) If the appellee in a civil action brought under any legal theory obtains a judgment directing the payment or expenditure of money in the amount of twenty five million dollars ($25,000,000) or more, and the appellant seeks a stay of execution of the judgment within the period of time during which the appellant has the right to pursue appellate review, including discretionary review and certiorari, the amount of the undertaking that the appellant is required to execute to stay execution of the judgment during the entire period of the appeal shall be twenty five million dollars ($25,000,000).

(c) If the appellee proves by a preponderance of the evidence that the appellant for whom the undertaking has been limited under subsection (b) of this section is, for the purpose of evading the judgment, (i) dissipating its assets, (ii) secreting

8

its assets, or (iii) diverting its assets outside the jurisdiction of the courts of North Carolina or the federal courts of the United States other than in the ordinary course of business, then the limitation in subsection (b) of this section shall not apply and the appellant shall be required to make an undertaking in the full amount otherwise required by this section.

In considering the Parties' contentions, the Court notes first that for the reasons set out in the previous section, Defendant's Motion is moot to the extent it relates to the period prior to determination of the Motion for Reconsideration. In addition, to the extent Defendant generally seeks application of North Carolina law under Rule 62(f), the Court rejects that contention for all of the reasons set out in the previous section. Therefore, Defendant's Motion will be denied, and the case is instead now before the Court under Rule 62(b), for the Court to consider setting a bond amount to stay execution of the judgment while the case is on appeal.

A supersedeas bond under Rule 62(b) is typically set at an amount that will permit full satisfaction of the judgment together with costs or interest. Courts sometimes recognize an exception to this general rule if (1) the judgment debtor has the ability to easily meet the judgment and demonstrates that he will maintain the same level of solvency during appeal, or (2) the judgment debtor's present financial condition is such that the posting of a full bond would impose an undue financial burden. Alexander v. Chesapeake, Potomac & Tidewater Books, Inc., 190 F.R.D. 190, 193 (E.D. Va. 1999); Denver Glob. Prods., Inc. v. Leon, No. 5:17-cv-00102-MOC-DSC, 2019 WL 2057277, at *2 (W.D.N.C. May 9, 2019). The Court of Appeals for the Fifth Circuit has set out the framework for such an analysis, noting that if the judgment debtor's present financial condition is such that the posting of a full bond would impose an undue financial burden, the court may exercise "discretion to fashion some other

9

arrangement for substitute security through an appropriate restraint on the judgment debtor's financial dealings, which would furnish equal protection to the judgment creditor." Poplar Grove Planting & Refin. Co. v. Bache Halsey Stuart, Inc., 600 F.2d 1189, 1191 (5th Cir. 1979). Courts considering alternative security options specifically look for whether there is "some other way to make the judgment creditor as well off during the appeal as it would be if it could execute at once, but not better off." See, e.g., Diamond Falls Ests., LLC v. Nantahala Bank & Tr. Co., No. 2:14-cv-00007-MR-DLH, 2015 WL 6394194, at *2 (W.D.N.C. Oct. 22, 2015) (internal quotation omitted). "If a court chooses to depart from the usual requirement of a full security supersedeas bond to suspend the operation of an unconditional money judgment, it should place the burden on the moving party to objectively demonstrate the reasons for such a departure." TransPacific Tire & Wheel, Inc. v. Orteck Int'l, Inc., No. DKC 2006-0187, 2010 WL 2774445, at *5 (D. Md. July 13, 2010) (quoting Poplar Grove, 600 F.2d at 1191.) In exercising its discretion, a court should act to preserve the status quo while protecting the interest of the non-appealing party. Alexander, 190 F.R.D. at 193.

Here, the judgment amount is just over $524 million. Defendant does not contend that he can easily pay that amount and also maintain the same level of solvency during the appeal period, so this is not a case where a bond is unnecessary. Thus, a supersedeas bond in the full judgment amount plus interest would ordinarily be appropriate. Counsel for Defendant nevertheless contends that such a bond would impose an undue financial burden. Counsel contends that Defendant does not have the ability to obtain a bond for $524 million because his assets are largely in trusts that he does not directly control and cannot access directly. Defendant reasons that because his net worth is comprised of his interests in a

complex structure of trusts and corporations, which includes entities that he uses to hold his personal assets and to conduct his personal transactions, the Court should set the bond at less than the full judgment amount. However, according to his own filings, Defendant's net worth is between $830 million and $1.43 billion, as set out in an expert report that Defendant previously submitted [Doc. #38-1; Doc #49-1]. In addition, at the hearing, Defendant testified that he is the sole shareholder of Global Growth Holdings, and that businesses under that umbrella include 120 companies that generate revenue, with $1.8 billion of revenue in 50 different countries. (Tr. Vol. 1 [Doc. #218] at 81-82, 102, 125, 146-47.) Thus, by Defendant's own account he clearly has assets to satisfy the Judgment or post a bond. Defendant also testified that there were 1,500 or 1,000 additional corporate entities that hold assets or handle aspects of the business, (Tr. Vol. 1 at 115-16), and on review of the evidence it appears that this use of hundreds of corporate entities makes it particularly difficult to account for the assets or determine how income is being directed. The testimony and evidence also reflects that while 85% of the revenue comes from businesses that are subject to the restrictions of the Wake County TRO, 15% of the revenue comes from businesses that are not subject to that TRO (Tr. Vol. 2 [Doc. #219] at 281-84), and one of these non-SAC businesses has a total value of approximately $1.3 billion which could be used to secure a bond [Doc. #49-1]. In addition, while most of the businesses are managed by trusts, Defendant remains the sole shareholder and beneficial owner of the businesses, and Defendant continues to use several of the businesses for his personal expenses. (Tr. Vol. 1 at 44-46, 50, 146-47.) In the circumstances, Defendant has not shown that posting the full bond amount would impose an undue financial burden. To the extent that Defendant cannot access the assets necessary to

post the full judgment amount, the evidence reflects that it is due in large part to the unnecessarily complex corporate structure that Defendant has created, which includes hundreds of entities, making it difficult to clearly determine where and how the assets are held or how Defendant's interests could be pledged or attached. Under these circumstances, it would be unfair to Plaintiff to allow Defendant's intentionally complex system of corporations and trusts to justify lowering the bond amount. If the assets that Defendant owns are as valuable as he asserts, he can use these assets to satisfy the Judgment or post a bond, so posting a full bond would not impose an undue financial burden.

Defendant nevertheless asserts that "[e]ven if Defendant's interests in various businesses could be easily liquidated, to do so could result in substantial harm that could not be undone should the judgment be overturned on appeal." (Def.'s Suppl. Br. [Doc. #240] at 6.) Defendant also argues that permitting Plaintiff to execute on the Judgment will be to the detriment to Plaintiff as well as Defendant's other creditors because "sale of Defendant's businesses through ULICO executing on its judgment will obtain a lower price than what those businesses are worth." (Def.'s Suppl. Br. at 6-7.) The Court appreciated this concern and directed further briefing on whether Defendant would be able to secure a $524 million bond to stay execution, including the effects that could not be undone if the bond could not be posted, as well as the feasibility of another arrangement for substitute security to preserve Defendant's current ability to satisfy the Judgment while the case is on appeal, and the availability of other options that the Court could consider to potentially provide an alternative means to secure a stay. However, in response, Defendant failed to propose an alternative means to secure a stay that would furnish equal protection to Plaintiff. Defendant set forth

12

two alternative security proposals. The first proposal is an assignment of $80,000,000 of the proceeds on the Clanwilliam Trust Note to the ULICO Reinsurance Trust. However, the supplemental briefing and the Parties' June 16, 2023 Joint Status Report reflect that this proposed security was previously proposed as payment toward the judgment, and the deal has not been successful to date, and furthermore, Plaintiff asserts that the transaction is no longer viable. (Pl.'s Suppl. Br. [Doc. #241] at 5; Def.'s Suppl. Reply Br., Ex. 1 [Doc. #242-1].) The second proposal is an assignment of the grantor rights to $145,000,000 of proceeds from the Beckett Trust to ULICO. According to Defendant, Beckett with other affiliates were valued at over $1.5 billion in 2022 by a third party. (Def.'s Suppl. Br. at 16.) However, Plaintiff raises concerns that deals of this nature have not been successfully completed to satisfy a portion of the judgment, and this proposal is similarly an insufficient alternative security to protect Plaintiff's interest in the judgment pending appeal. Furthermore, both of Defendant's proposals would require court approval pursuant to the Wake County TRO in state court. (Def.'s Suppl. Br. at 16.) In light of the issues that may arise in the execution of these proposals and the necessity of state court approval before these proposed alternative securities could be available to post with the Court, these alternative security proposals are too speculative. See IA Labs CA, LLC v. Nintendo Co., 946 F. Supp. 2d 429, 431-32 (D. Md. 2013) (denying motion to stay and to post alternative security where the proposed alternative security was too speculative in value). In addition, the Court notes that Defendant has not offered to post, transfer, or encumber his interests in Global Growth Holdings or the assets that are not subject to the Wake County TRO. Indeed, Plaintiff notes that one of these non-SACs has a total value of $1.3 billion, but Defendant has not offered these assets to secure a bond or

13

provide alternative security. Given that Defendant is not willing to offer security in the assets available to him, and given his unwillingness to provide any viable alternative and failure to explain why he would be unable to post a bond in light of his beneficial interests in the Global Growth businesses, setting the supersedeas bond at the amount of the Judgment (plus interest) is appropriate.

Moreover, the Court has significant concerns regarding Defendant's dissipation or secretion of assets to avoid enforcement of the Judgment. At the evidentiary hearing, Plaintiff presented evidence of Defendant diverting, secreting, and dissipating assets. The evidence reflects that since the May 2022 Judgment, Defendant gave significant monetary gifts to friends, made significant monetary transfers and payments for hundreds of thousands of dollars for Defendant's girlfriend, purchased multiple homes for several million dollars, and made unexplained monetary transfers between entities that Defendant owns or maintains a beneficial interest in, including what appears to be hundreds of thousands of dollars in international wire transfers, occurring after the May 3, 2022 Judgment, which are outside of the ordinary course of business as they were for Defendant's personal expenses or personal benefit. The evidence reflects that since May 3, 2022, Defendant has routinely spent over $1 million per month on personal expenses, in addition to other unexplained transfers and transactions. Additionally, Defendant uses various corporate entities for payment of his personal expenses, and admitted at the hearing this was specifically to avoid attachment of his personal accounts because his "personal accounts keep getting shut down will all these false accusations being leveled" at him. (Tr. Vol. 1 at 70.) Defendant has also been inconsistent in how he describes or discloses these assets, leading to further concern that the corporate

14

structure he has created has been used to hide assets even from the state courts. In addition, Defendant was less than transparent in describing his assets during the evidentiary hearing. All of these concerns provide further support for a bond for the full judgment amount. [2]

The Court has additional concerns given that Defendant is currently under indictment for crimes including wire fraud, false insurance business statements presented to regulators, false entries about the financial condition or solvency of an insurance business, and money laundering conspiracy. See Bill of Indictment, United States v. Lindberg, No. 3:23-cr-00048-MOC-DSC (W.D.N.C. Feb. 23, 2023), 2023 WL 2394298. The indictment specifically alleges in detail fraud and misrepresentations to enrich himself and to take assets out of the insurance companies, through his affiliated companies, ultimately for his own personal expenses and benefit. In the circumstances, the Court is concerned that Defendant will continue to funnel money to himself through various corporate structures to divert it from being used to satisfy the Judgment or post a bond.

Nevertheless, the Court has considered an alternative to specifically address the contentions raised by the Parties. In particular, Defendant repeatedly notes that pursuant to the Side Agreement, Plaintiff has security in $230 million of preferred equity in AAPC that was transferred to the ULICO Reinsurance Trust, in addition to a total of approximately $96 million in asset sales or other security from PBLA (including $25 million pursuant to the Side Agreement). If the Court allowed equitable credits for these amounts, or found that they

---

[2] In light of this evidence, the Court finds that even if Rule 62(f) applied, and by extension N.C. Gen. Stat. § 1-289(c), Plaintiff has shown by a preponderance of the evidence that since the judgment of this Court was entered on May 3, 2022, Defendant has dissipated, secreted, and diverted assets, other than in the ordinary course of business, and for the purpose of evading the judgment, and therefore, the $25 million cap on the bond under state law would not apply in any event.

constituted sufficient security for approximately $325 million, that would leave an unsecured deficit of approximately $200 million. A bond of this amount would not impose an undue financial burden, given that Defendant testified that he could access "north of $178 million" within a matter of weeks, and also testified that "Accounts Receivable Management Group is a lender willing to lend $200 million." (Tr. Vol. 1 at 48-49, 55.) Thus, Defendant can secure such a loan or can use his other assets that are not subject to the Wake County TRO as security to allow posting of such a bond. Therefore, to address Defendant's contention that requiring him to post the full judgment amount would be unfair and result in execution on his assets that could not be undone, and in light of the additional contention that he should receive equitable consideration for amounts provided by PBLA or secured by the AAPC stock transfer, the Court will provide an alternative option of $200 million bond, but as a condition of this lower bond amount, Defendant must agree and stipulate that he will remain in compliance with the Wake Court TRO and the Durham County injunction dated October 25, 2022, and Charging Order dated November 16, 2022, and in compliance with the terms of the Side Agreement, including the requirement that Defendant complete the transfer of the AAPC preferred shares valued at $230 million, with violation constituting a contempt of court in this case. These provisions are necessary to provide sufficient assurance that the full amount will in fact still be available to satisfy the Judgment, in light of the concerns noted above.

With respect to accruing interest, the Court notes that under Rule 62(b), the bond amount is informed by former Rule 73(d), which required a bond for satisfaction of the judgment in full plus interest and costs. The Court does have discretion to vary from that under Rule 62(b). Here, given the amount of the judgment, the difficulties in calculation and

16

logistics, and the interest in setting a clear and certain bond amount without waiting for additional evidence and briefing regarding interest and costs, the Court will include $25 million to help secure accruing interest. Therefore, the Court concludes that it is appropriate to set a supersedeas bond with two options:

1. $524 million, which approximately reflects the judgment amount, plus $25 million to secure at least part of the interest, but with credit for $25 million paid under the Side Agreement;

   or alternatively:

2. $225 million, which approximately reflects the judgment amount of $524 million, plus $25 million to secure at least part of the interest, but with equitable consideration of payments by PBLA and securities transferred pursuant to the Side Agreement, but this option would require that Defendant stipulate in this Court that he will remain in compliance with the Wake County TRO, the Durham County injunction dated October 25, 2022, and Charging Order dated November 16, 2022, and in compliance with the terms of the Side Agreement, including the requirement that Defendant complete the transfer of the AAPC preferred shares valued at $230 million.[3]

If a bond is posted, it will be maintained as provided in the Federal Rules of Civil Procedure and Local Rules of this Court. The Court will enter this as a Recommendation to allow for review of this determination by the District Judge, and will extend the stay of execution on the previous terms, including compliance with the Side Agreement and the Durham County injunction and Charging Order, to allow time for objections and review by the District Judge. The Court will recommend that Defendant be required to post a supersedeas bond under

---

[3] The Court notes that, as discussed in the Recommendations in this case, Defendant is not entitled to an offset in the Judgment amount on the contract since the contract language in the Guaranty specifically defined his obligations and provided that Defendant's right to reimbursement, set-off, or contribution is deferred until performance in full of the Guaranteed Obligations. However, the setting of the bond amount can take equitable considerations into account, and this alternative is designed to provide an option that would still ensure adequate security to Plaintiff taking into account the amounts paid by PBLA or otherwise secured, but with the additional ongoing limitations to address concerns that Defendant may dissipate or divert assets that should be used to satisfy the Judgment amount.

either of the above alternatives within 14 days after it is set by the District Judge on review of this Recommendation, and the stay remains in effect until that time.

IV.     OTHER ISSUES

The Court reserved several issues at the evidentiary hearing and will briefly outline the resolution of those issues here.

a.    Fifth Amendment Issues

First, Plaintiff argued that the Court should draw adverse inferences based on Defendant's assertion of the Fifth Amendment privilege at the evidentiary hearing and based on subpoenaed witnesses Eric Bostic's and Christopher Herwig's intent to assert their Fifth Amendment privilege, as noted in their Motions to Quash. Defendant contends that he answered most of the questions at the hearing and further contends that Plaintiff has not met the burden to show that adverse inferences against non-parties Bostic and Herwig are appropriate.

With respect to Defendant, the Court may draw adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence against them. See Baxter v. Palmigiano, 425 U.S. 308, 318-20 (1976); see also ePlus Tech., Inc. v. Aboud, 313 F.3d 166, 179 (4th Cir. 2002). Defendant asserted his Fifth Amendment privilege in response to questions about his representations made on a mortgage application, including questions related to his assets and debts, and questions related to Standard Advisory Systems Limited and Defendant's assets in Malta. Defendant refused to answer questions about whether he misrepresented his assets and debts to a potential creditor when applying for a mortgage and refused to answer questions about assets outside of the United States in Malta. These

18

questions were based on probative evidence before the Court and the subject matter was directly relevant to whether Defendant was dissipating, secreting, or diverting assets and to the Court's determination of an appropriate bond amount. Defendant asserted his Fifth Amendment privilege in response to these questions. In the circumstances, the Court draws an adverse inference with respect to the apparent misrepresentation of his assets and debts and the apparent transfer of undisclosed personal assets of Defendant outside of the United States. These inferences provide further support for the Court's findings in setting the bond amount, as explained above.[4]

Plaintiff subpoenaed Christopher Herwig and Eric Bostic to testify as witnesses at the evidentiary hearing. Mr. Herwig moved to quash the subpoena noting his intent to "assert his Fifth Amendment privilege against self-incrimination to any question posed regarding his employment with Global Growth or its predecessor Eli Global." (Herwig Mot. [Doc. #165] at 2-3.) Mr. Bostic also moved to quash the subpoena noting that he would intend to assert his Fifth Amendment privilege to "questions regarding his employment at GGHI." (Bostic Mem. [Doc. #178] at 5-6.) In determining whether adverse inferences against non-parties Bostic and Herwig are appropriate, the Court considers (1) the nature of the relevant relationships; (2) the degree of control of the party over the non-party witness; (3) the compatibility of interests of the party and non-party witness in the outcome of the litigation; and (4) the role of the non-party witness in the litigation. United States ex rel. Lutz v. Mallory, 988 F.3d 730, 740 (4th Cir. 2021). Mr. Herwig and Mr. Bostic were previously employed at

---

[4] The Court also notes, however, that even without this adverse inference the Court's Recommendation would remain the same, based on the analysis set out in the previous section.

19

Global Growth, a company where Defendant is the sole shareholder and as such exercises control over the company and its employees. In the circumstances, there may be a sufficient basis to draw an adverse inference based on their noted intent to invoke their privilege against self-incrimination. However, the Court ultimately need not rely on any adverse inference, since the Court's conclusion would remain the same regardless. Therefore, the Court has not relied on any adverse inference as to Mr. Herwig and Mr. Bostic.

  b. Testimony of Rachelle Frisby

  Defendant contends that Rachelle Frisby was not timely disclosed pursuant to Rule 26(a)(3), and that Ms. Frisby's testimony was inadmissible hearsay and irrelevant. Ms. Frisby served as joint provisional liquidator for PBLA by appointment of the Bermuda Supreme Court, and she testified based on her investigation and review of PBLA's records in that capacity, including transfers to and involving Defendant. In response to Defendant's objections, Plaintiff contends that Ms. Frisby is a non-retained expert and further contends that the timeline set out in Rule 26(a)(3) would not apply to an evidentiary hearing. Plaintiff further contends that Ms. Frisby's testimony was relevant to whether Defendant is dissipating assets and is admissible under the hearsay exception in Federal Rule of Evidence 803(8).

  In considering these contentions, the Court notes first, with respect to timely disclosure, the Court directed the Parties to disclose witnesses, and Plaintiff properly listed Ms. Frisby in its February 20, 2023, Witness List. As the Court noted at the hearing, given the scope of the post-judgment evidentiary hearing, there was no Rule 26(f) period that required expert disclosures. With respect to Ms. Frisby's testimony, after considering the direct and cross examination of Ms. Frisby and the arguments raised at the hearing and in the post-

hearing briefing, the Court finds that Ms. Frisby is a non-retained expert because she testified based on her direct involvement in an investigation of PBLA as a result of her appointment as joint provisional liquidator. Furthermore, given that the knowledge of the facts that Ms. Frisby testified to were gained through a "legally authorized investigation" following her appointment by the Bermuda Supreme Court, and given that Defendant did not show that Ms. Frisby's testimony was not trustworthy, her testimony falls within the public records hearsay exception. See Fed. R. Evid. 803(8)(A)(iii). In addition, Ms. Frisby's factual testimony provided context about the structure of Defendant's businesses and how Defendant conducts transactions and moves assets using various entities, which was helpful background information. Therefore, the testimony offered by Ms. Frisby was admissible and is properly before the Court.[5]

c. Defendant's Objections to Evidence

At the evidentiary hearing, Defendant lodged a standing objection to Plaintiff's exhibits and testimony based on relevance to the extent the exhibits and testimony related to the period prior to February 2023 when the Motion for Reconsideration was denied. The Court also heard Defendant's objections based on hearsay and other relevance issues. The Court addressed the hearsay objections and reserved final determination on the standing objection to relevance, noting that the Parties could address that issue further in post-hearing briefing.

---

[5] As the Court noted at the hearing, most of what was covered in Ms. Frisby's direct examination was already covered by the other evidence, including Defendant's own testimony in which he admitted to spending $1 million per month for personal expenses, in addition to purchasing multi-million dollar homes and making additional transfers among entities. Therefore, even if the testimony of Ms. Frisby was not considered, it would not have changed the Court's determination on the issue of dissipation.

In the briefing, Defendant objects to the majority of Plaintiff's exhibits, challenging their relevance as they relate to periods prior to the February 2023 denial of the Motion for Reconsideration. (Def.'s Br. Ex. A [Doc. #216-1].) However, the Court concludes that information since the May 3, 2022, Judgment is clearly relevant to the Court's findings of dissipation and the appropriate bond amount. In addition, information prior to the May 3, 2022, Judgment may provide additional context and background, and the Court has considered the testimony in that framework. With respect to the exhibits, the Court has not relied on exhibits that pre-date May 3, 2022 that were not specifically discussed during the hearing, given the lack of discussion of the exhibits during the hearing, and the lack of any impact on the outcome.

In the briefing, Defendant also raises hearsay objections to Plaintiff's Exhibits 41, 57, 59, 115, 118, 126, 160, 163, and 164. With respect to Exhibits 41, 59, 115, 160, 163, and 164, the Court addressed Defendant's hearsay arguments at the hearing, and after discussion Defendant conceded and withdrew the hearsay objections, and the Court admitted these exhibits. With respect to Exhibits 57, 118, and 126, Defendant did not raise or preserve a hearsay objection as to these exhibits at the hearing. Therefore, these objections are overruled.[6]

Defendant also raises a new objection to Exhibit 41, asserting that it is irrelevant and improper to the extent Plaintiff offered the entire transcript from another proceeding.

---

[6] The Court notes that the Parties have stipulated that these are true and accurate copies of the documents, and have expressly waived any requirement that the documents be authenticated under the Federal Rules of Evidence. (Joint Report [Doc. #210] at 18-19.) Even if Defendant had preserved a hearsay objection, it appears that Exhibit 57 is former testimony, and Exhibits 118 and 126 are business records.

However, at the hearing, Plaintiff noted that only a small section of Exhibit 41 was offered and relied upon, specifically page 965 line 10 to page 967 line 2. Given that position, the Court will admit only those portions of Exhibit 41, and the remainder is redacted.

### d. Defendant's Request to Strike Plaintiff's Response Brief

Defendant's counsel seeks to strike a portion of Plaintiff's Response Brief, specifically Plaintiff's speculation on page six of its Post-Hearing Response Brief questioning whether Defendant's counsel "have been complicit in Lindberg's efforts to defraud his creditors." (Pl.'s Resp. Br. [Doc. #224] at 6.) The Court finds no basis to support such speculation by Plaintiff. In light of Defendant's request and the nature of the speculation, the Court will strike that section of Plaintiff's Post-Hearing Response Brief, specifically the second paragraph on page 6 of the Response Brief [Doc. #224].

### e. Status of the Parties' Agreed Stay

At the close of the two-day evidentiary hearing on March 8, 2023, the Court noted that:

> [U]ntil my order is entered and to the extent I need to do it by recommendation until a final determination is made by the district judge, then the stay that you all agreed to remains in place. So under the terms that you previously agreed, that will continue until the district judge enters a determination as to the bond amount.

(Tr. Vol. 2 at 458.) In order to preserve the force and effect of the Court's decision, the Court again notes that the stay remains in place on the terms set out in the Side Agreement until 14 days after the District Judge makes a determination on the bond amount.

## V. CONCLUSION

IT IS ORDERED that Defendant's Motion to Stay Enforcement of Judgment under Rule 62 [Doc. #140] and Defendant's Motion to Approve $25 Million Supersedeas Bond and

Stay under Rule 62(b) and 62(f) [Doc. #146] are DENIED, but the stay remains in place, on the terms set out in the Side Agreement, until 14 days after the District Judge makes a determination on the bond amount.

IT IS RECOMMENDED that the Court set a supersedeas bond under Federal Rule of Civil Procedure 62(b) of:

1. $524 million, which approximately reflects the Judgment amount plus $25 million to secure at least part of the interest, but with credit for $25 million paid under the Side Agreement;

or alternatively at Defendant's election:

2. $225 million, which approximately reflects the Judgment amount plus $25 million to secure at least part of the interest, but with an equitable reduction in light of the payments by PBLA and securities transferred pursuant to the Side Agreement, but this option would require that Defendant stipulate in this Court that he will remain in compliance with the Wake County TRO, the Durham County injunction dated October 25, 2022, and Charging Order dated November 16, 2022, and in compliance with the terms of the Side Agreement, including the requirement that Defendant complete the transfer of the AAPC preferred shares valued at $230 million;

to be posted within 14 days of the District Judge's Order on this Recommendation, and if posted will stay execution of the Judgment under Rule 62(b).

This, the 21st day of September, 2023.

                        /s/ Joi Elizabeth Peake
                        United States Magistrate Judge

Case 1:20-cv-00681-LCB-JEP    Document 251    Filed 09/21/23    Page 24 of 24